IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE COLORADO RIVER INDIAN          )
TRIBES                              )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Case No. 1:06cv02212-JR
                                    )
DIRK KEMPTHORNE,                    )
Secretary of the Interior, et al.   )
                                    )
            Defendants.             )
_____)

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed.R.Civ.P. 65 and L.Cv.R. 65.1, plaintiff Colorado River Indian Tribes

("CRIT") seeks a preliminary injunction to halt Defendant Kempthorne and the Bureau of Indian

Affairs ("BIA") from unlawfully depleting the Colorado River Agency Electrical Services

operation and maintenance reserves ("Electrical Trust Fund") to finance a $9 million project to

rehabilitate the spillway gates on Headgate Rock Dam.  Congress has mandated that the

Electrical Trust Fund – which holds revenue derived from operating the CRIT Reservation's

electrical power system -- be used only for the operation and maintenance of the power system.

25 U.S.C. § 385c.  The spillway gates are not part of the power system but, instead, are part of

the irrigation system for which the dam originally was constructed almost 50 years before a

power plant was added to it.

As set forth more fully in the accompanying Memorandum of Points and Authorities,

there is an overwhelming likelihood of CRIT's success on the merits; CRIT faces irreparable

injury if an injunction is not granted; the grant of injunctive relief will not harm defendant

Kempthorne or the BIA; and the public interest favors enjoining a federal agency to abide by the law.

WHEREFORE, it is respectfully requested that CRIT's motion for a preliminary injunction be granted.

Dated: February 20, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:  /s/ Steven D. Gordon
    Steven D. Gordon (D.C. Bar No. 219287)
    Lynn E. Calkins (D.C. Bar No. 445854)
    Stephen J. McHugh (D.C. Bar No. (485148)
    Holland & Knight L.L.P.
    2099 Pennsylvania Ave. NW, Suite 100
    Washington, D.C. 20006
    202-955-3000 (phone)
    202-955-5564 (fax)

    *Counsel for Plaintiff the Colorado River
    Indian Tribes*

*Of Counsel*

Eric N. Shepard
Attorney General
Colorado River Indian Tribes
Route 1, Box 23-B
Parker, Arizona 85344

# 5132901_v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE COLORADO RIVER INDIAN TRIBES | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:06cv02212-JR |
| DIRK KEMPTHORNE, Secretary of the Interior, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Colorado River Indian Tribes ("CRIT") seeks a preliminary injunction to halt Defendant Kempthorne and the Bureau of Indian Affairs ("BIA") from unlawfully depleting the Colorado River Agency Electrical Services operation and maintenance reserves ("Electrical Trust Fund") to finance a $9 million project to rehabilitate the spillway gates on Headgate Rock Dam.  Congress has mandated that the Electrical Trust Fund – which holds revenue derived from operating the CRIT Reservation's electrical power system -- be used only for the operation and maintenance of the power system.  25 U.S.C. § 385c.  The spillway gates are not part of the power system but, instead, are part of the irrigation system for which the dam originally was constructed.

## BACKGROUND

The CRIT Reservation straddles the lower Colorado River for approximately 55 miles in Arizona and California and contains over 264,000 acres. The reservation was established to

1

provide a permanent homeland for Native Americans living along the river by act of Congress, approved by the President on March 3, 1865.

### A.    Construction of the Dam

Headgate Rock Dam is located on the river within the CRIT Reservation.  The Dam was authorized under the River and Harbors Act of 1935.[1]  Construction of the Dam was initiated by the BIA in 1938 and was completed in 1941.  The Dam is operated by the BIA.

The Dam was built as a diversion structure to provide irrigation water for more than 100,000 acres on the CRIT Reservation.  "Principally, Headgate Rock Dam is for diverting water for irrigation and development of lands of the Colorado River Indian Reservation.  Provision has been made for future electrical power installation providing the river degrades sufficiently in later years."  Department of the Interior, Office of Indian Affairs, *Final Report, Headgate Rock Dam*, June 1, 1943 at 2-3.  (Exhibit 1)(emphasis added).  The Dam provides a reliable means of diverting water into CRIT's irrigation canal while permitting most of the river flow to pass through the Dam's spillway.

As constructed, the Dam had ten large spillway gates to regulate the flow of water through the spillway.  Each of these ten gates has a radius of 32.5 feet and covers an opening 35 feet wide and 21.5 feet high.  *Id.* at 96.  By any measure, the spillway gates are a major part of the Dam structure.

### B.    Construction of the Power Plant

In 1977 the CRIT Tribal Council requested federal assistance in the construction of facilities to generate hydroelectric power on the Reservation.  In 1980, the BIA requested the Bureau of Reclamation to update a 1967 feasibility report for the construction of a low head

---

[1] Act of August 30, 1935, § 2, 49 Stat. 1028, 1039-40.  Notably, Congress made no mention of electric power generation in authorizing the construction of Headgate Rock Dam, whereas it specifically did so for the Parker Dam and Grand Coulee Dam which were authorized in the same statutory section.

power generation plant at the Dam. (Exhibit 2). In 1984 the Department of Interior sought Congressional approval to construct hydroelectric facilities on the dam, characterizing the project as follows: "[t]he powerplant is considered to be an extension of the Colorado River Indian Irrigation Project." *Energy and Water Development Appropriations for 1985: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 98th Cong. 144 (Feb. 27, 1984) (Exhibit 3). The purpose of the power plant was to "provide for a total of 19,500 kilowatts of capacity and an annual average production of 86.5 million kilowatt-hours of energy for irrigation and drainage pumping and other uses on the Colorado River Indian Reservation." *Id.*

Congress appropriated funds in 1985 for the construction of a power plant with three turbine generating units and associated transmission facilities. Pub.L. 99-88, 99 Stat. 293, 319-30. A Department of the Interior memorandum which initiated construction of the power plant, approved by Interior Secretary Donald Hodel, again acknowledged that the dam's original purpose was to divert water for irrigation: "[t]he dam was designed to provide permanent diversion facilities for irrigation of up to 100,000 acres of land in Arizona on the Colorado River Indian Reservation." (Exhibit 4) (emphasis added). Construction of the power plant involved certain modifications to three of the existing spillway gates, numbers 8, 9, and 10. *See Energy and Water Development Appropriations for 1986: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 99th Cong. 706-07 (March 7, 1985) (Exhibit 5). Construction was completed in 1992.

## C.    The Rehabilitation of the Dam Spillway Gates

On May 22, 2007, CRIT Tribal Chairman Daniel Eddy, Jr. wrote to the BIA's Colorado River Agency ("CRA") seeking information about BIA's plans concerning the replacement or rehabilitation of the Dam spillway gates. He asked about the status and expected time-frame for

such plans and whether the BIA had identified a funding source for the project. On June 29, 2007, CRA Superintendent Perry Baker informed CRIT that: (1) the BIA intends to rehabilitate, but not replace, the ten spillway gates; (2); the rehabilitation project would be funded entirely from the Electrical Trust Fund and (3) the contract for the project already had been awarded. (Exhibit 6).

### D.    CRIT's Appeal of BIA's Funding Decision

Because this use of the Electrical Trust Fund violates applicable laws and regulations, CRIT filed a Notice of Appeal with Allen Anspach, the Regional Director of the BIA Western Regional Office on July 26, 2007.   CRIT subsequently submitted a Statement of Reasons on August 31, 2007.  CRIT argued that the rehabilitation project did not fit within any of the four enumerated purposes for which the Electrical Trust Fund can be used:  (1) payment of the expenses of operating and maintaining the power system; (2) creation and maintenance of reserve funds to be available for making repairs and replacements to the power system; (3) amortization of power system construction costs; and (4) payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law.

On October 31, 2007, CRIT sent Mr. Anspach a follow-up letter, requesting a decision on this matter.  Mr. Anspach made no response.  Accordingly, on November 14, 2007, CRIT formally requested a decision on its appeal pursuant to 25 C.F.R. § 2.8.

### E.    BIA's Final Decision

On January 16, 2008, Mr. Anspach responded to CRIT's appeal.  He took the position that CRIT did not have a right to appeal BIA's actions and that his letter was not subject to any further appeal within the agency.

On the merits, Mr. Anspach announced that the rehabilitation project was being performed through an interagency agreement between BIA and the Bureau of Reclamation. He stated that the most recent funding transaction had occurred on November 30, 2006, but he did not explain that transaction or provide any information about further funding transactions. Mr. Anspach asserted that "[t]here are ten gates at the Dam---gates 1-7 are spillway gates and gates 8-10 are powerhouse gates." He defended the propriety of BIA's actions as follows:

> The ten gates at the Dam are connected to and operated under a System Control and Data Acquisition (SCADA) program which adjusts all the gates automatically depending on the water flow and the amount of electricity being produced. A properly functioning spillway gate is crucial to the operation of the powerhouse. If a power plant equipment failure occurs, the SCADA system responds by shutting down one or more of the three powerhouse units, depending on the problem encountered, thereby closing the gates to the powerhouse, and routing the water to the spillway gates. Due to the fact that the generating facility at Headgate Rock Dams [*sic*] is a run-of-the-river facility, there is no ability to store water above the dam structure. Therefore, the spillway gates have to be able to pass the water around the powerhouse to avoid flooding the powerhouse. Additionally, if a spillway gate fails and is stuck in an open position, power generation and deliveries into the irrigation canal will cease.

(Exhibit 7).

## F.     The Funding Constraints Facing the BIA

As will be discussed in detail below, the rehabilitation of the spillway gates is part of maintenance of the CRIT irrigation system rather than the CRIT power system. The BIA manages a separate trust fund composed of revenues collected from CRIT irrigation system users that is supposed to be used for the operation and maintenance of the irrigation project. Why then, did the BIA not fund the rehabilitation of the spillway gates out of this trust fund? Because there evidently were insufficient funds in the irrigation trust account.

In 2006, the General Accountability Office ("GAO") reported that the CRIT irrigation project has not been adequately maintained and that the BIA estimated the project's total deferred

maintenance costs to be $134,758,664.  GAO, "Indian Irrigation Projects: Numerous Issues Need to Be Addressed to Improve Project Management and Financial Sustainability," GAO-06-314 (March 27, 2006).  In April 2007 the BIA published a notice of Rate Adjustments for Indian Irrigation Projects in which it acknowledged that operation and maintenance revenues were insufficient to maintain the projects because operation and maintenance rates had not been based on the full cost of delivering water, including the costs of systematically rehabilitating and replacing project facilities and equipment, and because project personnel did not seek regular rate increases to cover the full cost of operation.  72 Fed. Reg. 19950-51 (2007).

### G.    The Instant Action

CRIT already had pending before this Court claims seeking declaratory and injunctive relief requiring the United States to provide it with an accounting.  Because the Government has not yet filed a responsive pleading, CRIT may amend its pleading as a matter of course. Fed.R.Civ.P. 15(a)(1)(A).  Accordingly, CRIT has filed an amended complaint adding claims seeking declaratory and injunctive relief with respect to the funding of the rehabilitation of the spillway gates.  CRIT seeks preliminary injunctive relief with respect to these new claims.

### ARGUMENT

### I.    BIA's Invasion of the Electrical Trust Fund Is Unlawful

The Permanent Appropriations Repeal Act ("PAR Act"),[2] enacted in 1934, was part of a congressional effort to control the government's fiscal program by subjecting most federal expenditures to the annual appropriations process.  The PAR Act repealed over 370 laws that allowed executive branch agencies to access the federal treasury without submitting budget requests for congressional approval.  Among other things, the PAR Act repealed the automatic appropriation of funds collected on Indian irrigation projects.  At the same time, the PAR Act

---

[2] Act of June 26, 1934, 48 Stat. 1224 (1934)

directs the government to hold funds collected for specific purposes in separate trust accounts and provides that these funds are to be withdrawn and used (through the appropriations process) in a manner consistent with the purpose for which they were collected. *See Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 69 Fed. Cl. 639, 649-52 (2006) (discussing the PAR Act).

In 1946 the Department of the Interior persuaded Congress to enact legislation returning funds collected on Indian irrigation projects to the "special fund" status they had prior to PAR's enactment.[3]  Congress amended the PAR Act by creating separate trust funds for revenues collected from Indian irrigation projects:  one related to collections made from irrigation water users, and the second related to revenues collected from power operations.[4]  Revenues collected from water users were authorized to be used for the operation and maintenance of the relevant irrigation project.  25 U.S.C. § 385a.[5]  Conversely, revenues collected from power operations were authorized to be appropriated for the operation, maintenance and repair of the power system (or for repayment of  construction costs or payment of other expenses permitted by law, purposes which are irrelevant here):

> Revenues collected after August 7, 1946, from power operations on each Indian irrigation project and deposited into the Treasury … are authorized to be appropriated annually, in specific or in indefinite amounts, equal to the collections so credited, for the following purposes in connection with the respective projects from which such revenues are derived:  (1)  Payment of the expenses of operating and maintaining the power system; (2) creation and maintenance of reserve funds to be available for making repairs and replacements to, defraying emergency expenses for, and insuring continuous operation of the power system, the fund for each project to be maintained at such level, within limits set by the Director of the Office of Management and Budget, as may from time to time be prescribed by the

---

[3] H. Rep. No. 2489, 79th Cong.  Modifying Sections 4 and 20, Permanent  Appropriations Repeal Act, 1934, Funds Collected, Indian Service Irrigation Projects.
[4] Act of August 7, 1946, 60 Stat. 895 (1946).
[5] "Effective August 7, 1946, collections made from water users on each Indian irrigation project on account of assessments levied to meet the cost of operating and maintaining such project shall be deposited into the Treasury for credit to a trust-fund account pursuant to section 1321 of Title 31, and shall be available for expenditure in carrying out the purposes for which collected."

> Secretary of the Interior; (3) amortization, in accordance with the repayment provisions of the applicable statutes or contracts, of construction costs allocated to be returned from power revenues; and (4) payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law.

25 U.S.C. § 385c. These limitations upon the expenditure of power operations revenues are repeated in 25 C.F.R. § 175.10(a). Furthermore, the Executive Branch is constrained from disbursing federal funds except for the objects for which appropriations are made. 31 U.S.C. § 1301(a).

The rehabilitation of the spillway gates does not qualify as maintenance or repair of the CRIT power system because the spillway gates are not part of that system. They were constructed as part of the original dam, long before the power plant was added almost fifty years later. At most, the modifications made to gates 8, 9, and 10 when the power plant was added might be deemed part of the power system. But the other seven gates plainly are part of the irrigation project, not part of the power system. Thus, funding the rehabilitation project entirely through the Electrical Trust Fund violates 25 U.S.C. § 385c and 31 U.S.C. § 1301(a) and, more fundamentally, the Appropriations Clause of the Constitution. Accordingly, it is subject to invalidation by this Court. *See, e.g., Alabama Power Co. v. U.S. Dep't. of Energy,* 307 F.3d 1300, 1312-16 (11th Cir. 2002) (court invalidated government attempt to circumvent statutory limits on expenditures from fund); *Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958, 968 (4th Cir. 1984) (enjoining "agency's end-run around normal appropriation channels"); *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Defense*, 87 F.3d 1356, 1361-63 (D.C. Cir. 1996) ("*SATO*") (approving declaratory and injunctive relief to halt violation of Miscellaneous Receipts statute).

Furthermore, in 1983 Congress amended 25 U.S.C. § 162a to direct the Secretary of Interior to invest the trust funds collected from power operations to generate an investment return. 25 U.S.C. § 162a(b). Improper disbursements from the Electrical Trust Fund diminish the accumulation of the investment income that these funds would otherwise generate. The loss of this income also violates the BIA's trust fund management obligations.

CRIT is entitled to challenge these unlawful expenditures pursuant to the Administrative Procedure Act. *See Raymond Proffitt Foundation v. U.S. Army Corps of Engineers*, 343 F.3d 199, 207 (3d Cir. 2003) (an aggrieved party can bring an action to challenge an agency's expenditures as inconsistent with the permissible statutory objectives); *SATO*, 87 F.3d at 1360 (private party is a suitable challenger to enforce appropriations limitation). Because the purpose of the power system is to provide power for the CRIT Reservation and the purpose of the Electrical Trust Fund is to maintain the power system, CRIT is aggrieved when funds are illegally diverted from the trust fund for other purposes. And CRIT has standing to contest an improper depletion of the trust fund without regard to whether CRIT is entitled to demand that distributions from the trust fund be made at any particular time for any particular purpose. *See Washington v. Reno*, 35 F.3d 1093, 1101-02 (6th Cir. 1994) (inmates had standing to contest depletion of trust fund although they could not demand particular expenditures from that fund).

The BIA's rationale for invading the Electrical Trust Fund to rehabilitate the spillway gates is that (1) all ten gates – the three "powerhouse gates" and the seven "spillway gates" – are linked to, and controlled by, a common control system, and (2) failure of the spillway gates would have an impact on the power plant as well as the irrigation system. This argument proves too much. The fact that operation of the irrigation and power systems are coordinated does not transform them all into parts of the power system. Nor does the fact that failure of the spillway

gates would affect the power system make them part of the power system.  The failure of the

dam, itself (or an upstream dam) would also have disastrous consequences for the power plant

but that does not give the BIA the ability to invade the Electrical Trust Fund to repair the dam.

The BIA's attempt to stretch the spending authority granted it by 25 U.S.C. § 385c is

"breathtaking" in scope and completely unreasonable.  *See California Indep. System Operator*

*Corp. v. FERC*, 372 F.3d 395, 401 (D.C. Cir. 2004).

      The Sixth Circuit confronted an analogous situation in *Washington v. Reno*, *supra*.  In

that case, federal prison inmates challenged the use of the Commissary Fund – a trust fund to be

used for their welfare – to purchase equipment used to monitor inmate telephone calls.  The

Bureau of Prisons conceded that such monitoring was a security function but argued that the

monitoring equipment also was used for diagnostic purposes that benefited the inmates.  The

circuit court cut through such sophistry and ruled that the nature – and so the propriety -- of an

expenditure should be determined by its <u>primary function</u>.

> If the overriding purpose of an expenditure is to provide for the amusement,
> education, library, or general welfare of the inmate population, the fact that the
> expenditure also incidentally serves a security or monitoring function may be
> irrelevant.  If, however, evidence establishes that the primary purpose of goods or
> services obtained with trust fund money is to provide for responsibilities
> "attendant upon the confinement of persons" housed in federal correctional
> facilities, such illegal invasions of the trust must be enjoined.

35 F.3d at 1102.

      So, too, here.  The spillway gates are originally, and primarily, part of the irrigation

system, not part of the power system that subsequently was added to the dam and that involved

only the *modification* of three of the ten gates.  Thus, the rehabilitation of the spillways gates

constitutes maintenance of the irrigation system, not the power system.  Accordingly, BIA's

efforts to fund the entire rehabilitation from the Electrical Trust Fund is an illegal invasion of the

trust – and an end-run around the congressional appropriation process -- that should be enjoined.

## II.    CRIT Is Entitled to Preliminary Injunctive Relief

A four-part test governs whether preliminary injunctive relief should be granted in a

particular case.  This test considers: (1) the plaintiff's likelihood of success on the merits; (2) the

irreparable injury if an injunction is not granted; (3) potential injury to the other party; and (4)

the public interest.  *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746

(D.C.Cir.1995).  The test is a flexible one.  "If the arguments for one factor are particularly

strong, an injunction may issue even if the arguments in other areas are rather weak."  *Id.* at 747.

### A.    Likelihood of Success on the Merits

For the reasons discussed above, CRIT's likelihood of success on the merits is

overwhelming.  The rehabilitation of the spillway gates is part and parcel of maintaining the

CRIT irrigation system, not the power system. The expenditure of monies from the Electrical

Trust Fund for this purpose is explicitly prohibited by 25 U.S.C. 385c.  The BIA has no

principled justification for its action.  Rather, its raid upon the Electrical Trust Fund is an

obvious example of "robbing Peter to pay Paul."

### B.    Irreparable Injury

Although CRIT presumably could bring a damages action in the Court of Federal Claims

to recover the wrongfully disbursed funds and lost interest thereon, *see Short v. United States*, 50

F.3d 994, 998-99 (Fed. Cir. 1995), it nonetheless would suffer irreparable injury as a result of the

delay inherent in such a retrospective remedy.   The Seventh Circuit framed this issue in the

following terms:

> If there is irreparable harm from delay, then delay injures, and by injuring
> deprives.  But a loss of the time value of money, consequent on delay in receiving

> money to which one is entitled, is not considered an irreparable harm, even though it is a real loss, and even if there is no way to recover it.

*Schroeder v. City of Chicago*, 927 F.3d 957, 960 (7th Cir. 1991). In this case the injury caused by the BIA's illegal invasion of the Electrical Trust Fund goes beyond the loss of the time value of money; instead, it involves issues of resource allocation and political accountability.

Reportedly, the Electrical Trust Fund heretofore had a balance of approximately $20 million and was growing at a rate of about $1.2 million annually. *See* Declaration of Lee R. Gardner (Exhibit 8). The withdrawal of over $9 million to fund the rehabilitation of the spillway gates would cut the trust fund almost in half and it would take another eight years to re-grow the fund to its current level.

Meanwhile, there are significant unmet needs for the operations and maintenance of the on-Reservation power system, detailed in the attached declaration of Mr. Gardner, which are estimated to cost between $14.7 - $16.5 million. Another $10 million is needed as an adequate reserve for contingencies such as a sudden loss of major transformer capacity due to lightning or fire. *Id.* The total cost of these various needs is some $25-26 million, which exceeds the reported balance of the Electrical Trust Fund. The illegal depletion of the trust fund will reduce it to a level grossly insufficient to meet the current needs of the power system, and will prevent or delay many of these needs from being met. An eventual damages award that replenishes the depleted Trust Fund will not remedy the harm caused by this delay – it cannot undo service interruptions or losses that occurred during the interim. Nor can a damages award remedy lost business and economic opportunities during the interim period that were caused by deficiencies in the power system. *See Idea Intern., Inc. v. United States*, 74 Fed.Cl. 129, 141 (2006) (a lost opportunity may constitute irreparable harm entitling plaintiff to injunctive relief).

Moreover, this unlawful circumvention of the congressional appropriation process undermines political accountability by allowing the BIA to cover up the consequences of its failure to adequately fund the irrigation trust account through water user fees. The fundamental and comprehensive purpose of the Constitution's Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents ...." *OPM v. Richmond*, 496 U.S. 414, 428 (1990). If the irrigation trust fund is inadequate to pay for needed repairs and maintenance of the CRIT irrigation system, the BIA is required to find a legitimate, alternative funding source or else bring the matter to Congress' attention and seek an appropriation. Were the BIA to seek a congressional appropriation, then CRIT could lobby in favor of that solution. But CRIT cannot effectively lobby for congressional assistance so long as the BIA is covering up the problem.

For example, the 2008 appropriations "earmark" season (for Fiscal Year 2009) is now underway in Congress but will end in the near future. The House Appropriations Committee has asked House members to submit their requests for earmarks by March 19, 2008. Robert Pear, *Lawmakers Put Out New Call for Earmarks*, New York Times, February 14, 2008, at 18. CRIT cannot seek an earmark for funding the rehabilitation of the spillway gates when BIA is taking the position that the project already is fully and properly funded from an existing trust account.

Thus, the BIA's raid upon the Electrical Trust Fund not only undermines the integrity of the appropriations process but prevents or delays the solution of the underlying problem – the lack of needed funds to repair and maintain the irrigation system. Once again, this lost opportunity cannot be remedied by a subsequent damages award.

C.    Potential Injury to the Other Party

13

Entry of injunctive relief prohibiting Defendant Kempthorne from spending Electrical Trust Fund monies in violation of applicable statutory restraints does not harm him or the BIA. "[A] restriction on such spending will only place the defendants in the position in which they should have been initially—the position of requesting from Congress sufficient appropriations to fund" rehabilitation of the spillway gates. *Washington v. Reno*, 35 F.3d at 1103.

   D. <u>The Public Interest</u>

Although forcing the BIA to fund rehabilitation of the spillway gates through proper appropriations channels may result in a greater drain on the Government's finances, "the relatively minor increase in Congressional appropriations necessary to replace the monies improperly diverted from the [Electrical Trust Fund] does not outweigh the greater public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*

Wherefore, it is respectfully submitted that CRIT's motion for a preliminary injunction should be granted.

Dated:  February 20, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:  /s/ Steven D. Gordon
    Steven D. Gordon (D.C. Bar No. 219287)
    Lynn E. Calkins (D.C. Bar No. 445854)
    Stephen J. McHugh (D.C. Bar No. (485148)
    Holland & Knight L.L.P.
    2099 Pennsylvania Ave. NW, Suite 100
    Washington, D.C. 20006
    202-955-3000 (phone)
    202-955-5564 (fax)

*Counsel for Plaintiff the Colorado River Indian Tribes*

*Of Counsel*

Eric N. Shepard
Attorney General
Colorado River Indian Tribes
Route 1, Box 23-B
Parker, Arizona 85344

## CERTIFICATE OF SERVICE

I certify that, on this 20th day of February, 2008 I electronically transmitted the foregoing Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction to the Clerk of the Court, using the ECF systems for filing, and caused the ECF system to transmit a Notice of Electronic Filing to the counsel of record listed on the ECF system for this case.

/s/Steven D. Gordon
Steven D. Gordon

# 5113797_v5

16

# EXHIBIT 1

# INTRODUCTION

## FOREWORD

The theme of this report is taken as a fast moving, thoroughly planned, well scheduled and constructed project. There were four definite periods of construction, namely: Spillway Excavation, Spillway Concreting and Gate Assembly, Earth Fill Dam Excavation, and Earth Fill Dam Construction.

A very definite break occurred between the first two and the last two periods, as the spillway was and is used as the river channel while and since the construction of the earth fill dam.

## LOCATION

Headgate Rock Dam is situated on the Colorado River one mile northeast of Parker, Yuma County, Arizona. It is constructed on the site known as Headgate Rock; a conspicuous lava-capped butte of Temple Bar Conglomerate extending from the Arizona side well out into the river. It is about three miles inside the Northern end of the Colorado River Indian Reservation and about fifteen miles air line down river from the junction of the Bill Williams and the Colorado River. Headgate Rock was formerly known as Corner Rock until the construction in 1872 of an early irrigation diversion tunnel through this formation. A head gate to this tunnel was located at the east end of the tunnel, whence the name which the rock now bears.

## HISTORY OF THE PROJECT

Although the history of this district dates back to the

1

Spanish exploration by Alarcon in 1540 the first plans for developed irrigation were formulated in 1863 by Colonel Charles D. Poston, Superintendent of Indian Affairs and later Arizona's first territorial representative, and Mr. A. F. Waldemar, a civil engineer. Actual work was begun on the irrigation canal December 16, 1867 under the direction of George W. Dent, Superintendent of Indian Affairs. Five miles of canal were completed that year. Water was first turned into the canal in July, 1870 but could not be controlled and the system was washed out. In 1872 the canal was extended three miles up the river to Corner Rock and the head gate placed there, thus Headgate Rock was named. Tunnels on this canal caved in the same year and this method of diversion was abandoned.

There followed an erratic and unsuccessful era using water wheels, pumps, and sundry irrigation methods, until 1912 when the present pumping plant was constructed with two 20 inch pumps, operating first as a steam plant and later converted to diesel engine which has and is rendering good service. In 1918 a 36 inch pump was added in the plant to permit furnishing water for about 5,000 acres. This plant is to be abandoned in 1942 as it is inadequate for further development and gravity water will be available by that time.

## PURPOSE

Principally, Headgate Rock Dam is for diverting water for irrigation and development of lands of the Colorado River Indian

Reservation. Provision has been made for future electrical power installation providing the river degrades sufficiently in later years. The project involves 100,000 acres of irrigable lands, which will be developed in all probability as soon as water distribution systems and subjugation can be effected.

## GEOLOGY

Preliminary examinations and surveys along that part of the river within which diversion was fixed by reasonable limitations of cost of main canal, indicated four locations which by reason of their topography and surface geology offered possibilities as diversion sites.

From May, 1937, to February, 1938, Mr. F. M. Murphy, a geologist, made a geological study of four probable dam sites. Locations studied were: Empire Flat, Osborn Wash, Headgate Rock, and Bush Ferry damsites. In brief his report stated that the bed of the river needed further exploration for bed rock, that the exposed abutments would be satisfactory only on the first three sites, and that three geologic periods were evidenced, namely: the Pre Cambrian, Tertiary, and Quaternary, the latter two being the age of exposed abutment formations in the form of Alluvium, Chemehuevis Gravel, Basalts, Lake Bed, Conglomerate, and Soft Sandstones.

Alluvium existed along the river banks as washed materials from the river tributaries.

Chemehuevis Gravel, a capping formation overlying the entire district, is a well graded gravel from fine sand to 18" erratics.

3

# EXHIBIT 2



# United States Department of the Interior

## OFFICE OF THE SOLICITOR
Phoenix Field Office
One Renaissance Square
Two North Central
Suite 1130
Phoenix, Arizona 85004-2383

### October 8, 1996

Memorandum

To:      Area Director, Phoenix Area Office, Bureau of Indian
         Affairs

From:    Field Solicitor, Phoenix

Subject: Inspector General's Audit Concerning Repayment of
         Federal Investment in the Headgate Rock Dam Powerplant

## I.    INTRODUCTION

The Inspector General's Memorandum Audit Report No. 93-I-1546
(September 14, 1993) (Audit) questions, *inter alia,* the Bureau of
Indian Affairs' (BIA) handling of repayment of the construction
cost of the hydroelectric powerplant (powerplant) added to the
Headgate Rock dam located on the Colorado River.   The Audit
suggested, *inter alia,* that the BIA: (1) establish a plan for the
recovery of the reimbursable Federal investment in the
powerplant; (2) request the Solicitor to determine whether
Congress intended the power investment of the powerplant to be
repaid with interest, or seek Congressional clarification of
congressional intent if the Solicitor does not make the
determination; and (3) adjust the repayment plan based on the
determination made by the Solicitor or Congress on the interest
issue.   *See* Audit at p. 8.   Your office asked us for an opinion
on whether Congress intended the power component (distinguished
from the irrigation component) of the powerplant be repaid with
interest.   This constitutes our response[1] to that request.


## II.   ISSUE

Does the law require the addition of an interest component to the
amount expended in the construction of the Headgate Rock Dam
Hydroelectric Project in calculating the construction cost of the
powerplant?

---

[1]  This memorandum corrects typographical errors contained
in our September 6, 1996 memorandum.   The analyses and
conclusions are the same in both opinions.

III. FACTS

Headgate Rock Dam was authorized under the River and Harbors Act of 1935.  The act of August 30, 1935, 49 Stat. 1028 ("River and Harbors Act of 1935"), provides in pertinent part:

> SEC.  2.    That for the purpose of controlling floods, improving navigation, regulating the flow of the streams of the United States, providing for storage and for the delivery of the stored waters thereof, *for the reclamation of public lands and Indian reservations,* and other beneficial purposes, *and for the generation of electric energy as a means of financially aiding and assisting such undertakings,* * * *  The construction by the Secretary of the Interior of a dam in and across the Colorado River at or near Head Gate Rock, Arizona, and structures, canals, and incidental works necessary in connection therewith is hereby authorized, * * * .

(emphasis supplied).

Construction of the dam was initiated by the BIA in 1938 and was completed in 1941.  The dam was designed to provide permanent diversion facilities for irrigation of up to 100,000 acres of land in Arizona on the Colorado River Indian Tribe's (CRIT) reservation; it was authorized to generate electric power necessary to irrigate Indian lands.  The United States owns the dam, which is operated by the BIA.

In its January 31, 1977, resolution, the CRIT tribal council requested Federal assistance in the construction of facilities to generate hydroelectric power on the Colorado River Reservation so that CRIT would be able to expand its irrigated agricultural reservation land, engage in water-oriented recreation, and engage in residential development, all of which was directed at the heightened economic development of the Tribe and its members. *See id.*

In 1980, the BIA requested the Water and Power Resource Service[2] (herein Reclamation) to update a 1967 feasibility report for the construction of a low head power generation plant at Headgate Rock Dam, Arizona, to supply additional power to the CRIT

_____

    [2]  Formerly known, and subsequently redesignated, as the Bureau of Reclamation.  The Water and Power Resource Service is referred to herein as the Bureau of Reclamation or Reclamation.

2

reservation.[3]  In response, Reclamation updated a 1967 feasibility study concerning the proposed powerplant and prepared the June 1980 Advance Planning Report for the BIA.[4]  The 1980 Planning Report concluded that a Headgate Rock hydroelectric powerplant was economically justified and financially feasible, stating that all of the costs could be repaid within 50 years. *Id.* at p. 4.  According to the study, the powerplant would provide for a total of 19,500 kilowatt of capacity and an annual average production of 86.5 million kilowatt-hours of energy.  *Id.* The 1980 cost estimate for the powerplant was $35.5 million, of which $26.2 million was allocated to commercial power and $9.3 million was allocated to irrigation.[5]

Reclamation's 1980 Planning Report anticipated that all the power that could be produced by the powerplant would be used on the CRIT Reservation to operate the irrigation and drainage facilities and to supply a portion of the residential and commercial power requirements of the Reservation land.  *Id.* at p. 3.  26.3% of the power expected to be generated was anticipated to be used to irrigate CRIT's agricultural lands; 73.7% of the power was anticipated to be used to meet on reservation commercial and domestic needs.  *See id.* at p. 30.

The underpinnings of the economics and repayment statements contained in Reclamation's 1980 Planning Report, *see id.* at p. 30, were assumptions and methodology Reclamation uses for the development of Reclamation (as distinguished from BIA) projects. The 1980 Planning Report, at p. 30 stated in pertinent part:

> [t]he repayment analysis included in the study follows standard Service [Reclamation] procedures.  Since all the benefits are attributed to electrical power production, all project costs are considered reimbursable.

When the proposal for the construction and financing of the powerplant was considered by Congress, Reclamation assumptions [upon which the standard Reclamation procedures applicable to Reclamation projects, *inter alia,* the repayment principles contained in Reclamation's 1980 Planning Report] were not employed by Congress because Congress did not treat the powerplant as a Reclamation project but rather identified it as an Indian project.

---

[3]  Water and Power Resource Service, U.S. Department of the Interior, *Headgate Rock Hydroelectric Project, Advance Planning Report Prepared for the Bureau of Indian Affairs,* p. 1 (June 1980) (hereinafter the 1980 Planning Report).

[4]  *Id.*

[5]  *Id.* at p. 30.  These figures do not include interest.

3

In the Supplemental Appropriations Act for Fiscal Year 1985,[6] Pub.L. 99-88; 99 Stat. 293, 319 - 20, (August 15, 1985), Congress provided in pertinent part:

### DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

### Construction Program

For an additional amount for the Department of the Interior, Bureau of Reclamation, "Construction program", for the design and construction of * * * the Headgate Rock Project, Arizona,

* * *

Provided further, * * * $8,300,000 is appropriated pursuant to the Snyder Act (25 U.S.C. 13), to be expended by the Bureau of Reclamation for the purpose of designing and initiating construction of the Headgate Rock Hydroelectric Project, Arizona.

Shortly following the passage of the Supplemental Appropriations Act for Fiscal Year 1985, supra, Reclamation's Commissioner and the Secretary concurred, see the October 16, 1985, Secretarial decision memorandum, at p. 1, that Reclamation's standard repayment regime was not applicable to the construction and funding of the powerplant by stating,

at the explicit direction of P.L. 99-88, the powerplant will be constructed under the authority of the Snyder Act (Act of November 2, 1921, 42 Stat. 208). The Snyder Act gives the Secretary of the Interior broad authority to under take programs and projects for the benefit, care and assistance of Indians.

* * *

It should be noted that the Senate Report explains that P.L. 99-88 is not intended to change current financing requirements of Federal water projects with respect to Indian Tribes. The application of BIA's current policy of establishing power rates sufficient to amortize (without interest) the construction costs of the powerplant, would be consistent with congressional intent.

The Supplemental Appropriations Act for Fiscal Year 1985, supra, demonstrates that all of the powerplant features were authorized

---

[6] Approved August 15, 1985.

4

under the Snyder Act. The Secretary similarly viewed all of the powerplant features as authorized under the Snyder Act. *See* the October 16, 1985, Secretarial decision memorandum, at pp. 1 - 2. Accordingly, as to repayment of interest on the construction costs, there is no statutory distinction between irrigation and commercial uses of the electricity generated by the powerplant; neither use bears an interest component.

The Audit, at p. 6, recognizes the decision on the interest issue contained in the Secretary's October 16, 1985, decision memorandum. However, the Audit appears to question the propriety of the Secretary's decision on this point. *See* the Audit at pp. 6 - 7. Apparently, the Audit assumes that existing law requires that the portion of the powerplant construction cost which will generate energy to be used by CRIT for domestic and commercial purposes (as distinguished from power necessary to irrigate the CRIT farmlands) be repaid with interest. *See id.* at p. 7. The Audit appears to assume that the Permanent Appropriations Repeal Act of August 7, 1946, is applicable to the instant case, and appears to believe that statute requires the application of power revenues to the amortized portion of the reimbursable portion of the construction costs of the powerplant. *See* Audit at p. 6. Finally, the Audit appears to assume that Reclamation's 1980 Planning Report and Reclamation's annual budget justifications establish that all of the construction costs are reimbursable and that the commercial power component (as distinguished from the power necessary to make water deliveries necessary for irrigation) are reimbursable with interest. *See id.* at p. 6.

As of September 30, 1992, Reclamation determined the estimated total construction costs (without interest) to be $55.1 million and $70.6 million (with interest).[7] The United States owns and operates, through the Bureau of Indian Affairs, the powerplant, which is a part of Headgate Rock Dam, just as it owns and operates the dam.

IV. ADDITIONAL APPLICABLE STATUTES

The Permanent Appropriations Act of 1934, 48 Stat. 1224, repealed prior acts making permanent or continuing appropriations from the general fund for authorized governmental activities and substituted therefore the necessity for Congress to make annual appropriations to fund those activities. *See id.* at p. 1225, sec. 2. At that time, there were unobligated balances previously appropriated to certain appropriations accounts as well as receipts from sales, fees, etc., credited to appropriations

---

[7] *See* Reclamation's Headgate Rock Hydroelectric Statement of Project Costs and Repayment ~ Summary, approved by the Bureau's Regional Financial Management Officer, Lower Colorado Region (March 24, 1993).

accounts for particular projects and activities. Apparently, the prior practice was to deposit proceeds from leases, sales, charges, etc., into individual project accounts and to permit an agency to spend those monies to continue to operate the particular projects. Section 4 of the Permanent Appropriations Act of 1934, 48 Stat. 1227 - 1228, provided that receipts credited to certain appropriations accounts would be deposited in the Treasury as miscellaneous receipts and that equal amounts would be appropriated annually for the same purposes for which such receipts were then appropriated. Section 20 of the Permanent Appropriations Act of 1934, 48 Stat. 1233 - 1235, had a similar effect. Portions of both sections 4 and 20 involved Indian monies generally, but neither involved the Headgate Rock Dam or the subsequently constructed powerplant. *See id.*

The act of August 7, 1946, 60 Stat. 895, modified sections 4 and 20 of the Permanent Appropriations Act of 1934 by providing, *inter alia,* that collections made from water users on each Indian irrigation project on account of assessments levied to meet the costs of operating and maintaining such projects would be deposited into the Treasury and would be available for expenditure to carry out the purposes for which they were collected. *See id.*

Section 3 of the act of August 7, 1946, 60 Stat. 895 - 896, provided that revenues thereafter collected from power operations on each Indian irrigation project, and deposited into the Treasury for credit to miscellaneous receipts pursuant to section 4 of the Permanent Appropriations Act of 1934, were authorized to be appropriated annually in specific or indefinite amounts, equal to collections so credited, for: (1) payment of operation and maintenance (O&M) of the power system; (2) creation and maintenance of reserve funds to be available for making repairs and replacements to, defraying emergency expenses for, and ensuring continuous operation of the power system; (3) amortization, in accordance with the repayment provisions of applicable statutes or contracts, of construction costs allocated to be returned with power revenues; and (4) payments of other expenses and obligations chargeable to power revenues to the extent required or permitted by law. The act of August 7, 1946 is codified at 25 U.S.C. sec. 385a - 385c. The implementing regulations are found at 25 Code of Federal Regulations Part 175 (1995 ed.).

The Snyder Act, 25 U.S.C. sec. 13, the authority under which the powerplant was constructed, provides in pertinent part:

> [t]he Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following

6

purposes:

General support and civilization, including education.

* * *

For industrial assistance and advancement and general administration of Indian property.

For extension, improvement, operation, and maintenance of existing Indian irrigation systems and for development of water supplies.

V.   DISCUSSION

A.   The statements contained in Reclamation's 1980 Planning Report concerning anticipated repayment, interest, etc., are irrelevant in determining whether the law requires the inclusion of an interest component in the determination of the construction costs of the powerplant. Reclamation's methodology, as reflected in its 1980 Planning Report, on repayment and interest issues is derived from Reclamation's general governing statutes which require repayment contracts, payment of construction charges, interest components, etc. *See e.g.,* 43 U.S.C. sec. 485 et *seq.* Apparently, when it submitted that report, Reclamation believed that the construction would be performed under its authority, not under BIA's Snyder Act authority as Congress subsequently directed.

As noted above, the Snyder Act, 25 U.S.C. sec. 13, the Secretary's authority under which the powerplant was constructed, is quite different from his authority to construct Reclamation projects under Reclamation statutes, as the former states in pertinent part:

> *[t]he Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States* for the following purposes:

> General support and civilization, including education.

* * *

For industrial assistance and advancement and general administration of Indian property.

For extension, improvement, operation, and maintenance of existing Indian irrigation systems and for development of

7

water supplies.

(emphasis supplied); *see also generally, Morton v. Ruiz,* 415 U.S. 199, 205 - 209 (1974) (describing the Snyder Act).  Unlike the general statutes governing Reclamation's activities, the Snyder Act does not contain specific requirements on repayment, interest, etc.  *See* 25 U.S.C. sec. 13.  Rather, the Snyder Act gives the Secretary wide discretion to determine how, and on what terms, money appropriated under the Snyder Act will be expended. *See id.*  Since Congress chose to authorize the powerplant under the Snyder Act rather than under Reclamation's statutory authority, Reclamation's 1980 Planning Report offers no support for an assertion that Congressional intent on repayment and interest matters was other than that expressed by the Secretary in his October 16, 1985, decision memorandum.

B.    The Permanent Appropriations Repeal Act of August 7, 1946, *supra,* does not require the application of power revenues to repay the amortized portion, or interest on, of the reimbursable portion of the construction costs of the powerplant. *See id.*  As noted above, the pertinent portion of that statute, codified at 25 U.S.C. sec. 385c, merely identifies the "purposes," *see id.,* for which revenues collected from power operations on Indian irrigation projects and deposited in the Treasury are authorized to be appropriated.  That statute does not "provide criteria for the application of power revenues to the amortization of reimbursable Federal construction costs," *see* Audit at p. 6, as the Audit suggests.  Thus the Permanent Appropriations Repeal Act of August 7, 1946, *supra,* is not inconsistent with the decision articulated in the Secretary's October 16, 1985, memorandum of decision.

Further, to the extent it is applicable, the Permanent Appropriations Repeal Act of August 7, 1946, *see* 25 U.S.C. sec. 385c, permits the expenditure of funds for the "(3) amortization, in accordance with the repayment provisions of the applicable statutes or contracts." *See id.*  Our research has not identified any statutory provision requiring "repayment provisions," <u>see</u> 25 U.S.C. 385c <u>supra</u>, for the powerplant.  25 U.S.C. 385c <u>supra</u>, does not require repayment of the construction cost of the powerplant.  <u>See id.</u>  Similarly, our research has not disclosed any "contracts," <u>see</u> 25 U.S.C. 385c, <u>supra</u>, mandating the Secretary require repayment of the construction cost of the powerplant.  Finally, we are unaware of any applicable statutes or contracts which have determined the "construction costs" "allocated to be returned from power revenues." *See* 25 U.S.C. 385c.

C.    Reclamation's 1980 Planning Report and its annual budget justifications are not evidence that Congress intended all, or any, of the construction costs to be reimbursable or that Congress intended that the commercial power component (as

8

distinguished from the power necessary to make water deliveries necessary for irrigation) be reimbursable with interest.  A few months after the authorization of the powerplant in the Supplemental Appropriations Act for Fiscal Year 1985, *supra,* the Commissioner of the Bureau of Reclamation stated his understanding of the applicable statute was that no interest would be charged on any of the construction costs.  *See* the Secretary's October 16, 1985, decision memorandum.  The Secretary concurred that no interest would be added to any of the construction costs.  *See id.*

Reclamation's 1980 Planning Report is irrelevant because Reclamation's statutory authorities were not utilized in the authorization of the Hydroelectric Project.  Reclamation's budget submissions, tendered to the enactment of the authorizing statute and subsequent to the Commissioner's and the Secretary's interpretation of the authorizing statute that no interest would be charged on the construction costs for the powerplant Project, are not evidence of what Congress intended when it passed the authorizing statute.

## VI.  CONCLUSION

Based on the foregoing, it is our opinion that the law does not require the addition of an interest component to the amount expended in the construction of the powerplant to determine the construction cost of the powerplant.

The other issues concerning the powerplant, noted in the Introduction section of this memorandum and identified in the Audit, involve programmatic decisions or require factual development by the BIA before we can address the legal issues raised by those facts.  For example, establishing a plan for the recovery of the reimbursable Federal investment in the powerplant is a programmatic matter.  Prior to the development of such a plan, we suggest the BIA determine what, if any, costs are reimbursable.  We also suggest that the plan consider the CRIT's and its members' ability to pay power rates for the power generated by the powerplant.

The purpose of the statute authorizing and funding the powerplant was to displace energy now purchased from Arizona Public Service. *See* the Secretary's October 16, 1985, decision memorandum at p. 1.  It would seem that the rates for power generated by the powerplant must be competitive with Arizona Public Service rates in order to accomplish the purpose of the authorizing statute. The 100% overrun in projected construction expenditures is also a factor that should be considered.

Finally, as noted above, the Secretary has wide discretion in determining repayment issues on projects authorized and funded under the Snyder Act in order to fulfill the purposes of that

Act.  In our view, the Secretary is empowered to grant such additional relief in this case as he determines appropriate under the circumstances.

Robert Moeller
Acting Field Solicitor

Daniel L. Jackson
For the Field Solicitor

10

# EXHIBIT 3

Y 4.Ap 6/1: En 2/2/985/pt. 3

# ENERGY AND WATER DEVELOPMENT APPROPRIATIONS FOR 1985

# HEARINGS

BEFORE A

## SUBCOMMITTEE OF THE

## COMMITTEE ON APPROPRIATIONS

## HOUSE OF REPRESENTATIVES

### NINETY-EIGHTH CONGRESS

SECOND SESSION

SUBCOMMITTEE ON ENERGY AND WATER DEVELOPMENT

**TOM BEVILL**, Alabama, *Chairman*

LINDY (MRS. HALE) BOGGS, Louisiana
BILL CHAPPELL, JR., Florida
VIC FAZIO, California
WES WATKINS, Oklahoma
BILL BONER, Tennessee

JOHN T. MYERS, Indiana
VIRGINIA SMITH, Nebraska
ELDON RUDD, Arizona

HUNTER L. SPILLAN, GEORGE A. URIAN, DONALD E. SMITH, and AARON D. EDMONDSON, *Staff Assistants*

PART 3

|  | Page |
| --- | --- |
| Testimony of the Secretary of the Interior | 1 |
| Bureau of Reclamation | 35 |
| Tennessee Valley Authority | 745 |
| Appalachian Regional Commission | 1019 |

Printed for the use of the Committee on Appropriations

GELMAN LIBRARY
George Washington University
Washington DC 20052

APR 26 1984

Government Documents
Depository 0091

141

FISCAL YEAR 1984 SUPPLEMENTAL BUDGET REQUEST

*Question.* The Bureau is requesting appropriation language for fiscal year 1984 to allow the initiation of construction on three projects within available Bureau funds. The three projects are Buffalo Bill Dam, Wyoming; Headgate Rock, Arizona; and the Santa Margarita project in California.

Answer. We will place the proposed appropriation language and the justifications in the record at this point.

[The information follows:]

142

DEPARTMENT OF INTERIOR
BUREAU OF RECLAMATION

Proposed Appropriation Language for Supplemental
Appropriation for FY 1984 for Construction Program

Construction Program

"Within available funds, such sums as may be necessary
shall be available to initiate construction of the Head-
gate Rock Hydroelectric Project; the Buffalo Bill Dam
Modification, Pick-Sloan Missouri Basin Program, and the
Santa Margarita Project:  Provided, That the sums required
to construct the Headgate Rock Hydroelectric Project shall
be available pursuant to the Snyder Act (25 U.S.C. 13), to
be expended by the Bureau of Reclamation."

143

DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION

Construction Program

Fiscal Year 1984

Presently Available..................... $695,318,000
Proposed Supplemental...................      - -
Revised Estimate........................  695,318,000

Purpose and Need for Supplemental

Appropriation language is requested for fiscal year 1984 to permit construc-
tion to begin on three new projects.  These are the Buffalo Bill Dam
Modification, Pick-Sloan Missouri Basin Program, Wyoming; the Headgate Rock
Hydroelectric Project, Arizona; and the Santa Margarita Project, California.
Funds to begin these projects will be made available within the existing
appropriation.  Second year funding is requested in the fiscal year 1985 budget.

Buffalo Bill Dam Modification

This project is located at the confluence of the North and South Forks of the
Shoshone River in northwest Wyoming in Park County.  Buffalo Bill Dam will be
raised 25 feet to enlarge the reservoir and increase conservation storage by
271,300 acre-feet.  A new 18-megawatt powerplant will be constructed about
4,350 feet downstream from the dam utilizing the existing Shoshone Canyon
conduit as a penstock.  Also the existing powerplant structure will be uti-
lized to house a new 3 megawatt unit.  The project was authorized by Public
Law 97-293, October 12, 1982.

The total cost of this project is estimated to be $125 million, of which up to
$47 million will be financed from non-Federal sources.  The Wyoming Legislature
has appropriated $47 million to participate in financing Buffalo Bill Dam
Modification.

144

The first year cost of this project is estimated to be $2 million. The funds will be used for preconstruction as well as construction activities. Work will include the purchase of rights-of-way, the preparation of design data and specifications, initiation of construction of Shoshone River bridge, and furnishing riprap. The project will be completed in 1988.

<u>Headgate Rock Hydroelectric Project</u>

This project is located at Headgate Rock Dam on the Colorado River between La Paz County, Arizona and San Bernardino County, California, near Parker, Arizona. The project consists of constructing a powerplant and installing three turbine generating units and associated transmission facilities at the existing dam. The project will provide for a total of 19,500 kilowatts of capacity and an annual average production of 86.5 million kilowatt-hours of energy for irrigation and drainage pumping and other uses on the Colorado River Indian Reservation.

Headgate Rock Dam was authorized under the River and Harbors Act of 1935. Construction was initiated by the Bureau of Indian Affairs in 1938. The dam was completed in 1941 to provide permanent diversion facilities for irrigation of up to 100,000 acres of land in Arizona on the Colorado River Indian Reservation. The powerplant is considered to be an extension of the Colorado River Indian Irrigation Project. Funds to start preconstruction activities were appropriated to the Bureau of Indian Affairs in fiscal year 1980. The cost of this work was reimbursed to Reclamation by the Bureau of Indian Affairs under a Memorandum of Understanding dated May 7, 1980. Designs and specifications have been completed. The present plan envisions construction responsibility, including funding, being fulfilled by the Bureau of Reclamation under a revised Memorandum of Understanding with the Bureau of Indian Affairs. Upon completion, the entire plant will be transferred to the Bureau of Indian Affairs for operation and maintenance.

145

The total cost of this project is estimated to be $61 million with an esti-
mated completion date of 1988. The first year costs of this project are
estimated to be $5 million to initiate construction and acquire equipment for
the powerplant.

Santa Margarita Project

The Santa Margarita Project is a multiple purpose project located in northern
San Diego County, California near the town of Fallbrook. The project consists
of two dams and reservoirs on the Santa Margarita River and conveyance lines
to serve the Fallbrook Public Utility District and the Marine Corps Base at
Camp Pendleton. The project will provide 7,050 acre-feet of municipal and
industrial water to Camp Pendleton and 4,490 acre-feet of water to Fallbrook
Public Utility District (of which 1,570 acre-feet will be for municipal and
industrial use and 2,920 acre-feet will be used for agricultural purposes on
4,000 acres of presently irrigated land). The project will also provide flood
control, recreation, regulation of imported water, and wildlife mitigation.
Principal crops produced by the project lands include avocados, citrus,
strawberries, and nursery stock. Authorization for the project is included in
S. 805 as passed by the Senate on June 15, 1983, and referred to the House.

The total cost of the project is estimated at $233 million of which $121
million will be financed by the Department of the Navy and $11 million by the
Fallbrook Public Utility District. The contribution from the Navy will fund
the construction costs associated with project features for delivery of water
to Camp Pendleton for the U.S. Marine Corps.

First year funding of $600,000 will be used to prepare designs and specifica-
tions for, and to begin construction on, the relocation of the county road at
Fallbrook Reservoir. Preconstruction work will involve geologic exploration
and collecting needed design data. The project will be completed in 1990.

# EXHIBIT 4

4-94 13:45 FROM: BIA COLORADO RIVER AGENCY



United States Department of the Interior

BUREAU OF RECLAMATION
WASHINGTON, D.C. 20240

OCT 1 6 1985

NOV 29 1985

IN REPLY
REFER TO: 300

Memorandum

TO:            The Secretary

THROUGH:       Assistant Secretary - Water and Science

FROM:          Acting
               Commissioner  sgd/ Richard Itratar

SUBJECT SUMMARY: Request for Secretarial Approval of Initiation
               of Construction of the Headgate Rock Hydroelec-
               tric Project, Arizona, Pursuant to the FY 1985
               Supplemental Appropriations Act (P.L. 99-88)

DISCUSSION:  This memorandum is to request your approval for
initiation of construction of Headgate Rock Hydroelectric Project
in Arizona.

The existing Headgate Rock Dam was authorized under the River and
Harbors Act of 1935.  Construction was initiated by the Bureau of
Indian Affairs (BIA) in 1938 and the dam was completed in 1941.
The dam was designed to provide permanent diversion facilities for
irrigation of up to 100,000 acres of land in Arizona on the
Colorado River Indian Reservation.  The Bureau of Reclamation is
designing and will construct (upon availability of appropriated
funds) a new powerplant at the existing dam on behalf of the BIA.
Energy from the powerplant (19,500 KW of capacity) will displace
energy now purchased from Arizona Public Service Co.

The Supplemental Appropriations Act for FY 1985 (P.L. 99-88)
appropriates funds for several "new starts" including the
construction of the Headgate Rock Hydroelectric Project.
According to P.L. 99-88, these new construction starts may
commence when certain financing conditions have been met.
Specifically, the Secretary must determine to his satisfaction
that financing plans offered by non-Federal entities desiring to
participate in project construction demonstrate a reasonable
likelihood that the entity will be able to satisfy the terms and
conditions of the financing agreement.  Upon that determination,
initiation of project construction can take place.

However, at the explicit direction of P.L. 99-88, the powerplant
will be constructed under the authority of the Snyder Act (Act of
November 2, 1921, 42 Stat. 208).  The Snyder Act gives the

To: The Secretary                                                    2

Secretary of the Interior broad authority to undertake programs
and projects for the benefit, care, and assistance of Indians.
Upon completion of construction, the BIA will assume full respon-
sibility for operation and maintenance.  The BIA would also be
responsible for establishing rates for marketing the power to the
Colorado River Indian Reservation.  The BIA will establish rates
for this project sufficient to totally amortize construction
costs, without interest, over a 40-50 year period, consistent with
its current policy for repayment of hydroelectric projects.

Since this project is for the benefit of the Colorado River Indian
Reservation and will be constructed under the authority of the
Snyder Act, there has not been a non-Federal entity desiring to
participate in the project construction identified.  We believe
that P.L. 99-88 does not require an agreement if there is not a
non-Federal entity desiring to participate in project con-
struction.  It should also be noted that the Senate Report
explains that P.L. 99-88 is not intended to change current
financing requirements of Federal water projects with respect to
Indian Tribes.  The application of BIA's current policy of
establishing power rates sufficient to amortize (without interest)
the construction costs of the powerplant, would be consistent with
congressional intent.

Accordingly, we believe the non-Federal financing requirements of
P.L. 99-88 do not apply to the Headgate Rock Hydroelectric Project
and that the intent of the act's repayment requirements has been
met in any event.  We request your concurrence with our determina-
tion so that construction may be initiated.


Approve: _Donald Paul Hodel_____      Disapprove_____

Date: _____NOV 2 6 1985_____      Date: _____


Prepared by: Austin Burke    Ext. 4690

bc:  Secretary's Surname
     Secretary's Read File--WBR (2)
     PBA, SOL
     A/S - WS (3)
     Associate Solicitor-Energy and Resources
     Regional Director, Boulder City, Nevada
     W.O. Codes 102, 200, 300, 600

WBR:ABurke:rp:10/10/85:X4690

# EXHIBIT 5

Y 4.Ap 6/1:En 2/2/1986/pt.3

# ENERGY AND WATER DEVELOPMENT
# APPROPRIATIONS FOR 1986

# HEARINGS

BEFORE A

## SUBCOMMITTEE OF THE

# COMMITTEE ON APPROPRIATIONS

# HOUSE OF REPRESENTATIVES

### NINETY-NINTH CONGRESS

#### FIRST SESSION

SUBCOMMITTEE ON ENERGY AND WATER DEVELOPMENT

**TOM BEVILL**, Alabama, *Chairman*

LINDY (MRS. HALE) BOGGS, Louisiana
BILL CHAPPELL, Jr., Florida
VIC FAZIO, California
WES WATKINS, Oklahoma
BILL BONER, Tennessee

JOHN T. MYERS, Indiana
VIRGINIA SMITH, Nebraska
ELDON RUDD, Arizona

HUNTER L. SPILLAN, GEORGE A. URIAN, DONALD P. SMITH, and AARON D. EDMONDSON, *Staff Assistants*

## PART 3

| | Page |
|---|---|
| Tennessee Valley Authority | 1 |
| Appalachian Regional Commission | 267 |
| Testimony of the Secretary of the Interior | 349 |
| Bureau of Reclamation | 349 |

Printed for the use of the Committee on Appropriations

GELMAN LIBRARY
George Washington University
Washington D.C. 20052

MAY 2 1985

Government Documents
Depository 0091

706



707

142

# PROJECT DATA SHEET

PS-46-D (PR)
Bureau of Reclamation

| | Completion Date | % Complete | Date |
|---|---|---|---|
| | 1992 | 0 | 1/31/85 |

| BENEFIT COST RATIOS | | |
|---|---|---|
| Based on Direct Benefits | Based on Total Benefits | Date |
| 1.4 4/ | 1.4 3/ | 10/1/85 |

**REGION:** Lower Colorado

**PROJECT AND STATE:** HEADGATE ROCK HYDROELECTRIC PROJECT, ARIZONA

**AUTHORIZATION:** Snyder Act of November 2, 1921 1/

**LAND CERTIFICATION:** None Required 2/    DEFINITE PLAN REPORT

## SUMMARIZED FINANCIAL DATA

| | | | |
|---|---|---|---|
| Total Federal Obligations (Reclamation) 8/ | $58,100,000 | Allotments to September 30, 1984 | |
| Net Property and Other Transfers: | | Allotments for FY1985 | |
| Federal Participation 4/ | 1,387,000 | | |
| Non-Federal Participation | - | | |
| Adjustment 5/ | 2,516,000 | Allotments Required for FY 1986 | 1,000,000 |
| Total to be Allocated | $67,003,000 | Balance to Complete after FY 1986 | $57,100,000 |

### ALLOCATIONS 6/

| | | REPAYMENT | |
|---|---|---|---|
| Irrigation | $15,645,000 | Amount Repaid by Irrigators | |
| Power | 51,358,000 | Amount Repaid by Power 7/ | $67,003,000 |
| M & I Water | | Amount Repaid by M & I Water | |
| Recreation | | | |
| F & WL | | | |
| Flood Control | | | |

### AMOUNTS PER ACRE

Irrig. Invest. per Acre
Repayment of Investment per Acre:
By Irrigators
By Power Revenues
By M & I Water Uses

Payment Capacity per Acre
Annual Charges:
O & M
Construction

| | | | |
|---|---|---|---|
| Other | | Nonreimbursable | |
| Total | $67,003,000 | Total | $67,003,000 |

**STATUS OF REPAYMENT CONTRACT:** Reclamation will transfer the plant to the Bureau of Indian Affairs upon completion of construction. Requirement for repayment will be determined by the Bureau of Indian Affairs.

**STATUS OF NEPA COMPLIANCE:** Finding of No Significant Impact was filed on August 22, 1980.

**DESCRIPTION:** This project is located at Headgate Rock Dam on the Colorado River between La Paz County, Arizona, and San Bernardino County, California, near Parker, Arizona. The project consists of constructing a powerplant and installing three turbine generating units and associated transmission facilities at the existing dam. The project will provide for a total of 19,500 kilowatts of capacity and an annual average production of 86.5 million kilowatt-hours of energy for irrigation and drainage pumping and other uses on the Colorado River Indian Reservation.

GPO 842-446

PROJECT DATA SHEET - 2

HEADGATE ROCK HYDROELECTRIC PROJECT, ARIZONA

Funds to start preconstruction activities were appropriated to the Bureau of Indian Affairs in FY 1980. Funds to start construction will be requested for fiscal year 1986.

OTHER INFORMATION: Headgate Rock Dam was authorized under the River and Harbors Act of 1935. Construction was initiated by the Bureau of Indian Affairs in 1938. The dam was completed in 1941 to provide permanent diversion facilities for irrigation of up to 100,000 acres of land in Arizona on the Colorado River Indian Reservation. The powerplant is considered to be an extension of the Colorado River Indian Irrigation Project. Designs and specifications have been essentially completed. The cost of this work was reimbursed to Reclamation by the Bureau of Indian Affairs under a Memorandum of Understanding dated May 7, 1980. The present plan envisions construction responsibility, including funding, being fulfilled by the Bureau of Reclamation under a revised Memorandum of Understanding with the Bureau of Indian Affairs. Upon completion, the entire plant will be transferred to the Bureau of Indian Affairs for operation and maintenance and repayment.

Footnotes:

1/ Construction of a powerplant at Headgate Rock Dam by Reclamation is authorized under the Snyder Act of November 2, 1921, 42 Stat. 208.

2/ An Advanced Planning Report was submitted to and approved by the Bureau of Indian Affairs in June 1980. This report will serve as a Definite Plan Report.

3/ The ratios were computed using the interest rate of 7.625 percent.

4/ Represents funds transferred to Reclamation by the Bureau of Indian Affairs for design and specifications prior to Reclamation's decision to seek funding for construction of this project.

5/ Represents reimbursable interest during construction of $7,516,000 for power.

143

709

PROJECT DATA SHEET - 3
HEADGATE ROCK HYDROELECTRIC PROJECT, ARIZONA

Footnotes: (continued)

6/ Explanation of changes in allocations from fiscal year 1985 Budget Justifications:

| Allocation | FY 1985 estimate | FY 1986 estimate |
|---|---|---|
| Irrigation . . . . . . . . . . . . . . | $ 15,014,000 | $ 15,645,000 |
| Power . . . . . . . . . . . . . . . . | 46,308,000 | 51,358,000 |
| Total . . . | $ 61,322,000 | $ 67,003,000 |

Explanation

Amount of Change

$ 5,681,000

Indexing (Oct. 1984 to Oct. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 5,681,000

7/ Upon completion, Reclamation anticipates transfer of the plant to the Bureau of Indian Affairs (BIA) for operation and
maintenance and repayment. It will be the responsibility of BIA to establish the power repayment policy.

8/ This project is authorized under the provisions of the Snyder Act which does not specify an appropriation ceiling.

144

710

145

HEADGATE ROCK HYDROELECTRIC PROJECT, ARIZONA

PHYSICAL DATA ON STRUCTURES - 4

CONSTRUCTION PROGRAM:

Headgate Rock Dam Powerplant

Three Generating Units - 6,500 kilowatts each

Transmission Line and Switchyard Additions

69-kilovolt Transmission Line - 0.6 mile

711

146

Appropriation Title:  Construction Program
                      Construction Rehabilitation

HEADGATE ROCK HYDROELECTRIC PROJECT, ARIZONA - 5

FISCAL YEAR 1986

Work Proposed                                                                    Program

Headgate Rock Dam Powerplant. - A contract for furnishing turbines, generators, and    $1,000,000
governors will be awarded.                                                       _____

                                                          TOTAL                  $1,000,000
                                                                                 _____

# EXHIBIT 6



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
COLORADO RIVER AGENCY
Route 1, Box 9-C
Parker, Arizona 85344



IN REPLY REFER TO:
Branch of Electrical Services – MSC 462

JUN 2 9 2007

Mr. Daniel Eddy, Jr., Chairman
Colorado River Indian Tribes
Route 1, Box 23-B
Parker, Arizona 85344

Dear Chairman Eddy,

Thank you for your letter dated May 22, 2007 requesting information on the spillway gate work at Headgate Rock Dam. Specifically, you requested information on the upcoming replacement of the gates. Please be advised that there was never any plan to replace the spillway gates at the Dam. The plan was and is to complete a major rehabilitation of the existing gates pursuant to the interagency agreement between the Bureau of Indian Affairs and the Bureau of Reclamation signed on March 28th, 1988. Specifically, the Interagency Agreement delegates responsibility to the Bureau of Reclamation to oversee the operation and maintenance of the power plant, the dam structure and the spillway gates. Employing this agreement, the Bureau of Indian Affairs, Colorado River Agency-Electrical Services tasked the BOR with preparing design documents and specifications for rehabilitation of the gates, develop a contract, advertise and award the work to a qualified contractor and oversee the on-site work. The rehabilitation work is now in process and the first gate is currently back in position and being fine tuned for operation. The plan is for all ten (10) gates to be rehabilitated. As it stands the contractor, Alltech Engineering, is progressing along finishing the first gate and will be starting the second gate shortly.

In your letter you requested information to six (6) specific areas of concern. I have addressed each item of concern below in order of request.

1.    **Opportunity for CRIT to participate:** The contract has already been awarded and the rehabilitation work is in progress. The only opportunity for CRIT to participate in this specific project at this time is employment through the TERO Office which the Contractor has explored.

2.    **The Time-frames for Departmental Decisions:**

      a. 12/21/2003 - Original request from BIA to BOR noting that a budget amendment had been developed to fund the initial design and specifications for the contract to rehabilitate the spillway gates.

b. 08/18/2005 – An amendment was established to fund the first year of the contract to rehabilitate the spillway gates.

c. 10/28/2006 – An additional amendment was established to insure funding for the first two years of the spillway rehabilitation contract.

d. 07/07/2006 The request for proposal was advertised for potential bidders.

e. 12/20/2006 The contract was awarded to Alltech Engineering after the requests for proposals were evaluated.

3. **The estimated time-frame for the initiation and completion of the Project:**

a. Contract awarded on 12/20/2006

b. Completion date: 04/07/2009

4. **Funding Source:** The funding source for the spillway rehabilitation is the CRA-Electrical Services operation and maintenance reserves.

5. **Potential disruption to irrigation and power operations:** There are no planned interruptions to either irrigation or power operations during the life of the contract. The power bay gates are only to be done during regularly scheduled maintenance outage periods used yearly by the BOR-BIA to do routine and any large scale maintenance projects. Penalty clauses have been included in the contract. If the Contractor violates the dates for completion during the outage periods they will have to pay stiff penalties.

6. **Other pertinent information:** CRIT is welcome to schedule on-site visits to view any of the work during the life of the contract. Please contact CRA-Electrical Services to coordinate any potential visits to the site.

The Colorado River Agency will schedule a meeting with all interested parties at CRIT to discuss this contract or any future potential contracts. Specifically, we would like to address how you would prefer we involve CRIT in future contract development and award actions. If there is any issue you want to be presented or addressed at this meeting or if you would also like a representative from the Bureau of Reclamation to attend, please let us know.

If you have any questions please contact Scott Sutliff or Roger Hawkins at CRA-Electrical Services at 669-7156 or 669-7155 respectively.

Sincerely,

Perry J. Baker
Superintendent, CRA

# EXHIBIT 7



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WESTERN REGION
400 North 5th Street
Two Arizona Center – 12th Floor
Phoenix, Arizona  85004



IN REPLY REFER TO:

Division of Natural Resources
MS-460

## JAN 16 2008

Mr. Steven McHugh
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C.  20006

Dear Mr. McHugh:

This responds to your correspondence to this office dated July 26, 2007, August 14, 2007, August 31, 2007, October 30, 2007, and November 14, 2007, on behalf of the Colorado River Indian Tribes (CRIT).  There is related correspondence on this matter from the Bureau of Indian Affairs (BIA) either to you or the CRIT Chairman dated June 29, 2007, August 8, 2007, and November 16, 2007.  A courtesy copy of this response has been provided to the CRIT Chairman.

On November 16, 2007, I advised you that a response to your letters would be forthcoming within 60 days.  The underlying issue described in your correspondence is your contention that the use by the BIA of Headgate Rock Dam power revenues for rehabilitation of the Headgate Rock Dam spillway gates is not authorized by 25 U.S.C. 385c, and you appealed the BIA decision with respect to the obligation, disbursement, or use of the power revenues for rehabilitation of the spillway gates.  The following explanation provides BIA's response.  The facts and authorities provided in the explanation below: (1) clearly show that use of the power revenues for rehabilitation of the spillway gates is authorized by 25 U.S.C. 385c; and (2) indicate that the BIA action obligating and disbursing the funds for this purpose is not an action that is appealable under 25 CFR Part 2.

I would be pleased to meet with you and CRIT to discuss this information further.

Headgate Rock Dam Authority[1]

The Headgate Rock Dam and its associated irrigation facilities and power plant were authorized by Congress under the Rivers and Harbors Act of 1935 (Act), 49 Stat. 1028.  The Act provides:

---

[1] See January 9, 2001, Memorandum of the Acting Associate Solicitor of Indian Affairs regarding Repayment of Federal Investment in the Headgate Rock Hydroelectric Project.

SEC. 2. That for the purpose of controlling floods, improving navigation, regulating the flow of the streams of the United States, providing for storage and for the delivery of the stored waters thereof, for the reclamation of public lands and Indian reservations, and other beneficial purposes, and for the generation of electric energy as a means of financially aiding and assisting such undertakings . . The construction by the Secretary of the Interior of a dam in and across the Colorado River at or near Head Gate Rock, Arizona, and structures, canals, and incidental works necessary in connection therewith is hereby authorized . . . .

Construction of the dam was completed in 1941 and provides permanent diversion facilities for irrigation of land on the CRIT Reservation. Construction of the hydroelectric facilities to support the irrigation project was not initiated until supplemental appropriations for this purpose were provided by Congress in Fiscal Year 1985.[2] The planning report for this phase of the project reflects the understanding that the electricity produced by the power plant would be used on the CRIT Reservation to operate the irrigation and drainage facilities on the Reservation and to supply a portion of the residential and commercial power requirements of the Reservation land.[3]

## Collection of Power Revenues Associated with Headgate Rock Dam - Authorities

There are several statutes that govern revenues collected from power operations on Indian irrigation projects. These statutes are:

### A. Appropriations and disposition of power revenues (25 U.S.C. 385c)

This statute provides:

Revenues collected after August 7, 1946, from power operations on each Indian irrigation project and deposited into the Treasury for credit to miscellaneous receipts pursuant to section 4 of the Permanent Appropriations Act, 1934 (48 Stat. 1227), or pursuant to other provisions of law, are authorized to be appropriated annually in specific or in indefinite amounts, equal to the collections so credited, for the following purposes in connection with the respective projects from which such revenues are derived: (1) payment of the expenses of operating and maintaining the power system; (2) creation and maintenance of reserve funds to be available for making repairs and replacements to, defraying emergency expenses for, and insuring continuous operation of the power system, . . . (3) amortization, in accordance with the repayment provisions of the applicable statutes or contracts, of construction costs allocated to be returned from power revenues; and (4) payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law.

---

[2] Pub. L. No. 99-88, 99 Stat. 293, 319-20, which appropriated $8.3 million for this purpose under the authority of the Snyder Act, 25 U.S.C. 13.

[3] Water and Power Resource Service, U.S. Department of the Interior, Headgate Rock Hydroelectric Project, Advance Planning Report Prepared for the Bureau of Indian Affairs (June 1980).

B.  Proceeds from Power (Pub. L. 82-135, 65 Stat. 254)

This statute provides:

> Sums not in excess of the amount of power revenues covered into the Treasury
> during the current and each succeeding fiscal year to the credit of each of the
> power projects, including revenues credited prior to August 7, 1946, to remain
> available until expended for the purposes authorized by section 3 of the Act of
> August 7, 1946, as amended, . . . in connection with the respective projects from
> which such revenues are derived.

C.  Investments of Collections from Power Operations on Irrigation Projects (25 U.S.C.
162a(b))

This statute provides:

> The Secretary of the Interior is authorized to invest any operation and
> maintenance collections from Indian irrigation projects and revenue collections
> from power operations on Indian irrigation projects in:
>
> (1)  Any public-debt obligations of the United States;
> (2)  Any bonds, notes, or other obligations which are unconditionally guaranteed
>       as to both principal and interest by the United States; or
> (3)  Any obligations which are lawful investments for trust funds under the
>       authority or control of the United States.
>
> The Secretary of the Interior is authorized to use earning from investments under
> this subsection to pay operation and maintenance expenses of the project
> involved.

Repair/Rehabilitation of Headgate Rock Dam Spillway Gates

Upon review of pertinent information, it is clear that repair or rehabilitation of the spillway gates
fits within the purpose and authority found in 25 U.S.C. 385c. There are ten gates at the Dam---
gates 1-7 are spillway gates and gates 8-10 are powerhouse gates. All ten gates are currently
being repaired through an interagency agreement (IAA) between BIA and the Bureau of
Reclamation.[4] This IAA is a federal procurement transaction which provides for operation and
maintenance activities at Headgate Rock Dam. Funding modifications to this IAA are executed
annually or as needed to assure proper operation and maintenance of the BIA electrical system at
the Colorado River Agency associated with Headgate Rock Dam. Funds obligated to this IAA,
but unexpended, continue to earn interest in the Treasury account established for the program.

---

[4] Interagency Agreement No. H50C14IA8210 between BIA and the Bureau of Reclamation has been in place since
March 1988.

All transactions under this IAA are approved by a warranted contracting officer. The most recent funding transaction approved by the BIA warranted contracting officer regarding this matter occurred on November 30, 2006.

The ten gates at the Dam are connected to and operated under a System Control and Data Acquisition (SCADA) program which adjusts all the gates automatically depending on the water flow and the amount of electricity being produced. A properly functioning spillway gate is crucial to the operation of the powerhouse. If a power plant equipment failure occurs, the SCADA system responds by shutting down one or more of the three powerhouse units, depending on the problem encountered, thereby closing the gates to the powerhouse, and routing the water to the spillway gates. Due to the fact that the generating facility at Headgate Rock Dams is a run-of-the-river facility, there is no ability to store water above the dam structure. Therefore, the spillway gates have to be able to pass the water around the powerhouse to avoid flooding the powerhouse. Additionally, if a spillway gate fails and is stuck in an open position, power generation and deliveries into the irrigation canal will cease. In addition, a partial dewatering of the river channel affecting upstream and downstream entities will occur. The SCADA system also has to maintain the river level at 364.4 feet plus .25 feet and minus .4 feet. The SCADA system is constantly adjusting the spillway gates and the main turbine/generator units to stay within this window.

Operation and Maintenance Activities at BIA's Electrical System

The arrangement between the BIA and the Bureau of Reclamation concerning operation and maintenance activities at Headgate Rock Dam is one of long-standing. This arrangement is rational and appropriate in light of the fact that under Secretarial delegation, the Bureau of Reclamation is responsible for managing the other facilities and water deliveries on the lower Colorado River. However, if CRIT believes that it would like to assume all or part of the operation and maintenance activities associated with the BIA electrical system at the Colorado River Agency, I would be happy to discuss this matter with you.

BIA's Decision to Obligate and Disburse These Funds is Not Appealable Under 25 CFR Part 2

You contend that the use by the BIA of Headgate Rock Dam power revenues for rehabilitation of the Headgate Dam spillway gates is not authorized by 25 U.S.C. 385c, and you appeal the BIA decision with respect to the obligation, disbursement, or use of the power revenues for rehabilitation of the spillway gates. Neither the award of Federal procurement contracts nor performance under those contracts are matters which arise under 25 CFR Chapter I, or which fall with any of the other areas of the jurisdiction of the Interior Board of Indian Appeals as described in 43 CFR Part 4.1(b)(2). See *Pierre Indian Learning Center v. Aberdeen Area Director*, Docket No. IBIA 99-11-A, 1998 I.D. Lexis 136; 33 IBIA 90 (December 30, 1998).

Page 5

<u>Conclusion</u>

Thank you for the opportunity to provide this information to you. If you have any questions, or would like to arrange a meeting to discuss this matter, please contact Ms. Cathy Wilson, Supervisory Water Rights Specialist, at (602) 379-6789.

Sincerely,

Regional Director

cc: Superintendent, Colorado River Agency
    Chairman, Colorado River Indian Tribes

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE COLORADO RIVER INDIAN TRIBES | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:06cv02212-JR |
| DIRK KEMPTHORNE, Secretary of the Interior, <u>et al</u>. | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF LELAND R. GARDNER

I, Leland R. Gardner, am competent to make this declaration.

1.    I submit this declaration in support of plaintiff's motion for preliminary injunction.

2.    I am a Registered Professional Engineer in California.  I hold a bachelors and masters degree in civil engineering and a masters in business administration.  A true and accurate copy of a summary of my education and professional experience is attached hereto.

3.    For a number of years, I was an employee of the Pacific Gas & Electric Company ("PG&E") where, among other things, I supervised the department responsible for setting power rates and was the chief spokesman for the company in formal rate hearings before the California Public Utilities Commission.  Since 1991 I have owned and operated a consulting firm organized to assist Indian tribes develop and protect their natural resources.

4.    I was initially retained by the Colorado River Indian Tribes ("CRIT") in 1991 to prepare a report on future electrical service on the Colorado River Indian Reservation ("Reservation").  I completed this report in 1994.

5.    Since completing the report on future electric service, I have monitored local and regional electrical power developments concerning Bureau of Reclamation ("BoR"), Bureau of Indian Affairs ("BIA"), and the Western Power Administration ("WAPA").

6.    I recently assisted CRIT's successful effort to secure an allotment of power from WAPA.

7.    I remain in close contact with the Colorado River Agency, Branch of Electric Service, which operates and manages the BIA-owned electrical power system on the Reservation.

8.    My responsibilities as a consultant include periodic visits to the Reservation to meet with Tribal and BIA officials and employees. I use these opportunities to monitor the on-Reservation power system.

9.    I also monitor the BIA's plans and programs for maintaining and upgrading the power system's facilities, including plans for and uses of the CRA Electrical Service operation and maintenance reserves ("Electrical Trust Fund").

10.    From 2001 to 2003 I represented CRIT's interests in the development of an external study of rate structure and management of the power system performed by Electric Systems Consultants ("ESC") under contract to BIA.

11.    The Electrical Trust Fund is comprised of revenues from local ratepayers plus off-system revenues from wholesale purchasers. The BIA has informed me that the current balance in Electrical Trust Fund is about $20 million. This figure does not take into account BIA's recent decision to fund the $9 million rehabilitation of spillway gates at Headgate Rock Dam from the Electrical Trust Fund. In recent years, the Electrical Trust Fund has grown by some $1.2 million annually.

12.    I have been asked to identify and estimate the existing financial needs for operating and maintaining the power system on the Reservation and for maintaining reserve funds for making repairs and replacements to, defraying emergency expenses for, and insuring continuous operation of the system, which expenses could be paid from the Electrical Trust Fund.

13.    In my professional judgment, the following needs exist that could and should be paid from the Electrical Trust Fund:

A. Make needed system improvements. (1) In particular, the delayed looping of the 69 KV system between the Big River substation and the Poston Substation should be completed, at a cost of about **$1.5 to $2 million**. This would increase the reliability of the system. (2) Also, the addition of a major 230/161/69 KV substation to connect to the WAPA system at Black Point, on the California portion of the Reservation, would give the Reservation a second WAPA grid connection at a shared cost of perhaps **$4-$5 million**. This would greatly increase reliability and allow access to the electric grid for future reservation renewable generation developments. (3) Review and complete system improvements recommended by ESC as well as the replacement of old wooden poles at a cost of approximately **$4 million**. Such improvements will improve service to customers.

B. Enhance customer operations. (1) Adopt the FERC Uniform System of Accounts used by American regulated electric utilities and cooperatives. This will enable timely and meaningful operational reports and

accurate pairing of relevant revenues and costs. ESC and other professional reviewers have consistently noted this major operational deficiency. A multi-year program would probably cost **$3 million**. (2) Make the rate conditions more customer-friendly, notably by adopting a budget billing option so customers can pay a uniform amount every month; and by adopting a net-metering rate option that will allow customers to install rooftop solar modules and sell excess generation to the utility. These options should cost less than **$1 million**. (3) Initiate a customer awareness program that promotes summer peak load conservation and safety awareness, particularly among children. This program should resemble similar regulated utility programs and cost less than **$500,000** annually,

     C. Improve and maintain cooperation with CRIT. (1) Cooperative electric planning between BIA and CRIT is badly needed. CRIT wants commercial and industrial developments to promote employment and associated revenues but is unable to attract developments without a guarantee of reliable electric service. Meanwhile BIA has no responsibility for such economic developments and has no apparent plans for providing service when and where needed. Serious and sustained cooperative planning would be of joint benefit and is a proper utility operating cost, perhaps **$400,000** annually that BIA ought to provide. (2) Similarly, cooperative planning is clearly needed regarding future electric resources for the Reservation. BIA is the named recipient of two federal power allocations used for Reservation service. On the other hand, CRIT has recently received its own power allocation under a new DOE procedure that recognizes a tribal power preference equal to the preference granted to a state or city. CRIT is also considering whether it may qualify for other federal allocations or try to develop renewable solar and other power resources at the Reservation. Such load/resource planning is a traditional utility operating function that BIA should support. Its cost would probably be **$300,000 to $600,000** per year.

In total, I estimate that the foregoing needs would cost between $14.7 - $16.5 million.

    14.    In my professional judgment, the BIA should also retain a contingency reserve of at least $ 10 million in the Electrical Trust Fund. This figure is based on a discussion with the BIA electric supervisor about five years ago. At that time, it was believed that a sudden loss of major transformer capacity due to lightning or fire would require an emergency expenditure of about $8 million to restore the system to normal service. Allowing for inflation and for unforeseen events, I believe that $10 million ought to be the minimum balance retained as a contingency reserve under current circumstances.

    15.    The $20 million accumulated balance in the Electrical Trust Fund (assuming this figure is correct) is insufficient to cover all the foregoing needs of the power system, although it could cover many of them. If $9 million or more of this current balance is expended for the rehabilitation of the spillway gates on Headgate Dam, the remainder will be grossly insufficient, in my opinion, to cover the existing needs of the power system.

16.     If some of these needs are not addressed because of lack of available funding, the result likely will be service interruptions (power outages) or reduced levels of service, depending on the particular need at issue.

17.     If the funds expended from the Electrical Trust Fund for rehabilitation of the spillway gates subsequently were restored to the trust fund sometime in the future, some of the unmet needs could be addressed at that time but service interruptions or losses that had occurred during the interim obviously could not be cured.    Likewise, lost business and economic opportunities during the interim period that were caused by deficiencies in the power system could not be cured after the funding was restored.  In addition, the cost of addressing these needs is likely to increase by approximately 5% annually.

Pursuant to the requirements of 28 U.S.C. § 1746(b), I declare under penalty of perjury that the foregoing is true and correct, this _18th_ day of February, 2008.

Leland R. Gardner

# 5129425_v2

-4-