IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE COLORADO RIVER INDIAN TRIBES<br>Route 1, Box 23-B<br>Parker, AZ  85344<br><br>          Plaintiff,<br><br>    v.<br><br>DIRK KEMPTHORNE,<br>SECRETARY OF THE INTERIOR<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C.  20240<br><br>HENRY M. PAULSON, JR.,<br>SECRETARY OF THE TREASURY<br>U.S. Department of the Treasury<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20220<br><br>          Defendants. | Case No. 1:06-CV-02212-JR |

## FIRST AMENDED COMPLAINT

1.    This is an action by an Indian tribe for an accounting of its trust funds, and for related relief based on the enumerations that follow.

## PARTIES

2.    Plaintiff, the Colorado River Indian Tribes ("CRIT"), is recognized by the United States as sovereign Indian tribe with legal rights and responsibilities, eligible for the special programs and services provided by the United States to Indians because of their status as Indian tribes.

3. Defendant Dirk Kempthorne is the Secretary of the Interior and charged by law with carrying out the duties and responsibilities of the United States as trustee for CRIT.

4. Defendant Henry M. Paulson, Jr. is the Secretary of the Treasury and in that capacity, is custodian of tribal trust funds with responsibility for the administration of such funds and the preparation and maintenance of records in connection with those funds.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1362. This is a civil action brought by an Indian tribe and arises under the Constitution, treaties and agreements between the United States and CRIT, federal common law, and the federal statutes governing the administration and management of property held by the United States in trust for tribes. The Court also has jurisdiction under 28 U.S.C. § 1361, 5 U.S.C. §§ 702, 706, as this is an action for injunctive relief to compel federal officials to perform a duty owed to the plaintiff and to invalidate agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

6. Venue is properly in this district under 28 U.S.C. § 1391(e) because this is an action in which Defendants are officers and employees of the United States acting in an official capacity, and a substantial part of the events or omissions giving rise to the claims herein have occurred within this judicial district.

## ALLEGATIONS

7. CRIT is a federally recognized Indian tribe organized pursuant to the *Indian Reorganization Act of 1934* (48 Stat. 984; 25 U.S.C. § 461 et seq.)

8. The Colorado River Indian Reservation ("Reservation") was established by an Act of Congress dated March 3, 1865 (13 Stat. 559) and expanded by subsequent Executive Orders

of November 22, 1873, November 16, 1874, and May 15, 1876, with the southern boundary of the Reservation to the east of the Colorado River confirmed by Public Law 109-47 (restoring lands covered by Executive Order dated November 22, 1915). CRIT occupies this Reservation of almost 270,000 acres of land located along both sides of the Colorado River in Arizona and California, and is the beneficial owner of this land, title to which is held in trust by the United States for the benefit of the Tribes. Public Law 88-302 (April 30, 1964).

9. CRIT is the beneficial owner of the Reservation's land and natural resources, including valuable sand, gravel and other mineral reserves, within the Reservation, title to which is held in trust by the United States for the benefit of CRIT. CRIT's assets include land valuable for agricultural purposes. These trust assets also include fixtures and improvements located on the Reservation, including the Colorado River Indian Tribes Irrigation Project and the Headgate Rock Hydroelectric Power Plant which generates electrical power.

10. Under law, tribal land held in trust by the United States is inalienable except as authorized by Congress. 25 U.S.C. § 177. Congress has granted the Secretary of the Interior authority to approve conveyances of certain interests in trust land, such as leases, easements, and rights of way. The law further establishes the terms and conditions under which such conveyances may be made, and generally requires that compensation be paid to the tribe for the use of tribal lands.

11. By various Acts of Congress, commencing with statutes adopted more than a century ago, Congress authorized the Secretary of the Interior to collect income from tribal trust property and to deposit such trust income in the United States Treasury and other depositary institutions for the benefit of the tribes. E.g., Act of March 3, 1883, c. 141, § 1, 22 Stat. 590, codified at 25 U.S.C. § 155. By subsequent statutes, Congress directed that interest be paid on

tribal trust funds, and required that such trust funds be invested. See, e.g., Act of February 12, 1929, c. 178, 45 Stat. 1164, codified as amended, 25 U.S.C. § 161b; Act of June 24, 1938, 52 Stat. 1037, codified as amended, 25 U.S.C. § 162a.

12. Defendants assumed control and management over trust property of CRIT. Defendant Secretary of Interior has approved leases, easements, and grants to other interests in trust lands of CRIT. Both Defendants have assumed responsibility for collection, deposit and investment of the income generated by trust land of CRIT. These include funds generated by sand and gravel bid deposits, bonuses, rents, lease and royalty payments, agricultural leases, and judgments paid to CRIT.

13. Because the United States holds tribal land in trust, it has assumed the obligations of a trustee. United States v. Mitchell, 463 U.S. 206, 225 (1983); Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001). As trustee, the United States has a fiduciary relationship and obligations of the highest responsibility and trust to administer the trust with the greatest skill and care possessed by the trustee. The United States "has charged itself with moral obligations of the highest responsibility and trust' in its conduct with Indians, and its conduct 'should therefore be judged by the most exacting fiduciary standards.'" Cobell, 240 F.3d at 1099 (quoting Seminole Nation v. United States, 316 U.S. 286, 297 (1942)).

14. The trust obligations of the United States include, among other duties, the duty to ensure that tribal trust property and trust funds are protected, preserved and managed so as to produce a maximum return to the tribal owner consistent with the trust character of the property.

15. The trust obligations of the United States include, among other duties, the duty: to maintain adequate records with respect to the trust property; to maintain adequate systems and controls to guard against error or dishonesty; to provide regular and accurate accountings to the

trust beneficiaries; to refrain from self-dealing or benefiting form the management of the trust property.

16. Congress has charged the Defendants with fulfilling the obligation of the United States as trustee and with responsibility for the administration and management of all trust property of CRIT and/or assets to be used for the benefit of CRIT.

17. Defendants control all the books and records of account relating to trust funds and trust property and/or assets to be used for the benefit of CRIT. Defendants, however, have never rendered a reliable, accurate or complete accounting to CRIT for its trust monies, trust assets and/or assets to be used for the benefit of CRIT. Defendants have further failed to establish any effective system or provision for regular or periodic accounting for the trust property and funds. As a consequence, Defendants have kept and continue to keep CRIT, as the trust beneficiary, uninformed as to the trust property it owns, what income the trust property has produced, and what disposition has been made of the income.

18. As found by the United States Inspector General for the Department of the Interior, the United States General Accounting Office, and the United States Congress, among others, there are massive and long-standing problems with the Defendants' administration of Indian trust funds. After a series of oversight hearings on Interior's management of Indian trust funds, Congress issued a report condemning those practices. See Misplaced Trust, Bureau of Indian Affairs Mismanagement of the Indian Trust Fund, H.R. Rept. No. 102-499, 102d Cong. 2d Sess. (1992). As Congress found:

> Scores of reports over the years by the Interior Department's Inspector General, the U.S. General Accounting Office, the Office of Management and Budget, have documented significant, habitual problems in BIA's ability to fully and accurately account for trust fund moneys, to properly discharge its fiduciary responsibilities, and to prudently manage the trust funds [Id. at 2] . . .

5

> The Bureau has repeatedly ignored directives to undertake needed management reform measures. [Id. at 3] . . .
>
> As a result of this dismal history of inaction and incompetence, there is no assurance that the Bureau actually desires to, or will, make any substantial advancement toward rectifying the basic financial management failures brought to their attention. Despite a decade of initiatives, the Bureau's headquarters leadership and accountability continue to be woefully inadequate. . . .
>
> It is apparent that top Interior Department officials have utterly failed to grasp the human impact of its financial management of the Indian trust fund. The Indian trust fund is more than balance sheets and accounting procedures. These moneys are crucial to the daily operations of native American tribes and a source of income to tens of thousands of native Americans. [Id. at 5.]

Congress further found the Defendants' administration of Indian trust funds to be:

> Grossly inadequate in numerous important respects. The Bureau [of Indian Affairs] has failed to accurately account for trust fund moneys. Indeed, it cannot even provide account holders with meaningful periodic statements on their balances. It cannot consistently and prudently invest trust funds and pay interest to account holders. It does not have consistent written policies or procedures that cover all of its trust fund accounting practices. Under the management of the Bureau of Indian Affairs, the Indian trust fund is equivalent to a bank that doesn't know how much money it has. [Id. at 56.]

19. Upon information and belief, Defendants' mismanagement of trust funds has resulted in losses to trust beneficiaries. However, the extent of such losses is unknown to CRIT because Defendants have failed to provide CRIT with a reliable, accurate or complete accounting of its trust funds, and further have failed to maintain accurate books and records of account, lost and destroyed relevant trust account records, failed or refused to disclose known losses to the trust beneficiaries, and failed or refused to reimburse trust beneficiaries for losses to their trust funds. See Misplaced Trust, H.R. Rept. No. 102-499 at 37-41.

20. By the Act of December 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329, Congress imposed two requirements on Defendants: 1) that they audit and reconcile tribal trust funds, and 2) that they provide the tribes with an accounting of such funds. Congress reaffirmed the two mandates of the 1987 Act in subsequent statutes, namely the Act of October 23, 1989, Pub. L. No. 101-121, 103 Stat. 701; the Act of November 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915, and the Act of November 13, 1991, Pub. L. No. 102-154, 105 Stat. 990. By these Acts, Congress further required that the Defendants certify, through an independent party, the results of the reconciliation of tribal trust funds as the most complete reconciliation possible of such funds.

21. To protect the rights of tribes until accountings of their trust funds could be completed, Congress has provided, in each Interior Department Appropriations Act since 1990 that "the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." See Act of November 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915; Act of November 13, 1991, Pub. L. No. 102-154, 105 Stat. 990; Act of October 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374; Act of November 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379; Act of September 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499; Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; Act of September 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009; Act of November 14, 1997, Pub. L. No. 105-83, 111 Stat. 1543; Act of October 21, 1998, Pub. L. No. 105-277, 112 Stat. 2681; Act of November 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501; Act of October 11, 2000, Pub. L. No. 106-291, 114 Stat. 922; Act of November 5, 2001, Pub. L. No. 107-63, 115 Stat. 414; Act of February 20, 2003, Pub. L. 108-7, 117 Stat. 1; Act of February 20,

2003, Pub. L. No. 108, 117 Stat. 11; Act of November 10, 2003, Pub. L. 108-108; Act of December 8, 2004, Pub. L. 108-447; and the Act of August, 2, 2005, Pub. Law 109-54.

22. On October 25, 1994, Congress enacted the American Indian Trust Fund Management Reform Act, codified at 25 U.S.C. §§ 4001-61. Under this Act, Congress recognized the United States' pre-existing trust responsibilities, and charged the Defendants with additional responsibilities to ensure proper discharge of the trust responsibilities of the United States. These include the duty to provide periodic, timely accountings of trust funds to tribal and individual Indian beneficiaries, and the duty to cause an annual audit of all trust funds to be conducted. 25 U.S.C. § 4011; 25 U.S.C. § 162a (d).

23. As evidenced by reports issued by Interior Department Inspector General, the General Accounting Office, and the Office of Management and Budget, among others, notwithstanding the foregoing Acts of Congress, Defendants have continued to fail to implement the reforms required by law. The Defendants' continued failure to implement reforms required by Congress and to provide timely and meaningful accountings is now the subject of pending litigation in federal court, Cobell v. Norton, No. 96-1285 (D.D.C.). The proceedings in that case, which are focused on trust accounts of individual Indians, confirm the Government's fiduciary obligations to all Indian trust beneficiaries and the Government's breach of those obligations by failing to account. See Cobell v. Babbitt, 91 F. Supp. 2d 1 (D.C.C. 1999), aff'd, 240 F.3d 1081 (D.C. Cir. 2001).

24. In the early 1990's, the United States Department of the Interior entered into a contract with Arthur Andersen accounting firm under which Arthur Andersen was to provide a reconciliation of certain tribal trust fund accounts.

25. CRIT is in receipt of a report prepared by Arthur Anderson and dated January 1996, which was reportedly delivered to CRIT at some point in 1996. The report is entitled "Tribal Trust Funds Reconciliation Project, Agreed-upon Procedures and Findings Report for Colorado River Indian Tribes." CRIT is also in receipt of certain additional documents and materials that Defendant has characterized as additions and supplements to the Arthur Andersen report. CRIT requested that the Defendants provide it with the 1996 Arthur Andersen report along with any relevant supplements and work materials. On or about October 31, 2006, Mr. John H. McClanahan, Tribal Trust Accounting Program Manager, hand delivered two (2) compacts disks (marked "CD1" and "CD2" respectively) and one (1) digital video disk to Plaintiff's counsel (hereinafter the "Anderson report" or "AA Report").

26. In the AA Report, Arthur Andersen expressly states that the work done does "not constitute an audit made in accordance with generally accepted auditing standards."

27. The Andersen report was not certified by an independent party as required by the Acts of October 23, 1989, Pub. L. No. 101-121, 103 Stat. 701; November 5, 1990, Pub. L. No 101-512, 104 Stat. 1915, and November 13, 1991, Pub. L. No. 102-154, 105 Stat. 990, described in paragraph 18 above. Similar reports prepared by Arthur Andersen for other tribes have been criticized by the General Accounting Office, among others. See United States General Accounting Office, Report to Senate Committee on Indian Affairs, BIA's Tribal Trust Fund Account Reconciliation Results, GAO Report No. B-266127, May 3, 1996.

28. The Andersen report does not constitute a reliable, accurate or complete accounting of CRIT's trust funds because, among other reasons: a) the report was not conducted pursuant to generally accepted accounting principles, but was based on procedures defined by the Bureau of Indian Affairs ("BIA"), which imposed limitations on the scope of the work and made

9

changes in methodologies over the course of the project that were not disclosed to CRIT; b) the report was premised on the erroneous assumption that an accounting of trust funds could be done based on review of information recorded in the Bureau of Indian Affairs' accounting system, without determining whether all receipts or income due had been collected and properly recorded by the Bureau, and therefore fails to address the possibility that materially significant transactions were not recorded by the Bureau or that the information as recorded by the Bureau was inaccurate or in error; c) the report does not disclose adjustments that were recommended by Arthur Andersen but which the Bureau of Indian Affairs did not accept; d) the report fails to address many transactions where accounting records could not be located. See United States General Accounting Office, Report to Senate Committee on Indian Affairs, BIA's Tribal Trust Fund Account Reconciliation Results, GAO Report No. B-266127, May 3, 1996.

29. CRIT did not accept the AA report as a full and complete accounting, nor has it accepted the balances of its trust funds, as reflected in the Andersen report.

30. To date, the Defendants have failed to provide CRIT with the legally required accounting of its trust funds.

31. Headgate Rock Dam (the "Dam") is located on the Colorado River within the CRIT Reservation. The Dam was authorized under the River and Harbors Act of 1935. Act of August 30, 1935, 49 Stat. 1028.

32. Construction of the Dam was initiated by the BIA in 1938 and was completed in 1941. The Dam is operated by the BIA.

33. The Dam was built as a diversion structure to provide irrigation water for over 100,000 acres on the CRIT Reservation. As constructed, the Dam had ten spillway gates. The dam was constructed, and the spillway gates were specifically designed, to provide a reliable

means of diverting water into CRIT's irrigation canal while permitting large amounts of water to bypass the dam, primarily to satisfy downstream diversions.

34. In 1977 the CRIT Tribal Council requested federal assistance in the construction of facilities to generate hydroelectric power on the Reservation. In 1980, the BIA requested the Bureau of Reclamation to update a 1967 feasibility report for the construction of a low head power generation plant at the Dam.

35. Congress appropriated funds in 1985 for the construction of a power plant at the Dam with three turbine generating units and associated transmission facilities. Pub.L. 99-88, 99 Stat. 293, 319-30. Construction was completed in 1992.

36. The purpose of the power plant was to provide for a total of 19,500 kilowatts of capacity and an annual average production of 86.5 million kilowatt-hours of energy for irrigation and drainage pumping and other uses on the CRIT Reservation.

37. Upon information and belief, construction of the power plant involved certain modifications to three of the existing spillway gates, numbers 8, 9, and 10, but no modifications were made to spillway gates numbers 1 through 7.

38. In 1946 Congress mandated the creation of separate trust funds for revenues collected from Indian irrigation projects: one related to collections made from irrigation water users, and the second related to revenues collected from power operations. Revenues collected from water users were to be used for the operation and maintenance of the relevant irrigation project. 25 U.S.C. § 385a. Conversely, revenues collected from power operations were to be used for the operation, maintenance and repair of the "power system." 25 U.S.C. § 385c.

39. Upon information and belief, pursuant to 25 U.S.C. § 385c, the BIA has deposited revenues collected from the operations of the BIA Colorado River Agency Branch of Electrical

11

Services into the BIA Colorado River Agency Electrical Services operation and maintenance reserves ("Electrical Trust Fund").

40. On May 22, 2007, CRIT Tribal Chairman Daniel Eddy, Jr. wrote to the BIA's Colorado River Agency seeking information about BIA's plans concerning the replacement or rehabilitation of the Dam spillway gates. He asked about the status and expected time-frame for such plans and whether the BIA had identified a funding source for the project.

41. On June 29, 2007, the BIA informed CRIT that: 1) it intended to rehabilitate, but not replace the spillway gates; 2); the rehabilitation project would be funded <u>entirely</u> from the Electrical Trust Fund and 3) the contract for the project already had been awarded. According to documents subsequently provided to CRIT by the BIA, the cost of the project exceeds $9 million.

42. CRIT filed a notice of appeal of the funding decision with the BIA's Western Regional Office on July 26, 2007. CRIT subsequently submitted a Statement of Reasons ("SOR") on August 31, 2007, arguing that the rehabilitation project did not fit within any of the enumerated purposes for which the Electrical Trust Fund can be used.

43. Thereafter, the BIA failed to respond to CRIT's appeal for two months, prompting CRIT to write to the BIA on October 30, 2007 about the matter and to request a decision within 30 days.

44. The BIA did not respond to CRIT's October 30, 2007 letter. Accordingly, on November 14, 2007, CRIT formally requested a decision on its appeal pursuant to 25 C.F.R. § 2.8.

45. On January 16, 2008, Allen Anspach, the Regional Director of the BIA Western Regional Office, responded to CRIT's appeal. He took the position that CRIT did not have a

right to appeal BIA's actions and that his letter was not subject to any further appeal within the agency.

46.     Mr. Anspach announced that the rehabilitation project was being performed through an interagency agreement between BIA and the Bureau of Reclamation. He stated that the most recent funding transaction had occurred on November 30, 2006, but he did not explain that transaction or provide any information about further funding transactions.

47.     Mr. Anspach asserted that "[t]here are ten gates at the Dam---gates 1-7 are spillway gates and gates 8-10 are powerhouse gates." He defended the propriety of BIA's funding of the rehabilitation projects as follows:

> The ten gates at the Dam are connected to and operated under a System Control and Data Acquisition (SCADA) program which adjusts all the gates automatically depending on the water flow and the amount of electricity being produced. A properly functioning spillway gate is crucial to the operation of the powerhouse. If a power plant equipment failure occurs, the SCADA system responds by shutting down one or more of the three powerhouse units, depending on the problem encountered, thereby closing the gates to the powerhouse, and routing the water to the spillway gates. Due to the fact that the generating facility at Headgate Rock Dams [*sic*] is a run-of-the-river facility, there is no ability to store water above the dam structure. Therefore, the spillway gates have to be able to pass the water around the powerhouse to avoid flooding the powerhouse. Additionally, if a spillway gate fails and is stuck in an open position, power generation and deliveries into the irrigation canal will cease.

## COUNT I
### Declaratory Judgment - Accounting

48. CRIT realleges and incorporates by reference the allegations contained in paragraphs 1 through 30 above.

49. Defendants owe CRIT a fiduciary duty and obligations of the highest responsibility and trust to administer CRIT's trust property with the greatest skill and care possessed by the trustee.

50. Defendants fiduciary duties include, among others, the duty to provide CRIT with a full and complete accounting of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT.

51. Defendants have failed to provide CRIT with an accounting of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT and this failure is a breach of Defendants' fiduciary duties to CRIT in violation of federal law.

52. CRIT is entitled to a declaratory judgment that the Defendants have not provided CRIT with a full and complete accounting of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT as required by law.

## COUNT II
### Injunction Compelling an Accounting

53. CRIT realleges and incorporates by reference the allegations contained in paragraphs 1 through 30 and 48 through 52 above.

54. Defendants' continuing failure to provide CRIT with complete and accurate accountings of its trust funds, trust assets and/or assets to be used for the benefit of CRIT will cause CRIT irreparable injury, as records necessary for proper accounting have been, and may

continue to be lost or destroyed, depriving CRIT of the information essential to determining whether these assets and funds have been properly administered.

55.     CRIT is entitled to declaratory and injunctive relief requiring Defendants to provide CRIT with a full and complete accounting of all of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT.

## COUNT III
### Violation of the Administrative Procedure Act

56.     CRIT realleges and incorporates by reference the allegations contained in paragraphs 1 through 47 above.

57.     The BIA's decision to fund the rehabilitation of the spillway gates from the Electrical Trust Fund and Mr. Anspach's letter of January 16, 2008 constitute final agency action.

58.     The Administrative Procedure Act provides that a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706.

59.     Funding the entire cost of the rehabilitation of the spillway gates from the Electrical Trust Fund violates 25 U.S.C. § 385c and the Appropriations Clause of the Constitution, and is otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with law.

60.     Secretary Kempthorne is required to invest the trust funds in the Electrical Trust Fund so as to generate interest income.  25 U.S.C. § 162a(b).

61.     The unlawful expenditure of funds from the Electrical Trust Fund to rehabilitate the spillway gates causes a loss of investment income in violation of 25 U.S.C. § 162a(b) and is otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**WHEREFORE**, CRIT prays for the following relief:

1. For a declaration that the Defendants have not provided CRIT with a full and complete accounting of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT as required by law;

2. For an injunction requiring the Defendants to provide a full and complete accounting of CRIT's trust funds, trust assets and/or assets to be used for the benefit of CRIT, including the CRA Power Trust Fund;

3. For an order holding unlawful and setting aside the decision to fund the rehabilitation of spillway gates 1-7 from the Electrical Trust Fund; and

4. For an order holding unlawful and setting aside the decision to fund the rehabilitation of spillway gates 8-10 from the Electrical Trust Fund except to the extent that such rehabilitation involves features of those gates that were constructed or modified in connection with the construction of the power plant;

5. For an order directing Defendant Kempthorne to restore to the Electrical Trust Fund all monies unlawfully expended on the rehabilitation of the spillway gates and all investment income that those funds should have accumulated had they not been unlawfully expended;

6. For an award of attorneys fees and costs as provided by law; and

7. For such other relief as may be just and equitable.

Dated:  February 20, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: /s/ Steven D. Gordon
Steven D. Gordon (D.C. Bar No. 219287)
Lynn E. Calkins (D.C. Bar No. 445854)
Stephen J. McHugh (D.C. Bar No. (485148)
Holland & Knight L.L.P.
2099 Pennsylvania Ave. NW, Suite 100
Washington, D.C. 20006
202-955-3000 (phone)
202-955-5564 (fax)

*Counsel for Plaintiff the Colorado River Indian Tribes*

*Of Counsel*

Eric N. Shepard
Attorney General
Colorado River Indian Tribes
Route 1, Box 23-B
Parker, Arizona 85344

## CERTIFICATE OF SERVICE

I certify that, on this 20th day of February, 2008 I electronically transmitted the foregoing Complaint to the Clerk of the Court, using the ECF systems for filing, and caused the ECF system to transmit a Notice of Electronic Filing to the counsel of record listed on the ECF system for this case.

/s/Steven D. Gordon
Steven D. Gordon

# 5104895_v3