# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COLORADO RIVER INDIAN TRIBES,    )
                                       )
        Plaintiff,                      )
                                       )
        v.                             )       Case No. 06-CV-2212-JR
                                       )
DIRK KEMPTHORNE, Secretary of the   )
Interior, and HENRY M. PAULSON, JR.,   )
Secretary of the Treasury,           )
                                       )
        Defendants.                 )
_____)

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants hereby submit the following Memorandum of Points and Authorities in Opposition to the Motion for Preliminary Injunction filed by Plaintiff Colorado River Indian Tribes ("CRIT") on February 20, 2008 (Dkt. 23)("CRIT's PI Motion").

CRIT requests that the Court enjoin the United States Department of the Interior ("Interior") and the Bureau of Indian Affairs ("BIA") from funding the rehabilitation of ten spillway gates on the Headgate Rock Dam with revenues derived from the operation of the hydroelectric power plant at the dam. As explained in greater detail below, CRIT's PI Motion must fail because CRIT has not met any of the criteria for this extraordinary remedy. CRIT fails to meet each of the prongs of the preliminary injunction test. First and foremost, CRIT has not demonstrated that it will be irreparably injured in the absence of injunctive relief, because the injuries it alleges either: (1) involve property to which CRIT does not have an interest; (2) are speculative or conjectural, and therefore insufficiently certain to constitute a cognizable injury; and/or (3) are economic, and therefore do not constitute irreparable harm. Second, CRIT has not demonstrated a likelihood that it will prevail on the merits of its underlying claim because BIA action to which it objects is not reviewable in this

Court, and, even if it were, BIA correctly applied the applicable law.  Finally, CRIT's motion for preliminary injunction should be denied, because granting the injunction might adversely affect Defendants, other interested parties, and the public interest.

## I.    RELEVANT FACTUAL BACKGROUND

The operation of Headgate Rock Dam is instrumental to providing valuable irrigation and hydroelectric power services to CRIT, as well as other Indian and non-Indian parties.  The dam is the centerpiece of a highly coordinated, interdependent, and unified system that provides electricity for the CRIT Reservation's domestic and commercial needs, as well as the power necessary to operate the Reservation's irrigation network.

### A.    Headgate Rock Dam

Congress authorized the construction of Headgate Rock Dam in 1935.  See Rivers and Harbors Act of 1935, ch. 831 § 2, 49 Stat. 1028, 1039-40.  Construction on the dam was initiated in 1938 and completed in 1941.  The dam is located on the Colorado River within the exterior boundaries of the CRIT Reservation.

Headgate Rock Dam consists of the dam structure and twelve gates.  See Exh. 1, Declaration of Scott Sutliff ¶¶ 6-7 ("Sutliff Dec.").  Of these gates, Gates 1 through 10 are "spillway gates" that operate collectively to control the water level behind, and the water flow through, the dam, while Gates 11 and 12 are "irrigation gates" that are situated at a higher elevation than the spillway gates and used to direct the water into the main irrigation canal.  Id.

Initially, Headgate Rock Dam was used to divert water for irrigation and development of reservation lands.  Nevertheless, from the beginning, both BIA and CRIT contemplated the possibility of using the dam to generate hydroelectric power.  See Exh. 2, Letter from Daniel Eddy,

Jr. to Walt Mills at 2 n.1 (dated May 19, 1993)("Generation of electricity at the Headgate Rock Dam was first contemplated when the dam was built in 1938. . . ."); Pl. Exh. 1, Department of the Interior, Office of Indian Affairs, Final Report, Headgate Rock Dam, at 3 (dated June 1, 1943)("Provision has been made for future electrical power installation providing the river degrades sufficiently in later years.").  In 1977, consistent with that understanding, CRIT requested the Interior Department help it develop a hydroelectric power facility at the dam that could be used to facilitate and expand its irrigation efforts.  After conducting a feasibility study, BIA endorsed CRIT's interest in developing a powerplant.  See Exh. 3, Headgate Rock Hydroelectric Project: Advanced Planning Report at 4 (dated June 1980).

        In 1985, Congress, pursuant to the Snyder Act, 25 U.S.C. § 13, appropriated monies to the Bureau of Reclamation ("BOR") "for the purpose of designing and initiating construction of the Headgate Rock Hydroelectric Project."  Supplemental Appropriations Act for Fiscal Year 1985, Pub. L. No. 99-88, 99 Stat. 293, 319 (1985).  Construction of the project involved the construction and placement of three hydroelectric turbines in front of Gates 8 through 10.  See Exh. 1, Sutliff Dec. ¶ 7.  Now, when water passes through Gates 8 through 10, it turns a turbine/generator in front of the gate and generates hydroelectric energy. Id.  BOR completed construction of the project in 1993 and transferred the facility to BIA for purposes of management and operations.  See Exh. 4, Interagency Agreement No. H50C14IAB210 at 1:12-14 ("Interagency Agreement").

        Power operations generate revenues from power customers.  See Exh. 5, Declaration of Perry J. Baker ¶ 10 ("Baker Dec.").  BIA charges fees for power provision.  Id..  The revenues collected in association with these sales are deposited as miscellaneous receipts into the General Fund of the Treasury.  Id.; 25 U.S.C. § 385c.  BIA uses these revenues  to pay for both routine and unexpected

operation and maintenance costs associated with the power system, and the Superintendent of the Colorado River Agency is authorized to collect revenues and make expenditures from these monies. See Exh. 5, Baker Dec. ¶ 10.

**B.      Spillway Gates Rehabilitation Project**

Headgate Rock Dam is operated pursuant to an Interagency Agreement between BOR and BIA. See Exh. 4, Interagency Agreement. The Interagency Agreement provides for routine maintenance of the dam's components, including the spillway gates, that are critical to maintaining water levels for irrigation and power operations. See id. ¶1, at 2. In 2003, to facilitate the rehabilitation of the spillway gates, BIA and BOR amended the Agreement to provide for the completion of the rehabilitation project. See Exh. 6, Letter from David M. Palumbo to Perry Baker (dated February 4, 2008)("Palumbo Letter").

Work on the rehabilitation of the spillway gates began in December 2006. See Exh. 1, Sutliff Dec. ¶ 9. BIA is using money from power revenues to fund the rehabilitation project. See Baker Dec. ¶ 9.

**C.      CRIT's Objections**

CRIT sent a letter challenging the manner in which BIA was funding the rehabilitation project to the BIA Western Regional Office on July 26, 2007. See Exh. 7, Letter from Stephen J. McHugh to Allen Anspach (dated July 26, 2007). At that time, CRIT argued that BIA's use of funds from power revenues to repair the spillway gates violated 25 U.S.C. § 385c and other applicable regulations and policies. See id. at 1. On January 16, 2008, BIA's Western Regional Director, Allen J. Anspach, issued CRIT a letter stating, among other things, that the use of power revenues to rehabilitate the spillway gates was lawful. See Pl. Exh. 7, Letter from Allen J. Anspach to Steven

J. McHugh (dated January 16, 2008)("Anspach Letter").

## II.   **RELEVANT PROCEDURAL BACKGROUND**

In its PI Motion, CRIT requests the Court enjoin the BIA from using funds from power revenues to finance the rehabilitation of the spillway gates. See CRIT's PI Motion at 1. CRIT's First Amended Complaint added a claim for violation of the Administrative Procedures Act ("APA"). See First Amended Complaint ¶¶ 56-61, at 15, filed February 20, 2008 (Dkt. 24)("First Amended Complaint"). CRIT contends that BIA's decision to fund rehabilitation of the spillway gates with monies from power revenues constitutes Final Agency Action, see id. ¶ 57, at 15, and that the decision is arbitrary, capricious, an abuse of discretion, or otherwise unlawful, see id. ¶ 58, at 15. CRIT also charges that the Interior Department is required under statute to invest monies in the power revenues account to generate income, and that unlawful expenditures causes an illegal loss of investment income. See id. ¶ 61, at 15. In association with this new claim, CRIT requests the Court: (1) declare unlawful BIA's decision to fund rehabilitation of Gates 1-7 from power revenues, see id. ¶ 3, at 16; (2) declare unlawful BIA's decision to fund rehabilitation of Gates 8-10 to the extent that rehabilitation is not connected with construction of the power plant, see id. ¶ 4, at 16; and (3) direct Defendant Kempthorne to restore all monies unlawfully expended on the rehabilitation project and all investment income that those funds should have generated had they remained in the power revenues account, see id. ¶ 5, at 16.

On February 21, 2008 CRIT filed a First Amended Complaint in its parallel action in the United States Court of Federal Claims ("CFC"). Count Four of that complaint alleges that the United States "violated its fiduciary and legal duties to CRIT with regard to maintenance of the Irrigation Project and caused damages to CRIT, including financial losses." Colo. River Indian

<u>Tribes v. United States</u>, No. 06-901 L (Fed. Cl.), First Amended Complaint ¶ 22 (Dkt. 17).  In its action in the CFC, CRIT alleges that the United States breached its fiduciary obligation by: (1) "failing to preserve and maintain the Irrigation Project;" (2) "failing to establish sufficient operation and maintenance rates;" and (3) "failing to collect operation and maintenance fees, and to appropriately invest and manage the fees it collected."  <u>Id.</u>

## III.     <u>STANDARD FOR GRANTING PRE-TRIAL INJUNCTIVE RELIEF</u>

The Supreme Court has emphasized that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, <u>by a clear showing</u>, carries the burden of persuasion."  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)(emphasis in original). In order to sustain a motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs bear the burden of establishing four requisite factors.  See <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers</u>, 415 U.S. 423, 442-43 (1974); <u>Mova Pharms. Corp. v. Shalala</u>, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  First, Plaintiffs must demonstrate a substantial likelihood of success on the merits.  See <u>Sorono Labs., Inc. v. Shalala</u>, 158 F.3d 1313, 1317 (D.C. Cir. 1998); <u>Mova Pharms. Corp.</u>, 140 F.3d at 1066.  Second, Plaintiffs must demonstrate that they will be irreparably injured if the Court does not issue a preliminary injunction.  See <u>Sorono Labs.</u>, 158 F.3d at 1317; <u>Mova Pharms. Corp.</u>, 140 F.3d at 1066.  Moreover, "the injury must be both certain and great; it must be actual and not theoretical."  <u>Wis. Gas Co. v. Fed. Energy Regulatory Comm'n</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)(per curiam).  Third, Plaintiffs must demonstrate that a preliminary injunction will not substantially injure another party.  See <u>Sorono Labs.</u>, 158 F.3d at 1317; <u>Mova Pharms.</u>, 140 F.3d at 1066.  This is a reflection of the fact that the Court is balancing the relative hardships of different parties in determining whether to issue a preliminary injunction.

See Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 318-19 (D.C. Cir. 1987).  Finally, Plaintiffs must demonstrate that a preliminary injunction would be in the public interest.  See Sorono Labs., 158 F.3d at 1317-1318; Mova Pharms., 140 F.3d at 1066.

## IV.    ARGUMENT

As the party requesting injunctive relief, CRIT bears the burden to prove that the imposition of a preliminary injunction is warranted at this time.  CRIT has not carried and indeed cannot carry its burden.  Each of the four factors that the Court has to consider weighs against granting a preliminary injunction.  Accordingly, the Court should deny CRIT's PI Motion.

### A.    CRIT Is Not Likely to Succeed on the Merits.

CRIT contends that, with respect to Count III in its First Amended Complaint, there is "an overwhelming likelihood of [its] success on the merits."  CRIT's PI Motion at 1.  As detailed below, CRIT's assertion is without merit.

### 1.    CRIT Lacks Standing to Assert Injury From Congress' Authorization to Use Revenues for Power Purposes.

Federal courts have "always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit."  Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982).  To satisfy the "case" or "controversy" requirement contained in Article III of the Constitution, "which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  Bennett v. Spear, 520 U.S. 154, 162 (1997)(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Standing is a threshold inquiry that "in no way depends on the merits of the petitioner's contention that particular conduct is illegal."

Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)(quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)).

CRIT cannot establish that it will suffer an injury in fact from the BIA's use of funds from the power revenues, because it does not possess any interest in the funds stored in the power revenues. Revenues that BIA collects in association with its power operations are neither trust funds in which CRIT has an ownership interest nor funds that the United States holds in trust for CRIT's benefit; rather, they are public monies subject to Congressional control. See Am. Fed'n of Gov't Employees, AFL-CIO, Local 1647 v. Fed. Labor Relations Auth., 388 F.3d 405, 408 (3d Cir. 2004)(noting that "public money includes money from any source such as taxes, customs and user fees, and other proceeds of government agency activities"). Indeed, the plain text of 25 U.S.C. § 385c instructs that the revenues collected from power revenues are to be "deposited into the Treasury for credit to miscellaneous receipts . . . ." 25 U.S.C. § 385c (emphasis added).[1] Consequently, Congress can use these public funds for any purpose. That Congress has chosen to appropriate the electrical power revenues back to BIA for the purposes articulated in 25 U.S.C. § 385c does not give CRIT a property interest in the money. Cf. Core Concepts of Fla., Inc. v. United States, 327 F.3d 1331, 1338 (Fed. Cir. 2003)(noting that judgment against a non-appropriated fund could not be paid out of Treasury's general fund); Elephant Butte Irrigation Dist. of N.M. v. U.S.

---

[1]    CRIT incorrectly states that Congress created separate trust funds for revenues collected from irrigation water users and revenues collected from power operations. See Memorandum in Support of Plaintiff's Motion for Preliminary Injunction at 7 (Dkt. 23)("CRIT's Memorandum"). 25 U.S.C. § 385a contains such a reference to trust funds, as it provides that irrigation revenues "shall be deposited into the Treasury for credit to a trust-fund account." 25 U.S.C. § 385a. Significantly, 25 U.S.C. § 385c contains no such reference to a trust fund, providing instead that revenues "collected from power operations on each Indian irrigation project and deposited into the Treasury for credit to miscellaneous receipts." 25 U.S.C. § 385c.

Dep't of Interior, 269 F.3d 1158, 1164-65 (10th Cir. 2001)(explaining that monies derived from power sales associated with Bureau of Reclamation irrigation projects become part of the General Fund of the Treasury).  In sum, the fact that BIA has chosen to use funds contained in the power revenues account cannot injure CRIT, because CRIT has no interest in that account.  Accordingly, CRIT has no standing to assert Count III in its First Amended Complaint, and the Court should deny its motion for preliminary injunction based thereon.

> **2.    The Revenues that Power Operations at the Headgate Rock Dam Generate Are Not Trust Funds in Which the Tribe Has a Property Interest.**

"It is, of course, well established that the government in its dealings with Indian tribal property acts in a fiduciary capacity." United States v. Cherokee Nation of Okla., 480 U.S. 700, 707 (1987).  That federal responsibility, however, "do[es] not create property rights where none would otherwise exist but rather presuppose[s] that the United States has interfered with existing tribal property interests."  Id.  In this case, there are no existing tribal property rights to which a federal "trust" responsibility could attach.

The seed monies used to build the dam projects were Congressional appropriations, not trust funds belonging to CRIT.  See Supplemental Appropriations Act for Fiscal Year 1985, Pub. L. No. 99-88, 99 Stat. 293, 319 (1985); see also Scholder v. United States, 428 F.2d 1123, 1129 (9th Cir. 1970)(explaining that "gratuitous appropriations of public moneys," even for the benefit of Indians, were not Indian monies, and distinguishing such appropriations from treaty or tribal funds that belong to the Indians and which the United States holds in trust on the Indians' behalf).  In distributing such funds, "the United States acts in no more a fiduciary capacity . . . than it does in distributing any funds appropriated by Congress." James v. U.S. Dep't of Health Human & Servs.,

No. 85-417, 12 Indian L. Rep. 3097, 3100 (D.D.C. Aug 14, 1985)(holding that monies spent pursuant to statutes that grant authority to spend gratuitous appropriations for the benefit of Indians are not trust property in which the Indians have an interest as beneficiaries)(attached as Exh. 8).

The general trust relationship alone does not support the inference that a monetary remedy is available for allegedly improper use of federal monies. In Mitchell v. United States, 445 U.S. 535 (1980)("Mitchell I"), the Supreme Court found a more substantial trust relationship than is the case here, as the United States held land in trust for Indian allottees, but because that trust relationship was limited, no inferences could be drawn to create an actionable money interest. Here, beyond the general trust relationship between CRIT and the United States, which is similar to that which exists between the United States and all other federally recognized Indian tribes, there is no specific trust at issue. There is not even a "bare" or "limited" trust, as was the case in Mitchell I, because there is no trust corpus. See Inter Tribal Council of Ariz., Inc. v. Babbitt, 51 F.3d 199, 203 (9th Cir. 1995)(noting that elements of a common law trust "are a trustee (the United States), a beneficiary (the Indian allottees) and a trust corpus (the regulated Indian property, lands, or funds)")(citing United States v. Mitchell, 463 U.S. 206, 225 (1993)("Mitchell II")). The United States Court of Appeals for the Ninth Circuit recently emphasized the importance of establishing the existence of trust property:

> We are not aware of any circuit or Supreme Court authority that extends a specific Mitchell-like duty to non-tribal resources. Indeed, as we recently stated in Marceau [v. Blackfeet Housing Authority, 455 F.3d 974 (9th Cir. 2006)], the government does not bear complete fiduciary responsibility unless it has "full control of a tribally-owned resource and manage[d] it to the exclusion of the tribe." 455 F.3d at 984 (emphasis added); see also id. at 984 ("[F]iduciary duties arise under Mitchell only where the federal government pervasively regulates a tribally-owned resource."); Inter Tribal Council of Arizona, Inc., 51 F.3d at 203 (finding no Mitchell-like trust duty because "[t]he off-reservation school was not part of Indian lands, but was

merely allocated by the BIA for use by the Tribes."). Therefore, because the tribes in Marceau failed to show how funding from the Department of Housing and Urban Development could be a tribal resource, the court held that no Mitchell fiduciary duty existed.

Gros Ventre Tribe v. United States, 469 F.3d 801, 813 (9th Cir. 2006)(emphasis in original).

Distribution of federal monetary assets with restrictions and conditions on the use of the federal monies does not make them trust assets or create fiduciary duties. See Marceau v. Blackfeet Housing Auth., 455 F.3d 974, 984 (9th Cir. 2006)("To say that government funding, conditioned on the performance of certain acts and heavily regulated by a government agency, is a tribal resource subject to Mitchell fiduciary duties is a step we are unwilling to take in the absence of precedent extending the doctrine that far."). Accordingly, CRIT simply has no right to any remedy directing that money already expended be replaced in the power revenues fund.[2]

### 3.    CRIT's Claim Is Outside the APA's Waiver of Sovereign Immunity Because CRIT Has an Adequate Remedy in the Court of Federal Claims.

Any cause of action that CRIT might otherwise have under the APA must also be rejected, because, to the extent that CRIT has a right to any monetary relief, that action is within the exclusive jurisdiction of the United States Court of Federal Claims. The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in

---

[2]    In its memorandum, CRIT also states that 25 U.S.C. § 162a(b) "direct[s] the Secretary of [the] Interior to invest the trust funds collected from power operations to generate an investment return." CRIT's Memorandum at 9. CRIT's characterization of 25 U.S.C. § 162a(b) incorporates a mandate that the plain language of the statute does not contain. See 25 U.S.C. § 162a(b)(providing that the Secretary is "authorized" to invest revenue collected from power projects in three categories of investment instruments). Moreover, 25 U.S.C. § 162a(b) unambiguously allows the Secretary "to use earning [earnings] from investments under this subsection to pay operation and maintenance expenses of the project involved."

a court [is] subject to judicial review."  5 U.S.C. § 704.  The APA does not, however, waive

immunity where there are adequate remedies in another court.  Suburban Mortgage Assocs., Inc. v.

U.S. Dep't of Housing & Urban Dev., 480 F.3d 1116, 1122 (Fed. Cir. 2007)(observing that a suit

may lie under the APA "only if there were 'no adequate remedy' in a court")(quoting 5 U.S.C. §

704).  In other words, the APA's limited waiver of sovereign immunity is unavailable "if an

adequate judicial remedy is already available elsewhere."  Consol. Edison Co. of N.Y., Inc. v. U.S.

Dep't of Energy, 247 F.3d 1378, 1382-83 (Fed. Cir. 2001). See also Transohio Sav. Bank v. Office

of Thrift Supervision, 967 F.2d 598, 607 (D.C. Cir. 1992).  In sum, 5 U.S.C. § 704 makes clear that

where agency action is otherwise reviewable in a court and an adequate remedy is available in

conjunction with that review, the APA's waiver of sovereign immunity under 5 U.S.C. § 702 is not

available.  See Consolidated Edison Co. of N.Y., 247 F.3d at 1382-85; Kanemoto v. Reno, 41 F.3d

641, 644 (Fed. Cir. 1994); Mitchell v. United States, 930 F.2d 893, 895-96 (Fed. Cir. 1991).

      CRIT has an "adequate remedy in a court," because an action for damages in the CFC under

the Indian Tucker Act [3] can provide the essential relief that CRIT seeks, assuming, arguendo, the

---

[3]    The Indian Tucker Act provides that:

    The United States Court of Federal Claims shall have jurisdiction of any claim
    against the United States accruing after August 13, 1946, in favor of any tribe . . .
    whenever such claim is one arising under the Constitution, laws or treaties of the
    United States, or Executive orders of the President, or is one which otherwise would
    be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe,
    band, or group.

28 U.S.C. § 1505.  The reference to "claims which otherwise would be cognizable in the Court of
Federal Claims" incorporates the Tucker Act, 28 U.S.C. § 1491.  The Tucker Act grants the CFC

    jurisdiction to render judgment upon any claim against the United States founded
    either upon the Constitution, or any Act of Congress or any regulation of an
                                     (continued...)

Tribe could: (1) establish on the merits the existence of a trust <u>res</u> in the power revenues; (2) prove

a breach of fiduciary duties; and (3) identify a source of substantive law that can be interpreted fairly

to mandate compensation for damages sustained as a result of the breach.  <u>See</u> <u>United States v.</u>

<u>Navajo Nation</u>, 537 U.S. 488, 506 (2003).  In determining whether there is an adequate remedy in

the CFC, the United States Court of Appeals for the Federal Circuit has stated that "we customarily

look to the substance of the pleadings rather than their form."  <u>Brazos Elec. Power Coop., Inc. v.</u>

<u>United States</u>, 144 F.3d 784, 787 (Fed. Cir. 1998); <u>See</u> <u>also</u> <u>Katz v. Cisneros</u>, 16 F.3d 1204, 1207

(Fed. Cir. 1994)(explaining that the court looks to the "true nature of action" rather than a plaintiff's

characterization of the case).

The "substance" or "true nature" of Count III in CRIT's amended complaint is that

Defendants have injured the Tribe by unlawfully expending monies from what CRIT refers to

inaccurately  as the "Electric Trust Fund."  CRIT seeks to be made whole monetarily by having

Interior reimburse the fund with any lost investment income.  <u>See</u> First Amended Complaint ¶¶ 59-

61, at 15, ¶¶ 3-5, at 16.  CRIT claims that there have been unauthorized expenditures from an alleged

trust fund.  Under these circumstances, the CFC is the only permissible forum for granting monetary

relief for a breach of trust; indeed, it is the <u>only</u> court that can award damages for a breach of trust.

<u>See</u> 5 U.S.C. § 702 (providing that the APA's waiver of immunity extends only to claims "other than

money damages").  The CFC, or its predecessor courts, have historically remedied Indian tribes'

breach of trust claims, and a substantial body of Supreme Court authority is built on the assumption

---

[3]/(...continued)

> executive department, or upon any express or implied contract with the United
> States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  <u>See</u> <u>United States  v. Navajo Nation,</u> 537 U.S. 488, 502-03 (2003).

that such claims should proceed under the Indian Tucker Act.  See United States v. Navajo Nation,

537 U.S. at 502-507 (discussing contours of Indian Tucker Act jurisdiction in breach of trust claims

brought in CFC); United States v. White Mountain Apache Tribe, 537 U.S. 465, 472-475

(2003)(same). See generally, Mitchell II, 463 U.S. 206;[4] Seminole Nation v. United States, 316 U.S.

286 (1942).

CRIT cannot claim that the relief it might seek in the CFC will be less than ideal, and it

cannot create an expanded waiver of the limited APA waiver of sovereign immunity.  CRIT may

not circumvent the CFC's jurisdiction under the Indian Tucker Act.  Because CRIT has an adequate

remedy in another forum, it is precluded from bringing its claim in this Court.

> ### 4.     Review of the BIA's Decision to Fund the Rehabilitation Project with Electric Power Revenues is Also Not Available Under the APA Because Allocation Decisions Are Committed to Agency Discretion.

The APA affords judicial review to "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

5 U.S.C. § 702.  Accordingly, to assert a claim under 5 U.S.C. § 702, a plaintiff must demonstrate

"that 'the challenged action has caused them injury in fact' and that the injury is 'to an interest

arguably within the zone of interests to be protected or regulated by the statutes that the agencies

---

[4]     In Mitchell II, the Supreme Court observed that the legislative history of the Indian Tucker Act exhibits a clear intent to provide a remedy in the Claims Court "when trust funds have been improperly dissipated or other fiduciary duties have been violated."  Mitchell II, 463 U.S. at 215 (quoting from H.R. Rep. No. 1466, 79th Cong., 1st Sess., at 4 (1945)).  The Supreme Court noted that a damages remedy in the Claims Court is superior to the remedy of declaratory or injunctive relief available in district courts, because Indians "are in no position to monitor federal management of their lands on a consistent basis," and the "trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement."  Mitchell II, 463 U.S. at 226-27.  See also United States v. White Mountain Apache Tribe, 537 U.S. at 478-79 (same).

were claimed to have violated." <u>Wilderness Soc'y v. Griles</u>, 824 F.2d 4, 11 (D.C. Cir. 1987)(quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 733 (1972)). The United States Court of Appeals for the District of Columbia Circuit has noted that determining whether a plaintiff is aggrieved is closely related to the question of whether the plaintiff has constitutional standing to bring the lawsuit.

> Although the analysis of whether a plaintiff is 'aggrieved' within the meaning of [5 U.S.C. § 702] and whether he has alleged a 'case or controversy' under Article III of the Constitution are, and should be, analytically distinct questions, the Supreme Court has interpreted both [the APA] and the Constitution as requiring plaintiffs to show that they are personally injured by the challenged action and that their injury is caused by that action.

<u>Wilderness Soc'y v. Griles</u>, 824 F.2d at 11. As discussed above, CRIT is not aggrieved by BIA's use of monies from the power revenues, because CRIT has no interest in those revenues.

Moreover, the APA does not allow judicial review "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Indeed, the APA bars judicial review of agency action where the statute implicated "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985). Consistent with this provision, the Supreme Court has identified several categories of administrative decisions "that courts traditionally have regarded as 'committed to agency discretion.'" <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993)(quoting <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 817 (1992)(Stevens, J., concurring in part and concurring in judgment)). Among these categories is "the allocation of funds from a lump-sum appropriation." <u>Lincoln v. Vigil</u>, 508 U.S. at 192.

In determining whether an action is committed to agency discretion, the court considers both the nature of the agency action, and the language of the statute that supplies the applicable standard

for the action under review.  See Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002).  First, the nature

of BIA's action in this case exemplifies the type of action that is most appropriate for agency

discretion.  The maintenance and operation of Headgate Rock Dam and its elaborate, complicated,

and interdependent irrigation and power-production systems require "a complicated balancing of

a number of factors which are peculiarly within [BIA's] expertise."  Lincoln v. Vigil, 508 U.S. at

193.

Specifically, BIA must consider, and is in the best position to consider: (1) the type of

maintenance and operation projects on which its resources are best spent; (2) whether rehabilitation

of the spillway gates is likely to succeed in assisting BIA to deliver both power and irrigation

services most efficiently; (3) whether the rehabilitation project fits within BIA's overall policies;

and (4) whether BIA has enough resources to complete the rehabilitation project and still meet its

other administrative and operational responsibilities.  See id.  Because of the tremendous complexity

of the dam, irrigation, and power systems, and the scope of the required expertise necessary to make

prudent decisions regarding the operation of these interrelated systems, BIA "is far better equipped

than the courts to deal with the many variables involved in the proper ordering of its priorities."  Id.

Second, the court must also consider the language of 25 U.S.C. § 385c.  Naturally, "Congress

may always circumscribe agency discretion to allocate resources by putting restrictions in the

operative statutes."  Lincoln v. Vigil, 508 U.S. at 193.  In this case, although Congress has

enumerated permissible purposes for which money from electricity revenues may be spent, it has

not confined BIA's discretion with regard to how the agency may effectuate these purposes.

In Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002), the D.C. Circuit addressed

a similar case in which Congress authorized spending to meet a statutory purpose, but did not outline

the methods in which an agency might meet that purpose. In <u>Milk Train, Inc. v. Veneman</u>, a group of dairy producers challenged a cap that the Secretary of Agriculture imposed on subsidy payments from a 2000 appropriation that Congress instructed be used to compensate dairy producers "for economic losses incurred during 1999." <u>Id.</u> at 750. The Secretary countered that the imposition of the cap was not reviewable under the APA, because the application of the Supreme Court's decision in <u>Lincoln v. Vigil</u> was not limited to lump-sum appropriations. <u>See id.</u> at 751. Specifically, the Secretary argued that the Supreme Court's holding in <u>Lincoln v. Vigil</u> precludes review of the challenged decision "if the express conferral of discretion on the Secretary, as well as other characteristics of the administrative decision at issue, bring the funding for the 1999 program within [5 U.S.C]. § 701(a)(2)." <u>Id.</u>

The D.C. Circuit adopted the Secretary of Agriculture's position. In holding that the Secretary's decision was not reviewable in the district court, the D.C. Circuit noted that, "[i]nsofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the District Court lacked jurisdiction to review Milk Train's challenge to the . . . cap." <u>Id.</u> at 751. Because the appropriation left to the Secretary's discretion the methods best employed to compensate for the 1999 losses, consistent with the general policy to provide assistance to the dairy producers, the statute "provide[d] no relevant 'statutory reference point' for the court other than the decisionmaker's own views of what is an 'appropriate' manner of distribution to compensate for 1999 losses." <u>Id.</u> at 751 (quoting <u>Drake v. FAA</u>, 291 F.3d at 72).

Similarly, while 25 U.S.C. § 385c articulates statutory objectives for which money from power revenues may be spent, it in no way confines the Secretary's prerogative with respect to how the money should best be spent to meet those objectives. It does not direct the Secretary to spend

money in any particular manner to meet those purposes. BIA has determined that this expenditure to rehabilitate the spillway gates fulfills the statutory objectives, because it is necessary to ensure continuous operation of the power system at the dam. See Anspach Letter at 3-4; 25 U.S.C. § 385c. Consequently, because BIA has "allocate[d] funds from [a]n . . . appropriation to meet permissible statutory objectives, [5 U.S.C.] § 701(a)(2) gives the court no leave to intrude." Lincoln v. Vigil, 508 U.S. at 193 ("To [that] extent," the decision to allocate funds "is committed to agency discretion by law.")(quoting 5 U.S.C. § 702(a)(2)).

5.    **BIA's Decision to Use the Power Revenues to Fund the Rehabilitation of the Spillway Gates is not Arbitrary or Capricious and is in Accordance with Applicable Law.**

Even assuming arguendo that the Court could conclude that CRIT has raised a cognizable cause of action under the APA, CRIT has not established that it is substantially likely to prevail on the merits of its APA claim. CRIT appears to challenge BIA's funding of the spillway gate rehabilitation project as prohibited under 25 U.S.C. 385c. See CRIT's Memorandum at 9, 11. If CRIT is correct that BIA's funding decision is a reviewable agency action, that decision must be reviewed pursuant to Section 706 of the APA. The BIA's funding decision should be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); CRIT's Memorandum at 11.

A court's inquiry under 5 U.S.C. § 706(2)(A) should be "searching and careful," but the agency's actions are "entitled to a presumption of regularity." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971). To determine whether an agency action should be overturned under 5 U.S.C. § 706(2)(A) "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

- 18 -

Citizens to Preserve Overton Park, 401 U.S. at 416.  Ultimately, BIA's decision is arbitrary and

capricious if the agency "entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise."  Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

BIA's decision to fund the rehabilitation of the spillway gates from power revenue does not

contravene 25 U.S.C. § 385c.  Section 385c allows BIA to expend money from power revenues to

maintain the power system, insure continuous operation of the power system, and pay other

expenses chargeable to power revenues:

> Revenues . . . collected from power operations on each Indian irrigation project and deposited into the Treasury for credit to miscellaneous receipts . . . are hereby authorized to be appropriated annually, in specific or in indefinite amounts, equal to the collections so credited, for the following purposes in connection with the respective projects from which such revenues are derived: (1) Payment of the expenses of operating and maintaining the power system; (2) creation and maintenance of reserve funds to be available for making repairs and replacements to, defraying emergency expenses for, and insuring continuous operation of the power system, the fund for each project to be maintained at such level, within limits set by the Director of the Bureau of the Budget [Office of Management and Budget], as may from time to time be prescribed by the Secretary of the Interior; . . . and (4) payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law.

25 U.S.C. § 385c (emphasis added).  The purposes enumerated in 25 U.S.C. § 385c unambiguously

support funding any repairs that insure continuous operation of the power system.[5]

---

[5]    To the extent that CRIT suggests that the project to rehabilitate the spillway gates must "qualify as maintenance or repair of the power system," that suggestion is baseless.  CRIT's Memorandum at 8-10.  The "power system" and "other expenses and obligations" are plainly elements that are necessary to support power generation, even if those elements do not actively generate power.  Even if CRIT were correct that the spillway gates are not part of a limited "power system," they are still necessary to insure operation of that system—a valid purpose under 25 U.S.C.

(continued...)

BIA's conclusion that repairing the spillway gates is necessary to insure continuous operation of the power system places the spillway rehabilitation project squarely within the authorized purposes of 25 U.S.C. § 385c.[6] See Pl. Exh. 7, Anspach Letter at 4 (noting the ten spillway gates at the Headgate Rock Dam are necessary to insure continuous operation of the power system at the dam); Exh. 1, Sutliff Dec. ¶¶ 8, 10-12. The gates are necessary to regulate the flow of water at the dam. See Exh. 1, Sutliff Dec. ¶¶ 8, 10-12. Proper operation of the gates is necessary to ensure that a gate is not stuck in a closed position, which would render it incapable of passing water. See id. ¶ 11. Such a failure might lead to the flooding of the dam and a loss of power generation. See id. ¶¶ 11-12. Likewise, proper operation of the gates is necessary to ensure that a gate is not stuck in an open position. See id. ¶ 11. Such a failure might cause water levels to drop below the level necessary to generate power. See id. ¶¶ 11-12. Moreover, the gates help protect the integrity of the dam. See id. ¶ 13. Failure of the spillway gates would jeopardize continuous operation of the power system. Given the complicated nature of the Dam and the interdependent relationship between the spillway gates and the generation of hydroelectric power, BIA was correct in concluding, based upon its technical expertise, that repair of the gates was necessary to insure the continuous operation of the power system. See Appalachian Power Co. v. Envtl. Protection Agency, 249 F.3d 1032, 1051-52 (D.C. Cir. 2001)("Agency determinations based upon highly complex and

---

[5]/(...continued)
§ 385c.

[6]/    It is unclear how CRIT can contend that improvements such as "sustained cooperative planning," see Pl. Exh. 8, Declaration of Leland R. Gardner ¶ 13.c, constitute the maintenance and operation of the power system, or any other proper expenditure of power revenue pursuant to 25 U.S.C. § 385c, without acknowledging that the rehabilitation of the spillway gates is within BIA's broad discretionary funding authority under that statute, see CRIT's Memorandum at 12.

technical matters are 'entitled to great deference.'")(quoting <u>Pub. Citizen Health Research Group v. Brock</u>, 823 F.2d 626, 628 (D.C. Cir. 1987)).

CRIT relies on the United States Court of Appeals for the Sixth Circuit's decision in <u>Washington v. Reno</u>, 35 F.3d 1093 (6th Cir. 1994), arguing that it prohibits expenditures from a trust fund where the expenditures do not fulfill the primary purpose of that fund.  <u>See</u> CRIT Memorandum at 10. CRIT's attempt to impose a requirement that the "primary function" of any repair pursuant to 25 U.S.C. § 385c must be the maintenance of the power system is unavailing. Such a construction adds a non-existent restriction to the language of the statute.  Section 385c does not contain any such limiting criteria.  Moreover, even if a primary-purpose requirement did exist, <u>Washington v. Reno</u> is inapposite because CRIT fails to properly analyze the primary purpose of the spillway gate rehabilitation project.  Contrary to CRIT's representation, there are actually twelve gates at the Headgate Rock Dam.  <u>See</u> Exh. 1, Sutliff Dec. ¶ 6.  Ten of the gates are spillway gates. <u>Id.</u> ¶¶ 6-7.  Three of the ten spillway gates have hydroelectric turbines located in front of them.  <u>Id.</u> Two additional non-spillway gates are irrigation gates.  <u>Id.</u>  These two gates are not part of the spillway gates rehabilitation project.  The spillway gates "pass the water around the powerhouse" and downstream.  <u>See</u> Sutliff Dec. ¶ 6; Anspach Letter at 4.[7]  Accordingly, BIA's interpretation of 25 U.S.C. § 385c to allow the funding of the spillway rehabilitation project with power revenues was a proper construction of the statute and a correct application of the law.

## B.     CRIT Will Suffer No Irreparable Injury If an Injunction Does Not Issue.

As discussed above, CRIT has no interest in the funds that are the subject of this Motion for

---

[7]     The fact that the spillway gates were originally part of the irrigation system is irrelevant. The dam changed to include power generation with the addition of the hydroelectric plant.  <u>See</u> CRIT's Memorandum at 10.  The purpose of the gates is not immutable.

Preliminary Injunction.  CRIT cannot be injured, much less irreparably injured, by depletion of a fund in which it has no interest.

CRIT's purported injuries do not meet the high standard for irreparable injury necessary to justify the extraordinary relief of a preliminary injunction.  Moreover, no presumption of irreparable injury exists.  See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  CRIT's failure to demonstrate that it will be irreparably injured by the Government's funding of the spillway rehabilitation project alone is sufficient to support the denial of a preliminary injunction.  See Cityfed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995); St. Croix Chippewa Indians of Wis. v. Kempthorne, No. 07-cv-2210, 2008 U.S. Dist. LEXIS 12925, at *6, 2008 WL 474162, at *2 (D.D.C. Feb. 21, 2008)("[I]f a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.")(quoting Dodd v. Fleming, 223 F.Supp.2d 15, 20 (D.D.C. 2002)).

CRIT's purported economic injuries from BIA's continued funding of the spillway gate rehabilitation project are not irreparable.  CRIT complains of three economic injuries: (1) "wrongfully disbursed funds;" (2) "lost interest" that would otherwise be earned on such funds; and (3) losses, lost business opportunities, and lost economic opportunities from possible future service interruptions.  CRIT's Memorandum at 11-12.  It is "well settled" that such losses are economic, and therefore can not, or would not, irreparably injure CRIT.  Wis. Gas Co., 758 F.2d at 674 ("It is well settled that economic loss does not, in and of itself, constitute irreparable harm."); Boivin v. US Airways, Inc., 297 F.Supp. 2d 110, 118-19 (D.D.C. 2003)(Robertson, J.)("[T]he forced sale of a house, a boat or stock, or losses due to market declines and U.S. Airways' stoppage of paying health insurance premiums-do not rise to the level of 'irreparable' harm necessary to warrant the

extraordinary remedy of a preliminary injunction."). Contrary to CRIT's assertion, for the purposes of analyzing the propriety of a preliminary injunction, a damages award can "remedy lost business and economic opportunities." CRIT's Memorandum at 12.

CRIT admits that if it is entitled to any remedy related to the Government's funding of the spillway rehabilitation project, its remedy would be to "bring a damages action in the Court of Federal Claims to recover the wrongfully disbursed funds and lost interest thereon." CRIT's Memorandum at 11. CRIT asserts that, despite this potential alternative remedy, it would be injured by the delay inherent in pursuing such an action. See id. CRIT cannot be irreparably injured by any delay related to pursuing any rights it may have before the CFC. See Sampson v. Murray, 415 U.S. at 90 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); Suburban Mortgage Assocs., Inc., 480 F.3d at 1127 (quoting Bowen v. Massachusetts, 487 U.S. 879, 925 (1988)(Scalia, J., dissenting), for the proposition that "damages after the fact are considered an adequate remedy in all but the most extraordinary cases").[9]

---

[9]     CRIT's Motion for Preliminary Injunction is moot to the extent it seeks to halt the transfer of funds that BIA has already transferred from the power revenues to fund the spillway gate rehabilitation project. "The mootness doctrine ensures that federal courts only decide ongoing cases and controversies." Cody v. Cox, 509 F.3d 606, 608 (D.C. Cir. 2007). A case becomes moot if it is "impossible for the court to grant any effectual relief whatever." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992)(internal quotation omitted).

     CRIT does not seek any relief related to the funds that BIA has already transferred to fund the rehabilitation project. See CRIT's Motion at 1 (seeking to halt depletion of electric power revenues). CRIT appears to suggest, however, that granting the injunction it requests would result in roughly $9,000,000.00 being retained in the account. See CRIT's Memorandum at 12. BIA has already transferred $7,800,000.00 from the electrical power revenues to fund the rehabilitation project. See Exh. 5, Baker Dec. ¶ 8; Exh. 6, Palumbo Letter at 1 (dated February 4, 2008). The injunction that CRIT requests would have no restorative or remedial effect with respect to these funds. Even if CRIT sought the reinstatement of these funds, such relief is impossible. See City of

(continued...)

CRIT also alleges that it will somehow be irreparably injured, because funding the spillway rehabilitation project will leave the power revenues account unable to meet future necessary expenditures, which in turn will create a risk of service interruptions.  To the extent that there may be a non-economic component to any damages that potential future service interruptions cause, a conclusion for which CRIT has provided no support, such damages would not constitute an irreparable injury justifying injunctive relief.  Injunctive relief "'will not be granted against something merely feared as liable to occur at some indefinite time in the future.'" Apache Tribe of the Mescalero Reservation v. Reno, No. 96-115 (D.D.C. Feb. 5, 1996) Slip Op. at 3. (quoting Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931))(attached as Exh. 10).[9/] Moreover, for an injury to be irreparable, "the injury must be both certain and great; it must be actual and not theoretical." Wis. Gas Co., 758 F.2d at 674; Shoshone-Bannock Tribes v. Reno, No. 93-0581, Slip Op. at 10 (D.D.C. Aug. 2, 1993)(attached as Exh. 11).

CRIT's purported injuries are dependent on a series of speculative, theoretical assumptions

---

[8/](...continued)
Houston v. Dep't of Housing & Urban Dev., 24 F.3d 1421, 1426 (D.C. Cir. 1994)("Funds appropriated for an agency's use can become unavailable . . . if the funds have already been awarded to other recipients."). Indeed, even if CRIT raised this claim before an appropriation lapsed, "this circuit's case law unequivocally provides that once the relevant funds have been obligated, a court cannot reach them in order to award relief." Id.
    The only funds within the scope of CRIT's motion are the "possibly $3 million" that has not yet been obligated. Exh. 5, Baker Dec. ¶ 8. CRIT's motion is moot with respect to all other funds.

[9/] CRIT cites Idea International, Inc. v. United States, 74 Fed. Cl. 129 (2006), for the proposition that "a lost opportunity may constitute irreparable harm entitling plaintiff to injunctive relief." CRIT's Memorandum at 12 (citing Idea Int'l, Inc. v. United States, 74 Fed. Cl. at 141). The CFC's holding in Idea International, Inc., however, is inapposite, because it involved a non-speculative, past loss of a contract rather than the speculative possibility of lost future opportunities that CRIT invokes. See Idea Int'l, Inc.., 74 Fed. Cl. at 141 (denying injunction while finding that actual lost opportunity to fairly bid on a contract, coupled with the actual loss of employees to the winning bidder caused the irreparable injury factor to "tilt slightly in favor of Plaintiff").

about future occurrences.  Any future harm to CRIT would occur only if: (1) the spillway rehabilitation project were fully funded through the power revenues account; (2) the power revenues account were depleted to the extent suggested by CRIT; (3) future revenues and interest do not return sufficient funds to the power revenues account; (4) the repairs suggested by CRIT were necessary; (5) the repairs suggested by CRIT were unable to be made because of the depletion of the power revenues account; (6) BIA were unable to obtain an alternative source of funding for such repairs; (7) CRIT were unable to return sufficient funds to the power revenues account through any future award; (8) the electric generation capacity of the plant were somehow interrupted by an event that would have been prevented by the maintenance suggested by CRIT; (9) if CRIT or BIA were unable to obtain replacement power from another source; (10) if this inability to obtain power from another source causes an interruption in service; and (11) if CRIT suffers a non-economic loss due to the above.  This chain of events, all of which would have to occur before CRIT suffered the type of certain, actual, non-economic injury that would be a proper basis for injunctive relief is speculative, theoretical, and merely feared to be liable in the future.  See CRIT's Memorandum at 12.  Such speculation does not constitute an irreparable injury.

Such harm is not only speculative, but it is also overwhelmingly improbable.  Significantly, the injuries asserted by CRIT are unlikely to occur, because alternative electrical power can be purchased on the open market.  See Exh. 1, Sutliff Dec. ¶ 12.  In addition, the list of needed improvements and system enhancements that CRIT suggests does not account for work that BIA has already completed.   For example, BIA has almost completed the "replacement of old wooden poles," a project that CRIT's consultant asserts would cost approximately $4,000,000.00.  See Pl. Ex. 8, Gardner Dec. ¶ 13(b)(3); Ex. 1, Sutliff Dec. ¶ 14.  In addition, other projects that CRIT's

consultant suggests are not as urgent as CRIT implies.  See Pl. Exh. 8, Gardner Dec. ¶ 13; CRIT's Memorandum at 12; Exh. 1, Sutliff Dec. ¶ 14.  The alleged shortfalls of which CRIT complains are also not irreparable because the power revenue account is being replenished at a rate of $1,500,000.00 per year.  See Exh. 5, Baker Dec. ¶ 13.  Collectively, these facts indicate that the amount of money in the power revenues account is sufficient.  See id.

CRIT also appears to contend that BIA's funding and completion of a necessary maintenance project through the power revenues irreparably injures the Tribe, because it undermines the Tribe's lobbying efforts to secure alternative funding.  See CRIT's Memorandum at 13.  CRIT contends that it "cannot seek an earmark for funding the rehabilitation of the spillway gates when BIA is taking the position that the project already is fully and properly funded from an existing account."  Id.  CRIT is incorrect that it is somehow precluded from lobbying for an appropriation due to BIA's funding decision.[10]  CRIT "could lobby in favor" of any earmark it believes to be appropriate.  CRIT's Memorandum at 13.  In fact, nothing is stopping CRIT from lobbying for such earmarks today.  More significantly, any impairment to CRIT's lobbying efforts cannot constitute irreparable injury, because it is based upon one or more speculative assertions.  Initially, the success of any lobbying effort to obtain additional funds dedicated to the maintenance of hydroelectric power generation at the dam, wholly dependent on Congressional will, is inherently speculative regardless of the manner in which the spillway rehabilitation project is funded.  See CRIT's Memorandum at 13.  In addition, to the extent that CRIT contends BIA is somehow limiting CRIT's expressive lobbying activity, such a claim must fail, because it is premised on the speculative idea that a change

---

[10]     Cf. Badham v. March Fong Eu, 694 F.Supp. 664, 675 (N.D.Cal. 1988)("The First Amendment guarantees the right to participate in the political process; it does not guarantee political success.").

in BIA's funding mechanism for the spillway rehabilitation project would have some impact on CRIT's lobbying efforts. Cf. Wemhoff v. Bush, 31 Fed. Appx. 204, 204 (D.C. Cir. 2002)(finding no irreparable harm where a claim of irreparable harm "is premised entirely on . . . speculative assertion that the [World War II] memorial will limit expressive activity.").

### C.    The Imposition of a Preliminary Injunction Will Cause Defendants and Other Parties Substantial Harm.

A preliminary injunction should not be issued if the injunction will "substantially injure other interested parties." Mova Pharm. Corp., 140 F.3d at 1066. In this case, an injunction might injure not only Defendants but also other parties, including CRIT. The injunction that CRIT seeks might force BIA to terminate or breach its contract to complete the spillway rehabilitation project. See Pl. Exh. 6, Letter from Perry J. Baker to Daniel Eddy, Jr. at 2 (dated June 29, 2007); Exh. 5, Baker Dec. ¶ 14. Should that happen, the Government would be exposed to liability for breaching the contract. See Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 607-09 (2000). See also Exh. 9, Contract No. 07CC308061, Part 52.249-02 (outlining terms of the Government's obligation to the contractor should the Government be compelled to terminate the contract, in whole or in part).

Even more compelling, all parties purchasing power from the Headgate Rock Dam, including individual members of CRIT and other power customers, might be damaged by the failure of a spillway gate and the problems that such a failure might cause.[11] See Exh. 1, Sutliff Dec. ¶¶ 11-13. As discussed above, if the spillway gates are not repaired, it increases the likelihood that the gates

---

[11]    Defendants acknowledge that such speculative harms would not rise to the level of irreparable injury. Nevertheless, any balancing of even speculative harms militates against CRIT's request for preliminary injunction.

will fail in a manner that might: (1) cause the dam to flood; or (2) cause water to pass through uncontrollably.  See id. ¶¶ 11-12; Pl. Exh. 7, Anspach Letter at 4.   Either outcome "would undermine the power plant's ability to generate energy."  Exh. 1, Sutliff Dec. ¶ 11.  The risk of interruptions in power generation that could occur if the spillway gates are not repaired counsels against the imposition of a preliminary injunction.

### D.    The Imposition of a Preliminary Injunction Is Not in the Public Interest.

When injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden or cause irreparable injury to the movant.  See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-13 (1982); Yakus v. United States, 321 U.S. 414, 440 (1944). Moreover, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Romero-Barcelo, 456 U.S. at 312.

If the injunction is granted, BIA might have to consider funding the spillway rehabilitation project through alternative sources.  Naturally, the acquisition of alternative funding would threaten other BIA projects.  See Exh. 5, Baker Dec. ¶ 14.  These other projects that would be threatened also serve the public interest.[12] Any consequencial delay, reduction, or cessation of these projects would harm the public interest.

CRIT has not claimed, and cannot claim, that completing the spillway rehabilitation project is not in the public interest.  As discussed above, the spillway rehabilitation project benefits the

---

[12]    The BIA's "responsibility is the administration and management of 55.7 million acres of land that the United States holds in trust for American Indians, Indian tribes, and Alaska Natives.  There are 561 federal recognized tribal governments in the United States. Developing forest lands, leasing assets on these lands, directing agricultural programs, protecting water and land rights, developing and maintaining infrastructure and economic development are all part of the agency's responsibility. In addition, the Bureau of Indian Affairs provides education services to approximately 48,000 Indian students."  See BIA's website, available at http://www.doi.gov/bureau-indian-affairs.html.

public by decreasing the risk of failures that "would undermine the power plant's ability to generate electricity." Exh. 1, Sutliff Dec. ¶¶ 11-13.  Given the risk posed by failing to complete the spillway rehabilitation project, expeditious completion of the project is in the public interest.  See Wemhoff v. Bush, 31 Fed. Appx. at 204-05 (upholding denial of preliminary injunction in part because of a "public interest in [a] memorial's expeditious construction.").  Expeditious completion of the spillway rehabilitation project furthers the important public interest in completing repairs to the critical spillway gates.  Any halting of funding, to the extent that it halted the spillway rehabilitation project, would frustrate the public interest in the prompt completion of public works projects.  The above risks counsel against the imposition of a preliminary injunction.

## V.     **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for preliminary injunction should be denied. Respectfully submitted this 3rd day of March, 2008.

> RONALD J. TENPAS
> Assistant Attorney General
>
> */s/ Matthew M. Marinelli*
> MATTHEW M. MARINELLI, IL Bar # 6277967
> MARK BARRON, NM Bar # 24045
> ANTHONY P. HOANG, FL Bar #0798193
> United States Department of Justice
> Environment and Natural Resources Division
> P. O. Box 663
> Washington, D.C. 20044-0663
> Tel: (202) 305-0293
> Tel: (202) 305-0490
> Tel: (202) 305-0241
> Fax: (202) 353-2021

OF COUNSEL:

KENNETH DALTON
JASON HARTZ
DANIEL JACKSON
United States Department of the Interior
Office of the Solicitor
Washington, D.C. 20240

TERESA E. DAWSON
Office of Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C.  20227

# EXHIBIT

# 1

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE COLORADO RIVER INDIAN TRIBES<br>Route 1, Box 23-B<br>Parker, Arizona 85344 | )<br>)<br>)<br>)<br>) | |
| Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | |
| DIRK KEMPTHORNE,<br>SECRETARY OF THE INTERIOR<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240 | )<br>)<br>)<br>)<br>)<br>) | Case No. 1:06-CV-002212-JR<br><br>DECLARATION OF<br>JOHN SCOTT SUTLIFF |
| HENRY M. PAULSON, JR.,<br>SECRETARY OF THE TREASURY<br>U.S. Department of the Treasury<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

1.     I am a citizen of the State of Arizona and of the United States of America.

2.     I am the Supervisory Electrical Engineer for the Colorado River Agency, Bureau

of Indian Affairs, United States Department of the Interior. My office address is 12000

1st Avenue, Parker, Arizona, 85344.

3.     I have been the Supervisory Electrical Engineer, Branch Chief of Electrical

Services at the Colorado River Agency, BIA, since June 10, 2007.

4.     I graduate with a degree in electrical engineering from California Polytechnic

State University in 1980. In 1980, I was employed by Nevada Power in Law Vegas,

Nevada, as a Distribution Engineer. In 1981, I was employed by the U.S. Army Corps of

Engineers as Maintenance Engineer, Engineering Section, at The Dalles/John Project in

The Dalles, Oregon, on the Columbia River which includes two large scale hydroelectric

facilities. My position consisted of providing technical assistance to the operation and

maintenance crews, designing equipment modifications and administrating various

operations, maintenance and service contracts. In 1986, I transferred to another Corps of

Engineers Project, the Ice Harbor/Lower Monumental Project which includes two large

scale hydroelectric facilities in Pasco, Washington, on the Snake River. I was in charge

of the Maintenance Engineering Section and supervised various engineers in providing

assistance as indicated above for the Ice Harbor and Lower Monumental Dams on the

Snake River. In 1987, I was promoted to Chief of Maintenance, Engineering Section, at

the Ice Harbor/Lower Monumental Project being responsible for the proper maintenance

and thus the operation of all equipment and systems in the two power plants and

associated structures. In 2000, I was promoted to the position of Operations Manager for

the Project including the hydroelectric power plant, navigation lock, fish facilities and

various parks and levee pumping plants.   In 2005 I transferred to the Colorado River

Agency, BIA, as the Supervisory Electrical Engineer. In 2007 I was promoted to Branch

Chief of Electrical Services which post I hold today.

5.      In my present position I perform a variety of management functions, including

planning, organizing and controlling the activities of the Electrical Services Branch of the

Colorado River Agency. As part of the responsibilities of this position, I oversee the

operation and maintenance of the Headgate Rock Dam and powerplant on the Colorado

River.

6.     Headgate Rock Dam consists of a dam structure and 12 gates. Gates 1 through 7 are "spillway gates" that operate collectively to control the water levels behind, and water flow through, the Dam. Two gates, gates 11 and 12, are "irrigation gates," situated at a higher elevation than the spillway gates, and used to direct water into the main irrigation canal.

7.     A 1992 modification of the Dam placed three hydroelectric turbines downstream of the Dam in front of spillway gates 8 through 10. When water passes through gates 8 through 10, it turns a turbine/generator situated in front of the gates and generates electrical energy.

8.     Headgate Rock Dam is a run-of-the-river dam. This means there is no ability to store excess water above the Dam. If the water level in the River is within the level needed to generate electricity, the Dam gates are operated to maintain the River level to maximize electrical generation and irrigation. If a Dam spillway gate freezes open or catastrophically fails, the river level cannot be maintained to maximize the generation of electricity until the gate(s) are repaired or bulkheads are placed.

9.     Work on the rehabilitation of the spillway gates began on December 12, 2006. Spillway gate 7 was the first gate rehabilitated. As of February 28, 2008, the date the Tribes filed their motion for a preliminary injunction, work on two of the 7 spillway gates was complete, 2 of the power gates was complete, and half of another spillway gate is complete. Work on the entire project is expected to be completed on April 9, 2009.

10.    All of the Dam's gates operate in a coordinated fashion and interdependent manner to maintain the river level necessary to irrigate and to provide hydroelectric power. A single System Control and Data Acquisition ("SCADA") program operates the

7 spillway gates and 3 power gates simultaneously. This program automatically adjusts each of the gates as needed to maintain the required water levels behind the Dam and to regulate the amount of water passing through the Dam at any one time. Regulating this water level is critical for the ability to generate electricity.

11.     If any of the spillway gates are unable to pass water during extraordinary high flows, there is a threat that water might flood over the Dam. If any of the spillway gates is stuck in an open position or is dismounted from its moorings, and water was thus allowed to pass through uncontrollably, water levels may drop below minimum levels. Each of these possibilities would undermine the power plant's ability to generate electricity.

12.     If the spillway gates are not repaired, it increases likelihood that either of the two possible failures described in paragraph 11 above will occur. If the subject failures occur and generation is lost, sufficient alternative electrical power will have to be purchased on the open market at a potentially high cost to the end use customers.

13.     For the reasons stated above, the ten gates being rehabilitated operate as integral parts of the power plant system at the Dam. Additionally, all of the gates being repaired operate as an interrelated system protecting the integrity of the Dam and consequently the operation of the Government's management of the Colorado River.

14.     The Tribes' consultant states that a looping of 69 KV system should be completed. This proposed activity is not ready for construction. Western Area Power Authority has initiated preliminary studies on this activity. When those studies are completed, the BIA will be better able to plan for the completion of this activity.

The Tribes' consultant contends that a substation should be built to give the Tribes a second WAPA grid connection. This contention is an acceptable long term goal, but other more pressing priorities, such as repair of the Dam gates is a higher priority.

The Tribes' consultant' contends that the ESC contract recommendations should be completed. The BIA has been working and continues to work on those recommendations. The third and final stage (for the near future) of the pole contract is scheduled to be completed in April 2008.

In response to the asserted need to enhance customer operations, the BIA is in the process of acquiring a new computer system for the Agency' s Finance Section which will address this perceived need.

In response to the Tribe's allegation that funding is needed to improve cooperation between the Agency and the Tribes regarding potential economic development and related employment, the Agency has been and continues to be responsive to the Tribes' appropriate requests for such assistance.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated 2 /28/08

John Sutliff

# EXHIBIT

# 2



# COLORADO RIVER INDIAN TRIBES

*Colorado River Indian Reservation*

ROUTE 1, BOX 23-B
TELEPHONE (602) 669-9211
PARKER, ARIZONA 85344

May 19, 1993

In reply,
refer to: _____



Walt Mills, Phoenix Area Director
Bureau of Indian Affairs
P.O. Box 10
Phoenix, Arizona

Dear Mr. Mills:

As you know, Headgate Rock Dam was constructed in 1938 as a part of the Colorado River Indian Tribes Irrigation Project (Irrigation Project). The Irrigation Project itself was promised to the membership of the Tribes even before the Reservation was established. In 1985 Congress appropriated $8 million to begin the installation of three hydroelectric turbines on Headgate Rock Dam. (Approximately one-fourth of the electricity produced at Headgate will serve the Irrigation Project.) Presently, the estimated cost for the project is at or near $69 million. The Bureau of Indian Affairs (BIA) Colorado River Agency (CRA) currently controls the hydroelectric facility and plans to integrate the energy it produces into the CRA utility system that serves both the Reservation's commercial and residential population and the Irrigation Project. This will, presumably, result in the entire cost of the facility being paid by those using the electricity that is produced.

As the Headgate Rock Dam Hydroelectric Project (Project) begins to produce power, and as the Bureau of Indian Affairs begins to make arrangements to pass the cost of the Project on to ratepayer's, and as the Colorado River Indian Tribes (Tribes) through their energy consultant, Lee Gardner & Associates, begins to explore the feasibility and benefits of Tribal control of the electric utility system serving the Colorado River Indian Reservation (Reservation), the Tribes feel that this is an appropriate time to explore the administrative and legislative processes available to determine which costs should properly be borne by ratepayer.

The Tribes concerns can be divided into two categories: First, the Tribes wish to ensure that the portion of the cost of the Project attributable to the Colorado River Indian Irrigation Project is recognized as a federal responsibility, such that the cost of constructing the portion of the project attributable to the Irrigation Project is not passed on to the ratepayer. Secondly,

Walt Mills, Phoenix Area Director
May 19, 1993
Page 2

the Tribes consider it premature to impose the Project's cost on to
any ratepayer (through either reduced services, reductions-in-
force, or rate increases) until the actual value of the Project and
the portion fairly reimbursable by electricity users is determined.

Essentially, the Tribes wish to explore mechanisms for
providing the non-irrigation electricity users on the Reservation
with at least the same degree of protection afforded utility users
throughout the United States, where proposed rate increases to
impose the cost of new utility projects are first scrutinized by a
responsible independent agency, or perhaps a legislative body. The
Tribes are aware that 25 Code of Federal Regulations (CFR) §175.12
provides a mechanism for the review of any adjustments of utility
rates that are not due to changes in the cost of purchased power.
However, the Tribes believe that a less formal may be a more
appropriate vehicle for addressing the Tribes' concerns.

The Tribes would appreciate the BIA's views regarding which of
the issues raised in this letter can be taken into account through
some administrative process for determining how much of the total
costs of the project should be passed on to ratepayer and which
matters the BIA believes are solely within the authority of
Congress to address.

The Tribes have not produced a definite position on the
following items, nor are we committed to any specific course of
action for how to integrate these factors in order to determine the
appropriate project costs (although federal legislation offers the
obvious benefits of finality and breadth of authority) for the
present then, the Tribes make the following two requests. First,
that any costs associated with the construction of the
hydroelectric project be held in abeyance until opportunities to
reduce the debt burden are thoroughly explored. Second, we request
the BIA's assistance in gathering information and analyzing the
following issues to determine whether or to what extent they should
be considered when determining the portion of project construction
costs that are reimbursable by irrigation project users. Factors
that the Tribes see as potential starting points for an initial
inquiry into the reimbursable costs for the project include:

1. The relationship between project costs and benefits.[1]

_____

[1]Generation of electricity at Headgate Rock Dam was first
contemplated when the dam was built in 1938, at a cost of
$4,868,000. However nothing was done for the next 40 years. Then
the idea was revived and in 1977 the power project was formally
proposed within the BIA, at $15,670,000, with a cost-benefit ratio
of 1.5 to 1. Now, in 1993, we understand the latest estimate of
costs is at or near $69,660,000 and the comparative benefits are

Walt Mills, Phoenix Area Director
May 19, 1993
Page 3

2. The actual amount of time that the project will be operating
each year is less than originally estimated and will depend on a
variety of factors relating to the Bureau of Reclamation's
regulation of the Colorado River.

3. The Project is extremely vulnerable to being removed from
operation for extended periods of time due to weather conditions.

4. Because of unreliable features, the electricity produced by
Headgate has been judged to have no Capacity Value. It will have
value only for the intermittent energy that is produced. In other
words, this is a very low quality electricity product from this
project.

5. The operation and maintenance (O&M) costs estimated by the
Bureau of Reclamation are substantial. By themselves they produce
an electricity average cost that barely matches WAPA's price for
electricity generated in the area.

6. Whether revenues from the sale of surplus electricity generated
by the Project can be used to pay project O&M costs.

7. The rate structure for Headgate will presumably include some
increment allocated towards the repair or replacement of
significant, complex, and important parts of the Headgate
hydroelectric Project.

8. Additional costs have been included as project costs, which may
be questioned. For example, it appears that some of the work is
simply maintenance on the dam which should have been accomplished
over the last 55 years.

9. Whether a portion of the cost of the project should be forgiven
to enhance energy self-sufficiency and tribal self-determination
goals.

10. Whether any interest charges are appropriate.

    If Reservation ratepayer are required to bear these costs, it
may be that they will end up paying more for electricity produced
by Headgate Rock Dam than they would have to pay for other
electricity that is readily available in this area. One relatively
simple and equitable manner for addressing this situation would be
for the cost of Headgate electricity for non-irrigation usage match
the cost of Parker-Davis electricity. (This rate proposal has the
merit of relatively simple administration and obvious equities.)

---

dubious, as discussed herein.

Walt Mills, Phoenix Area Director
May 19, 1993
Page 4

    The Tribes's primary motivation in this second area of concerns is a desire to ensure that relatively expensive electricity does not act as an impediment to economic development on the Reservation and to ensure that the cost of the Project is kept in line in order to leave open the opportunity for the Tribes to eventually take control of the electric utility system serving the Reservation, a goal of self-determination that is in line with both the enlightened prevailing policy of the Federal government and the 1992 Energy Act.

    After you have had an opportunity to review these requests, it may be appropriate to schedule a meeting to coordinate the process of analyzing the issues raised in this letter. Please contact me or Steve McHugh of the Tribes'-Legal Department if we can be of any assistance.

                 Sincerely,

                 COLORADO RIVER INDIAN TRIBES

                 ACTING Daniel Eddy, Jr.
                 Chairman, Tribal Council

cc:  Michael D. Jackson, Office of Senator John McCain
     June Tracy, Office of Senator Dennis Deconcini
     Lisa Jackson, Office of Congressman Bob Stump
     Tribal Council
     Steven J. Bloxham, Tribal Attorney
     Planning Department
     Water Resources Department
     Lee Gardner, Lee Gardner & Associates
     Symanthia Ameelyenah, Exec. Secretary

# EXHIBIT

# 3

# HEADGATE ROCK HYDROELECTRIC PROJECT

## ADVANCED PLANNING REPORT
### PREPARED FOR THE
### BUREAU OF INDIAN AFFAIRS
### JUNE 1980



**U.S. DEPARTMENT OF THE INTERIOR**
**WATER AND POWER RESOURCES SERVICE**

# I. TRANSMITTAL

## A. Introduction

The Bureau of Indian Affairs (BIA) requested that the Water and Power Resources Service (Service) update the 1967 Feasibility Report for the construction of a low head power generation plant at Headgate Rock Dam, Arizona to supply additional power for the Colorado River Indian Reservation (Reservation). Marked photograph No. P423-300-12899 shows the spillway structure and the location for the three tube turbine generators. A 1967 report recommended that two 6,500 kW low head tube type turbine-generator units be constructed. With the rising energy costs, a new sizing study has indicated that three units at 6,500 kW each would produce the highest net benefits. The only present assured source of power to meet these needs is through private facilities. Even if additional Federal power facilities were established, it is probable that only a portion of the Reservation's power needs could be supplied from another Federal source. The most recent studies are a result of the Colorado River Indian Reservation Tribal Resolution 7-77, dated January 31, 1979, and the Memorandum of Understanding between the BIA and the Service dated May 7, 1980.

## B. Authority for the Advanced Planning Report

The revision and updating of the December 1967 report are pursuant to the act of May 21, 1920, (USC Title 31, Sec. 686) as amended by the Economy Act of June 30, 1932, and also as part of a request by the Bureau of Indian Affairs memorandum dated July 30, 1979, and Colorado River Indian Reservation Tribal Resolution R-7-77 dated January 1979, along with the Memorandum of Understanding dated May 7, 1980.

## C. Previous Investigations

The Service's initial investigation culminated with the Reconnaissance report entitled "Memorandum on Reconnaissance Studies of Headgate Rock Dam Power Potential," dated July 1965. As a result of this report, the BIA recommended that a detailed feasibility

1



Photograph No. P423-300-12899 -- An aerial view of Headgate Rock Dam, looking upstream with spillway gates 8, 9, and 10 on the right.

investigation be initiated.   At the conclusion of these investigations, the feasibility report "Report on Headgate Rock Hydroelectric Power Project (Bureau of Indian Affairs), Project Development Report December 1967," was issued.  A later report entitled "Reevaluation and Updating of the 1967 Feasibility Report, Headgate Rock Hydroelectric Power Project" was transmitted to the BIA, in June 1974.

A 1976 Bureau of Reclamation (Service) report, "The Western Energy Expansion Study," evaluated the Headgate Rock Hydroelectric Project and recommended it as the highest priority low head hydro project in the Lower Colorado Region.

D.    Present Conditions

The Reservation contains 264,333 acres along the Colorado River, with 225,995 acres in Yuma County, Arizona and 38,338 acres in San Bernardino and Riverside Counties of California.  Parker, Arizona, is the largest town within the reservation with an estimated population of 3,100 people in 1978.  The permanent population in the Parker Valley is another 5,000 people, with an additional transient population of several thousand on weekends and holidays.

The Reservation has been making steady economic growth during the last several years.  In 1965 there were 31,940 acres being irrigated while in 1978 there were 75,405 acres irrigated on the Reservation in Arizona.  The March 9, 1964 Supreme Court Decree, Arizona vs. California, provides for the eventual irrigation of 107,588 acres, in Arizona and California.  The Reservation's development of the remaining acreages will progress slower because of increased development costs and the required extension of the existing irrigation system.

The Reservation's electrical power requirements are allocated from two Federal sources, the Parker-Davis Project which supplies 8,900 kW during the summer and the Colorado River Storage Project which supplies 750 kW firm and 80 kW peaking during the summer.  The Reservation also has a contract with the Arizona Public Service Company to supply up to 16,500 kW.

Headgate Rock Dam is located on the Colorado River 14.4 river miles downstream from Parker Dam.  The dam was completed in 1941 and provides diversion facilities with sufficient capacity to serve about 100,000 acres of land in Arizona on the Reservation.

2

E.    Plan of Development

All of the power that could be produced at Headgate Rock Dam
Powerplant would be used on the Reservation to operate the irrigation
and drainage facilities and to supply a portion of the residental and
commercial power requirements on the Reservation land.

Three tube-turbine generator units, each with a rated capacity of
6,500 kilowatts, would be incorporated into and below the three left
spillway gate sections 8, 9, and 10 of the existing Headgate Rock Dam.
Draft tubes from these units would discharge into the existing spill-
way channel.   The powerplant switchyard would be located next to the
the left abutment of the spillway immediately adjacent and south of
the spillway gate sections.   A single 69-kilovolt transmission line
would be constructed from the powerplant switchyard to the substation
about 0.6 mile south of Headgate Rock Dam.

The generation from the 19,500 kilowatt powerplant would average
86,511,000 kilowatthours annually for the period 1985 through 2035 and
have an average annual plant factor of 62 percent.

F.    Economic and Financial Analysis

1.    Benefits.  Benefits are based on the production of electric
power for irrigation and drainage use on the Reservation.   The cost
benefits are based on a cost comparison of a Federal share arrangement
with a 800-MW coal fired powerplant.   The value of this power is
computed at the substation.

The value of power produced at Headgate Rock Dam Powerplant is
estimated to be 57.3 mills per kilowatthour.   The power benefits for
this project are estimated at $152.74 per kilowatt per year and 23.06
mills per kilowatthour.

The annual equivalent benefits for the three tube turbine genera-
tor units at 6,500 kW each are $5,017,000.   The net benefits are
$1,927,000 annually.

2.    Costs.   The total estimated project cost including
interest at 7.125 percent during construction for the 3 units is
$39,398,000.   This represents an annual equivalent cost of $2,810,000
based on a 100-year period of analysis.   The estimated annual opera-
tion, maintenance, and replacement costs are $280,000 per year giving
a total annual cost of $3,090,000.

3

3. _Benefit-Cost Ratio_. The construction of Headgate Rock Hydroelectric Project is economically justified with a benefit-cost ratio of 1.6:1.0 based on a 19,500-kW plant using three tube-turbine generators with a total design discharge of 18,390 $ft^3$/s.

4. _Cost Allocation and Repayment_. The project costs are divided into two segments, the costs for irrigation power and the costs for commercial power. Any costs that are related directly to irrigation are not interest bearing. The costs as related to com- mercial power are to be repaid with interest at the rate of 7.125 percent. Irrigation benefits are to include the increased use of power for both sprinkler irrigation and for drainage pumping. These benefits use about 26 percent of the power produced from the project.

G. Conclusions

1. Projections indicate that by 1985 the energy that can be generated by the Headgate Rock Powerplant could be used on the Reservation.

2. A 19,500-kW plant at a design head of 15.6 feet should be built using three tube turbine generator units at 6,500 kW each and producing a total of 86,511,000 kWh of energy annually.

3. The project plan is engineeringly feasible.

4. The project plan is economically justified, as indicated by the benefit-cost ratio of 1.6:1.0.

5. The project plan is feasible financially. All of the proj- ect costs can be repaid within 50 years after the project becomes operational.

6. The project would provide the most economical source of electric power that can be supplied to the Reservation.

4

# EXHIBIT

# 4

B.C. Draft 11/19/87

INTERAGENCY AGREEMENT NO. H50C14IA8210
UNITED STATES
DEPARTMENT OF THE INTERIOR
INTERAGENCY AGREEMENT
BETWEEN THE BUREAU OF RECLAMATION
AND THE BUREAU OF INDIAN AFFAIRS
PROVIDING FOR THE OPERATION AND MAINTENANCE
OF HEADGATE ROCK DAM

THIS AGREEMENT, made this _28th_ day of _march_, 198_6_, between the BUREAU OF RECLAMATION, hereinafter referred to as "Reclamation," represented by the Regional Director, Boulder City, Nevada, and the BUREAU OF INDIAN AFFAIRS, hereinafter referred to as "BIA," represented by the Area Director, Phoenix, Arizona;

WITNESSETH, THAT:

WHEREAS, BIA is responsible for the administration, operation and maintenance (O&M) of Headgate Rock Dam, and certain withdrawn lands and operational facilities thereon, each and all collectively operated to deliver irrigation water to water users on the Colorado River Indian Irrigation Project; and

WHEREAS, on July 15, 1986, BIA and Reclamation entered an Interagency Agreement (No. 6-AA-30-04110) whereby Reclamation agreed to provide architectural, engineering, contracting, construction administration, and related services to BIA for the construction of the Headgate Rock Hydro Electric Project; and

WHEREAS, BIA has requested that Reclamation operate and maintain Headgate Rock Dam and control gates, and maintain the irrigation diversion headworks appurtenant to Headgate Rock Dam; and

WHEREAS, upon completion of the new powerplant, BIA also has requested that Reclamation operate and maintain that facility; and

WHEREAS, Reclamation is willing to provide such O&M services to BIA;

NOW THEREFORE, the parties hereto agree as follows:

1. Upon execution of this agreement and subject to advance funding by BIA, Reclamation agrees to operate and maintain Headgate Rock Dam and control gates, and to maintain the irrigation diversion headworks appurtenant to Headgate Rock Dam on behalf of BIA in full compliance with the terms of this agreement, and in such manner that the works will remain in good and efficient condition. Reclamation also agrees to operate and maintain the new powerplant at Headgate Rock Dam upon completion of those facilities. The Headgate Rock Dam, the control gates, and the powerplant are collectively hereinafter referred to as "Project Works." Reclamation shall promptly make any and all repairs to the Project Works which are necessary for

proper care, operation, and maintenance. BIA shall retain responsibility for operation of the irrigation diversion headworks at Headgate Rock Dam. Reclamation activities under this agreement may also include minor construction activities, subject to the same funding procedure, established in this agreement for O&M activities.

2. BIA shall have the right to inspect the Project Works being operated and/or maintained by Reclamation and to make suggestions regarding the condition of the facilities or the adequacy of Reclamation's O&M activities.

3. Prior to the initiation of O&M activities by Reclamation, BIA and Reclamation shall develop detailed operating criteria for the Project Works which will govern Reclamation's routine, day-to-day activities under this agreement.

4. Prior to the initiation of O&M activities by Reclamation, Reclamation will provide BIA with an estimate of the cost to O&M the Project Works for the period covering initiation of O&M by Reclamation to the end of that fiscal year, along with an estimate of such costs for each of the next 3 fiscal years. Thereafter, on or before each July 1, beginning with the first full fiscal year of operation, Reclamation shall provide BIA with an updated cost estimate for each of the next 3 fiscal years.

5.  BIA shall be responsible for appropriating all funds necessary to cover Reclamation's O&M expenses. Reclamation's O&M expenses shall be deemed to include, without being limited to, expenditures for materials, supplies, equipment, salaries, travel, training, per diem, leave of employees, and overhead necessary to carry out its activities under this agreement. Reclamation's performance of O&M activities under this agreement shall be contingent upon BIA providing advance funding to Reclamation for such activities.

6.  Reclamation shall utilize the "OPAC-On Line, Payment and Collections" procedure to electronically transfer funds from BIA's treasury accounts to Reclamation's treasury accounts, for O&M expenses to be incurred by Reclamation under this agreement. Prior to initiation of O&M activities, Reclamation will transfer funds from BIA to cover anticipated O&M costs for the remaining portion of first month of operation and the second month. Thereafter, immediately prior to the beginning of each month, Reclamation will transfer funds from BIA to cover expenses for the next month.

7.  If at any time Reclamation should need additional funds to cover emergencies or unforeseen O&M costs, Reclamation will transfer funds from BIA to cover such costs, subject to prior approval by BIA. Reclamation reserves the right to cease O&M activities during any period

4

when funds have not been made available in advance by BIA.

8.   Reclamation shall keep accurate records of all expenses incurred for O&M of the Project Works.  If Reclamation transfers more funds from BIA during any month than were actually used, Reclamation shall reduce the amount of the next transfer by the amount of the overpayment.  BIA shall have the right during normal business hours to review and make copies of Reclamation's records regarding matters covered by this agreement.  A monthly report of expenditures will be submitted to BIA by Reclamation.

9.   Either party to this agreement shall have the right to cancel this agreement upon providing 1 years' advance notice to the other party.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written.

Regional Director
Lower Colorado Region
Bureau of Reclamation

Acting Area Director
Phoenix Area Office
Bureau of Indian Affairs

Contracting Officer
Phoenix Area Office
Bureau of Indian Affairs

5

# EXHIBIT

# 5

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE COLORADO RIVER INDIAN      )
TRIBES                         )
Route 1, Box 23-B              )
Parker, Arizona 85344          )
                               )
       Plaintiff,               )
                               )
    v.                       )
                               )
DIRK KEMPTHORNE,               )      Case No. 1:06-CV-002212-JR
SECRETARY OF THE INTERIOR      )
U.S. Department of the Interior )     DECLARATION OF
1849 C Street, N.W.            )      PERRY J. BAKER
Washington, D.C. 20240         )
                               )
HENRY M. PAULSON, JR.,         )
SECRETARY OF THE TREASURY      )
U.S. Department of the Treasury )
1500 Pennsylvania Avenue, N.W. )
Washington, D.C. 20220         )
                               )
       Defendants.              )
_____)

1.    I am a citizen of the State of Arizona and of the United States of America.

2.    I am the Superintendent of the Colorado River Agency, Bureau of Indian Affairs,

United States Department of the Interior. My office address is 12124 1st Avenue, Parker,

Arizona, 85344.

3.    I have been the Superintendent of the Colorado River Agency, BIA, since May 8,

2006.

4.    My primary functions are to manage the "trust" and" non-trust" programs

operated by the Bureau of Indian Affairs ("BIA") within the Colorado River Agency,

BIA, and I am the line official in charge of the operation of "trust" and" non-trust"

functions of the Colorado River Agency pursuant to my delegated authority. I am responsible for the administration of BIA's activities related to Headgate Rock Hydroelectric Generating Station. Headgate Rock Hydroelectric Generating Station is a dam sitting astride the Colorado River approximately one-half mile from Parker, Arizona.

5.      Headgate Rock Hydroelectric Generating Station and its facilities are owned by the United States, not by the Colorado River Indian Tribes.

6.      The Colorado River Indian Reservation ("Reservation") is within the jurisdiction of the BIA's Colorado River Agency. BIA functions involving the Reservation are administered by the Superintendent.

7.      In approximately 1988, the BIA entered into an agreement ("Interagency Agreement") with the Bureau of Reclamation to perform the operation, maintenance and related services on Headgate Rock Hydroelectric Generating Station.

8.      In 2003, pursuant to the Interagency Agreement, the BIA transferred funds from the Agency's Power Systems Revenue Account to the Bureau to the Bureau of Reclamation to perform an investigation of the Dam spillway gates at issue in this case. As a result of that inspection, the initial rehabilitation plan from the work on the ten spillway Dam gates now being performed was initiated.

9.      In 2005, the Agency authorized the transfer of $3.0 million from the Agency's Power Systems Revenue Account to the Bureau of Reclamation to fund the first year Dam radial gates rehabilitation. In 2006, the Agency authorized the transfer of $4.8 million from the Agency's Power Systems Revenue Account to the Bureau of Reclamation to fund two years of the Dam spillway account continuing the spillway gate rehabilitation. The BIA is in the process of authorizing additional funding, possibly $3

2

million, from the Agency's Power Systems Revenue Account to the Bureau of
Reclamation to complete the Dam rehabilitation.

10.    The BIA receives collections from its customers in exchange for providing
electrical power to its reservation and off-reservation customers. These services and
payments are made pursuant to 25 Code of Federal Regulation Part 175. These
collections are deposited daily in a US Treasury account. The Superintendent has the
authority to expend these collections for Headgate Rock Hydroelectric Generating Station
through sending requests for funds through the Bureau and the subsequent release of
funds by Treasury Department. When the electrical collections are returned from
Treasury account, they are currently deposited in the Power Systems Revenue Account,
H51463/08/52010.

11.    The BIA collections from its electrical customers are deposited in non-trust
account identified 14X5648(65)AR. This account is not a trust account. While
Superintendent, I have never referred to account 14X5648(65)AR as a "trust account." I
know that this account code is not an account that the BIA holds in trust for the benefit of
the Colorado River Tribes or their members. Except for possibly refunds to correct
payment issues, the Agency has not distributed any of the funds from this account to the
Colorado River Tribes or their members. Unlike the Colorado River Tribes' Proceeds of
Labor Account (#7218) and their Judgment Fund Account (#9348), neither the Colorado
River Tribes nor their members are owners of account No. 14X5648(65)AR.

12.    The ten gates of the Headgate Rock Hydroelectric Generating Station being
rehabilitated are directly related to the electrical generation capacity of the Dam and none
of the ten gates are irrigation features.

3

13.    The current balance in the Agency's Power Systems Revenue Account is approximately $11 million. After the transfer of remaining sums needed to complete the rehabilitation of the Dam spillway gates, there will be approximately $8 million left in the Agency's Power Systems Revenue Account. This $8 million will be a sufficient reserve to account for routine and unexpected maintenance of the power system, absent a total and unforeseeable catastrophe. The reserve fund will be replenished by approximately $1.5 million a year for approximately the next 6 years. The major maintenance schedule does not anticipate major expenditures for the Agency's Power Systems Revenue Account for the next six years.

14.    If the BIA was prohibited from dispersing additional funds from the Agency's Power Systems Revenue Account for the Dam spillway gate rehabilitation project, completion of the work may be jeopardized. If such a funding delay occurs, the Government may be required to suspend or terminate the construction contract and may be required to pay suspension or termination expenses. Acquisition of substitute funding would threaten other projects for which such funding has been allocated.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated 2-29-08

Perry J. Baker

4

# EXHIBIT

# 6



# United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470



IN REPLY REFER TO:

LC-6040
PRJ-8.10

**FEB 0 4 2008**

Mr. Perry Baker
Bureau of Indian Affairs
Colorado River Agency
12124 First Avenue
Parker, AZ 85344

Subject: Headgate Rock Dam Radial Gate Rehabilitation Project Update and Interagency
Agreement Amendment Request (Source Selection Sensitive)

Dear Mr. Baker:

It has been a pleasure working with your office on the Headgate Rock Dam Radial Gate
Rehabilitation Project (Project). Mr. Scott Sutliff's professional, technical, and managerial
acumen has been a benefit to the success of the Project.

Pursuant to the Project's funding, please accept the following correspondence for your
consideration.

After the technical proposal evaluation process for this project was concluded and the decision to
award a contract, 07-CC-30-8077, to AllTech Engineering Corporation, a funding summary was
provided to the Bureau of Indian Affairs (BIA) indicating that the contract award amount would
be $8,021,347 and the non-contract amount for planning, design, acquisition and construction
management would be $1,950,000. The contract and non-contract costs total $9,971,347.

In 2005, $3,000,000 was provided by BIA under Amendment No. 19 to Interagency Agreement
H50C14IA8210, and prior to award, $4,800,000 was provided by BIA under Amendment No.
23. The funding to date totals $7,800,000.

Pursuant to the baseline contract and non-contract costs, $9,971,347, and the current funding,
$7,800,000, there is a balance of $2,171,347 to be funded.

In coordination and consultation with BIA several required modifications to the contract have
been executed. When the gates were removed from the gate bays and the paint removed,
additional required repairs to address substantial physical and mechanical damage were
discovered. These repairs are expected to average approximately $68,000 per gate or for the 10
gates $680,000. Additionally, as a result of significant wear and corrosion, it was decided to
replace the flat wire ropes for each gate. This replacement is expected to average approximately
$75,000 per gate or for the 10 gates $750,000 including a spare. There have been miscellaneous
additional required modifications which include the provision to add a pneumatic controller for
the downstream stop logs and a surge barrier to provide additional height to the upstream stop

logs to avoid flooding of the gate bay while workers are present. These additional items are approximately $25,000. To account for miscellaneous, albeit minor, modifications, an allowance of five percent is recommended. The total current contract modification amount with a 5% allowance for additional modifications is $1,527,750

Based on the above values, an Interagency Agreement Amendment of $3,699,097 is requested to cover the base line balance, $2,171,347, and the contract modification balance, $1,527,750

In order to facilitate the timely definitization of the aforementioned modifications and avoid field schedule delays, it is kindly requested that this additional funding be processed in one amendment for $3,699,097 (The Intra-Governmental Payment and Collection (IPAC) process only transfers funding at the time of expenditure; therefore, un-liquidated obligated funding related to the amendment would remain in BIA's account.).

Reclamation's Engineering Services Office values our professional relationship with BIA and looks forward to our continued collaboration.

If you have any questions, comments or concerns whatsoever, please do not hesitate to contact me at 702-293-8131.

Sincerely,

David M. Palumbo, P.E.
Deputy Regional Engineer

# EXHIBIT

# 7

# Holland+Knight

Tel  202 955 3000
Fax  202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue. N.W.. Suite 100
Washington. D.C.  20006
www.hklaw.com

Stephen J. McHugh
202 419 2578
steve.mchugh@hklaw.com

July 26, 2007

VIA FAX (602) 379-4413
AND
VIA OVERNIGHT DELIVERY

Mr. Allen Anspach
Regional Director, Western Region
Bureau of Indian Affairs
400 North 5th Street
Two Arizona Center, 12th Floor
Phoenix, AZ 85004

   Re: Notice of Appeal

Dear Mr. Anspach:

   The attached letter from Perry J. Baker, the Superintendent of the Bureau of Indian Affairs ("BIA") Colorado River Agency ("CRA"), dated June 29, 2007, informs our client, the Colorado River Indian Tribes ("CRIT"), of the status of the BIA-Bureau of Reclamation ("BoR") spillway gates rehabilitation project on Headgate Dam ("Project"). Among other things, Mr. Baker's letter indicates that the source of funds for the Project is the CRA-Electrical Services Trust Fund ("Trust Fund"). It also indicates that a contract for the Project already has been executed.

   While CRIT previously had understood that the Project was in the offing, it had not known that the Project has already commenced. Nor had CRIT been authoritatively advised that the Project will be funded through the Trust Fund. CRIT believes that funding the Project through the Trust Fund violates 25 U.S.C. § 385c, as well as applicable regulations and policies. The CRIT Tribal Council has directed that we file this appeal of the BIA decision with respect to the obligation, disbursement, or use of the Trust Fund for the Project. This letter satisfies the requirements of 25 C.F.R. § 175.60(a).

   CRIT would prefer to resolve this matter within the BIA. It reserves, however, its right to challenge the BIA's action in the United States District Court. In order to avoid any injury to our client pending the final disposition of this agency appeal, the BIA and BoR must refrain from obligating, disbursing, or using the proceeds of the Trust Fund for the Project. If any of these

Mr. Allen Anspach, Regional Director
Western Region, Bureau of Indian Affairs
July 26, 2007
Page 2

funds have been so obligated or disbursed prior to your receipt of this letter, it is imperative that
the United States replace these funds without further delay. Please inform me immediately of
any prior Trust Fund disbursements related to the Project.

Paragraphs 2 (a) through (e) of Mr. Baker's letter refer to five documents associated with
the Project. Please provide copies of these documents, as well as an up-to-date copy of the
applicable CRA Electrical Utility Operations Manual, to Eric Shepard and me at your earliest
opportunity. These materials are essential for CRIT to prepare and provide your office with its
*Statement of Reasons*, as required by C.F.R. § 175.60(b). Unless we are informed otherwise in
writing, the Statement of Reasons will be filed thirty (30) days from our receipt of these
materials. CRIT reserves the right to amend this appeal upon review of these materials and upon
further review of the matters addressed in Mr. Baker's letter.

In closing, this letter should not be construed or be relied on as a basis for suspending or
delaying the Project.

Sincerely,

Stephen J. McHugh/dhs

Stephen J. McHugh
Holland & Knight

SJM/dhs

Attachment

cc:    Tribal Council
       Eric Shepard, Attorney General
       Perry Baker, CRA Agency Superintendent
       Steven D. Gordon, Holland & Knight

# 4691706_v3

# EXHIBIT

# 8

*Corp.*, 77 N.M. 384, 388, 423 P.2d 421, 424 (1966), the New Mexico Supreme Court stated that "the right of privacy is to be applied to the individual of ordinary sensibilities, not the super-sensitive." The New Mexico Court of Appeal[s] applied this standard in *Bitsie v. Walston, supra,* where a photograph was taken of a young Navajo child with the consent of the father. A sketch from the photograph was subsequently made, which in turn was reproduced onto note cards without the plaintiffs' consent and sold to help finance a pre-school for children with cerebral palsy. A local newspaper ran an article on the card sale, stating the purpose of the sale and publishing a photograph of the design identifying both the child and the artist. The plaintiffs brought suit alleging that because the article linked the healthy child to the disease of cerebral palsy, the child would have bad luck later in life, according to Navajo tradition. The court ruled that no invasion of privacy had occurred as a matter of law "because there is no evidence that, as a matter of fact, the newspaper story offended persons of ordinary sensibilities. . . . We cannot equate an offense to persons holding a traditional belief with an offense to persons of ordinary sensibilities because: (1) the tort relates to the customs of New Mexico at this time and does not extend to 'traditional' beliefs." 85 N.M. at 658-59, 515 P.2d at 662.

Plaintiffs in this case are claiming that the publication is offensive based on the traditional Navajo belief that "the publication of photographs can have bad effects on the people who are in the published photographs." Declaration of Lillie Benally at 2. Plaintiffs' pleadings are silent on the effect of the publication on the sensibilities of those who do not hold traditional Navajo beliefs. Applying the reasoning of *Blount* and *Bitsie* to the facts, the court therefore concludes that plaintiffs have failed to establish that a person of ordinary sensibilities would be offended by the publication of the Benally photograph.'

Section 652D of the *Restatement (Second) of Torts* requires that the matter publicized be both highly offensive to a reasonable person *and* not of legitimate public concern, in order for there to be an unlawful publication of private facts. The court's conclusion that the publication was not highly offensive eliminates the need to rule on the newsworthiness issue.

Since, as a matter of law, there was no publication of private facts, summary judgment is granted. An order will be entered in accordance with this opinion.

[Footnote:]
Plaintiffs allege that there is an additional element of the tort of unlawful public disclosure to be considered when evaluating the offensiveness of the publication, that is, whether the defendants should have known that the photograph would offend persons of ordinary sensibilities. Plaintiffs cite to *Bitsie* as the source of this additional element and argue that "Hundred Arrows knew or should have known of Native American and Navajo attitudes toward photography, and that the publication of the Gilpin photograph would be offensive to plaintiffs." Plaintiffs' memorandum in response to motion to dismiss and/or summary judgment of defendants Hundred Arrows Press, Inc., Mediatex Communication Corp., and Communications Specialist, Inc. at 15. As has been stated previously, the court in *Bitsie* was relying on § 867 of the *Restatement of Torts* in analyzing the claim of invasion of privacy. The Restatement (Second) of Torts is silent on the issue of the subjective knowledge of the defendant as it relates to unlawful public disclosure. Since this court has determined that the New Mexico courts would apply the definition of the tort of invasion of privacy as delineated by the *Restatement (Second) of Torts,* the issue of whether the defendants should have known that the photograph would offend the plaintiffs is irrelevant.

**Order**

This matter having come before the court on defendants' motion to dismiss and motion to dismiss, or, in the alternative, motion for summary judgment, and the court, having considered the pleadings and memoranda filed by the parties and being otherwise fully advised in the premises, and the court having issued its memorandum opinion,

It is Ordered, Adjudged and Decreed as follows:

1. The motion to dismiss all claims against defendant the Amon Carter Museum of Western Art be, and the same hereby is, granted;

2. The motion for summary judgment as to plaintiffs' unlawful public disclosure claims against defendants Art Magazine and Mediatex Corporation be, and the same hereby is, granted;

3. The motion to dismiss plaintiffs' unlawful public disclosure claims against defendants Hundred Arrows Press and Communication Specialists be, and the same hereby is, granted;

4. The motion for summary judgment as to plaintiffs' misappropriation of likeness claim against defendant Hundred Arrows Press be, and the same hereby is, granted; and

5. The motion for summary judgment as to plaintiffs' misappropriation of likeness claim against defendant Communication Specialists be, and the same hereby is, denied.

*Counsel for plaintiffs:* Stephen T. Lecuyer, Shiprock, NM

*Counsel for defendants Mediatex and Hundred Arrows Press:* David H. Donaldson, Jr., Robert M. Sumners, J. Douglas Foster

*Counsel for defendant CSI:* Robert M. Sumners, J. Douglas Foster

*Counsel for defendant Amon Carter Museum of Western Art:* Steven L. Tatum, Arthur O. Beach

---

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**JAMES, et al. v. U.S. DEPT. of HEALTH & HUMAN SERVICES, et al.**

**No. 85-417 (D.D.C., Aug. 14, 1985)**

**Summary**

The court finds that plaintiffs are 50 members of the Gay Head Wampanoag Indian Tribe of Martha's Vineyard, Massachusetts, who initiate this suit as part of an ongoing battle for tribal leadership between plaintiffs and another faction of the tribe which apparently controls the Wampanoag Tribal Council of Gay Head, Inc., also known as the "Widdiss Group." Plaintiffs sought: an injunction to terminate funding received by the Widdiss Group under a grant issued by the Administration for Native Americans (ANA), a component of the Department of Health and Human Services; a court order terminating a contract awarded to the Widdiss Group by the Indian Health Service (IHS), a component of the Department of Health and Human Services, under the authority of the Buy Indian Act (25 U.S.C. § 47); and an injunction against the Department of the Interior to require it to grant federal recognition to the Gay Head Tribe as "one of the Indian Tribes of the United States."

The court first considers plaintiffs' claim against the

Department of the Interior that the tribe was at one time recognized by the federal government, that such recognition continues until "expressly terminated by Congress," and thus that the Department of the Interior must be required to add the Gay Head Tribe to its list of federally recognized Indian tribes. The court finds that plaintiffs' claim can be dismissed either because the plaintiffs have advanced no reason why they should not be required to exhaust the comprehensive administrative scheme the Department of the Interior has established for consideration of petitions for acknowledgment by putative Indian tribes, or because the evidence submitted by the plaintiff is insufficient as a matter of law to compel federal recognition. The court expressly rejects the Department of the Interior's contention that the court lacks jurisdiction because plaintiffs have failed to exhaust the administrative scheme for federal recognition, noting that the exhaustion of administrative remedies is not "strictly speaking" jurisdictional, but rather the "deference doctrine" serves as a means of coordinating and conserving administrative and judicial resources by withholding judicial action until the agency has the opportunity to act. The court then turns to the motion to dismiss by defendant Department of Health and Human Services and holds that the plaintiffs lack standing to challenge either the funding of the Widdiss Group under the ANA grant or the contract between the Widdiss Group and IHS, on the grounds that plaintiffs have failed to demonstrate that they suffered any injury in fact or that any injury the plaintiffs may have suffered was to an interest arguably within the "zone of interests" protected or regulated by the Native American Programs Act (42 U.S.C. § 2991) or the Buy Indian Act. The court rejects: (1) plaintiffs' alleged injury on the basis that plaintiffs did not apply for the grant or contract in issue; (2) plaintiffs' allegation that the Widdiss Group has no legal authority to represent or contract for the tribe on the basis that neither the grant or the contract were premised upon recognizing the Widdiss Group as a tribe; and (3) plaintiffs' "trust" theory, on the grounds that the statutes authorizing the grant and contract create only discretionary authority to award contracts or grants to Indian organizations. Because the court finds the plaintiffs lack standing, the court dismisses all other pending motions as moot.

**Full Text**

Before FLANNERY, District Judge

### Memorandum

This matter comes before the court on a number of motions filed both before and since the court's denial of plaintiffs' motion for a preliminary injunction on March 22, 1985. Still pending at the time the court denied plaintiffs' motion for a preliminary injunction were plaintiffs' motions for judicial notice of administrative records and to strike Henry J. Sockbeson's certificate of representation without compensation, the motion of the Wampanoag Tribal Council of Gay Head, Inc. to intervene either permissively or as of right, and defendant United States Department of Health and Human Services' motion to dismiss for lack of standing. Subsequent to the court's ruling on the motion for preliminary injunction, plaintiffs amended their complaint to add the United States Department of the Interior as a defendant, and moved for a "mandatory injunction" ordering the Secretary of the Interior to add the Gay Head Tribe to the list of federally recognized tribes. Because of the possibility that the court's disposition of the motion of defendant Department of Health and Human Services might turn in part on the disposition of plaintiffs' claims against the Department of the Interior, the court's decision on the pending motions was withheld until the new defen-

dant had an opportunity to answer or otherwise respond to the amended complaint. Defendant Department of the Interior has now moved to dismiss the claim against it for lack of subject matter jurisdiction. For reasons stated herein, the court shall grant the motions to dismiss of defendants Department of Health and Human Services and Department of the Interior; deny plaintiffs' motion for mandatory injunction against the Secretary of the Interior; and dismiss as moot plaintiffs' motion for judicial notice of administrative records, the Wampanoag Tribal Council's motion to intervene, and plaintiffs' motion to strike Henry J. Sockbeson's certificate of representation without compensation.

### I. Background

Plaintiffs are 50 members of the Gay Head Wampanoag Indian Tribe of Martha's Vineyard, Massachusetts, who have initiated this suit as part of an ongoing battle for tribal leadership between plaintiffs and another faction of the tribe which apparently controls the Wampanoag Tribal Council of Gay Head Inc., which is also known as the "Widdiss Group." In their original complaint, plaintiffs sought an injunction to terminate funding received by the Widdiss Group under a grant issued by the Administration for Native Americans (ANA), a component of the Department of Health and Human Services (HHS), under the Native American Programs Act (NAPA), 42 U.S.C. § 2991 et seq. Plaintiffs also requested that the court order termination of a contract awarded to the Widdiss Group by the Indian Health Service (IHS) also a component of HHS, under the Buy Indian Act, 25 U.S.C. § 47. Plaintiffs allege that the grant and contract were made in violation of the federal trust responsibility to Indians, that the grant violates the purposes of the Native American Programs Act, that the grant and contract were fraudulently obtained, and that funds under the grant and contract are being used for illegal purposes.

The ANA grant was awarded to the Widdiss Group in November 1983 to establish the identity of the Gayhead Indian people, to insure the preservation and continuation of the culture, history, traditions and tribal lands of the tribe, to obtain federal recognition of the tribe, to unify the remaining descendants of the tribe, and to increase the effectiveness of the tribal council in addressing the social and economic needs of the Gayhead Indians. Plaintiffs claim that in awarding the grant to the Widdiss Group, defendant HHS abdicated its trust responsibility to plaintiffs by "bankrolling" one faction in an ongoing intratribal dispute. Plaintiffs also claim that HHS is funding the Widdiss Group as the governing body of the tribe based on the Widdiss Group's misrepresentations as to its status, that the Widdiss Group is not eligible for funding under the NAPA, and that, even if it is eligible, the ways in which the federal funds are being used runs counter to the NAPA's purpose of promoting economic and social self-sufficiency for American Indians.

Regarding the Indian Health Service contract with Donald Widdiss, plaintiffs contend that because Widdiss is not legally authorized to represent the tribe, the money spent under the contract is an illegal expenditure of federal money. Under the Buy Indian Act, the IHS contracts with tribal groups to assess their health needs so that a tribe can make use of IHS resources once it achieves federal recognition. The objectives of the contract are to insure awareness of IHS procedures and benefits, to perform a health assessment of tribal members, and to begin to develop a management system to plan, organize, coordinate, and evaluate health services in the area. According to an affidavit submitted by defendant, monitoring of the contract as of February 27, 1985, indicated that the contractor is performing satisfactorily and has been successful in obtaining a high response rate, and that all IHS funds are be-

ing used only for reasonable, allowable, and allocable costs. Millar affidavit at ¶14.

Following the court's denial of plaintiffs' motion for a preliminary injunction against further funding of the ANA grant and continued performance of the IHS contract, plaintiffs sought an injunction against the Department of the Interior to require it to grant federal recognition to the Gay Head Tribe as "one of the Indian Tribes of the United States." Were the tribe to receive federal recognition, plaintiffs apparently believe, its members would more clearly have standing to challenge governmental dealings with individuals who attempt to speak for the tribe without specific authority to do so. In support of their motion for a "mandatory injunction," plaintiffs cite several nineteenth century federal reports and documents in which the federal government and the state of Massachusetts purportedly "recognize" the Gay Head Tribe "as one of the Indian Tribes of the United States." Since the tribe was at one time recognized by the federal government, and such recognition continues until "expressly terminated by Congress," plaintiffs argue, the Department of the Interior must be required to add the Gay Head Tribe to its list of federally recognized Indian tribes. And, since tribal members have standing to question the government's decision to deal exclusively with certain members of a tribe, plaintiffs conclude, their claims against HHS cannot be dismissed for lack of standing.

### II. Discussion

### A. Department of the Interior's Motion to Dismiss

Dealing with plaintiffs' most recent contentions first, it is clear that plaintiffs' claim against the Department of the Interior should be dismissed for either of two reasons. First, plaintiffs have advanced no reason whatever why they should not be required to exhaust the comprehensive administrative scheme Interior has established for consideration of petitions for acknowledgement by putative Indian tribes. While the existence of such a scheme does not divest this court of "jurisdiction" in the sense apparently advocated by defendant,[1] this does appear to be precisely the type of case in which the court is required to defer to the administrative process. See, e.g., Chicago Merchantile Exchange v. Deaktor, 414 U.S. 113, 114-15, 94 S. Ct. 466, 466-67 (1973) (per curiam). Given the existence of specially prescribed procedures for recognition of tribes, the special expertise developed by the agency since the procedures were established in 1978, and the interest in uniformity of determinations regarding tribal status, the court is compelled to defer to the determination of the Department of the Interior as to the cognizability of the Gay Head Indians as an Indian tribe. Cf. Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580-81 [6 Indian L. Rep. B-3] (1st Cir.), cert. denied, 444 U.S. 866 (1979) (no need to grant continuance for Department of Interior to determine tribe's status prior to establish-

ment of procedures and development of agency expertise in distinguishing tribes from other groups of Indians).[2] Plaintiffs have not disputed defendant's contention that plaintiffs have not even submitted an acknowledgement petition with the Assistant Secretary-Indian Affairs as required under the Department's regulations. See 25 C.F.R. § 83.5 (1984). While defendant has cited no authority for its apparent contention that the Department's decision on acknowledgement, were it requested, would be unreviewable, plaintiffs' failure to even attempt to utilize available administrative procedures to obtain federal recognition mandates dismissal of their action at this time.

Even if the court were willing to examine the merits of plaintiffs' request for recognition despite their failure to exhaust administrative remedies, it is clear that the meager evidence submitted would be insufficient, as a matter of law, to compel federal recognition, justifying an order of summary judgment for defendant.[3] First of all, defendant submits that prior to the promulgation of the regulations set forth at 25 C.F.R. § 83 in 1978, no official list of federally acknowledged tribes existed. Declaration of William W. Quinn, ¶ 2. Therefore, as defendant argues, inclusion of the Gay Head Tribe in, for example, a "narrative...tour" performed in 1820 to ascertain "the actual state" of American Indian tribes is not the equivalent of acknowledgement within the meaning of 25 C.F.R. § 83. See plaintiffs' motion for mandatory injunction, exhibit A; supplemental memorandum of points and authorities in further support of defendant United States Department of the Interior's motion to dismiss at 2. Because the tribe has never been included in an "official" list of federally recognized tribes, plaintiffs cannot contend that they have been arbitrarily or capriciously "dropped" from such a list. Further, while the existence of references to the Gay Head Tribe in the documents referred to by the plaintiffs may provide evidence that the tribe was in existence when the reports were written in the early to mid-1800s, they provide no evidence whatever that the tribe's existence has been "substantially continuous . . . throughout history until the present" as required under the regulations for federal acknowledgement. 25 C.F.R. §§ 83.3(a), 83.7(a)(1)-(a)(7) (1984).

In sum, plaintiffs cannot contend that they were arbitrarily and capriciously "dropped" from the official list of federally recognized tribes because their tribe has never been included on such a list. Further, they cannot contend that the agency's

---

[1] The Department of the Interior appears to contend that the court lacks the jurisdiction to require the Department to add the Gay Head Indians to its list of federally recognized tribes under the doctrine of sovereign immunity because plaintiffs have failed to exhaust the administrative scheme for federal recognition. Yet the interests in "harmony, efficiency, and prudence" that are furthered by requiring exhaustion when administrative procedures exist are not, strictly speaking, jurisdictional. Instead, the "deference doctrine" serves as a means of coordinating and conserving administrative and judicial resources by withholding judicial action until the agency has had an opportunity to act. See Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 & n.1 (1st Cir.), cert. denied, 444 U.S. 866 (1979).

[2] Since the establishment of regulations and procedures for acknowledgement by the federal government of Indian tribes in 1978, the Bureau of Indian Affairs has established a Branch of Acknowledgement and Research (BAR), which currently consists of two historians, two anthropologists, and two certified genealogical researchers, all with graduate or specialist training in Native American history and culture. The BAR has evaluated 18 petitions for federal acknowledgment since its establishment, out of a total of 98 groups which have petitioned so far. Declaration of William W. Quinn at ¶¶ 2, 3, 6. Clearly, the agency will be able to bring considerable anthropological and historical expertise, as well as seven years of experience in determining tribal status, to the resolution of this matter.

[3] See Fed. R. Civ. P. 12(b) (examination of matters outside the pleadings converts motion to dismiss to motion for summary judgment). The court, of course, expresses no opinion as to the proper outcome of the petition for acknowledgement of the Gay Head Tribe which has been filed by the "Widdiss Group." The submission of further historical information or independent anthropological or historical research by the agency may well, in the agency's view, be sufficient to establish the Gay Head Indians as an Indian tribe under 25 C.F.R. § 83.

**INDIAN LAW REPORTER**

refusal to include them on the list of federally acknowledged tribes is arbitrary or capricious because they have never sought federal acknowledgement. Indeed, while the evidence submitted indicates the tribe's existence at some point in history, those exhibits, by themselves, are insufficient under the Department's regulations for federal recognition, particularly in that they include no evidence at all that the tribe continued to exist as such after 1861. Therefore, plaintiffs' claims against the Department of the Interior shall be dismissed.

### B. HHS' Motion to Dismiss

Regarding the motion to dismiss by defendant Department of Health and Human Services, it is clear that plaintiffs lack standing to challenge either the funding of the Widdiss Group under the ANA grant or the contract between the Widdiss Group and the IHS. First, plaintiffs have failed to demonstrate that they have suffered any injury in fact from the award of the grant or the contract to the Widdiss Group. Unlike the Widdiss Group, plaintiffs never even applied for the grant or contract at issue; rather, they are simply displeased with the methods and goals of the leaders of the Widdiss Group and fear that HHS, by providing funds to the Widdiss Group, gives plaintiffs' opponents an "unfair advantage" in the battle for leadership of the tribe. Plaintiffs themselves aptly summarized their position, stating that "[p]laintiffs have fought their battles without federal funding and there is no reason the Widdiss group should not do the same." See plaintiff's memorandum in support of their motion for preliminary injunction at 9. While plaintiffs' plea that the court require their opponents to "fight fair" may have some visceral appeal, it falls far short of demonstrating a legally cognizable injury sufficient to provide plaintiffs with standing to bring these challenges.

To resolve the standing inquiry, the court must carefully examine the allegations of the complaint. *Allen v. Wright*, 104 S. Ct. 3315, 3325 (1984). Plaintiffs' challenge to the IHS contract is based solely on their contention that the Widdiss Group has no legal authority to represent or contract for the tribe. See complaint ¶¶ 12, 14, 15. Similarly, plaintiffs' challenge to the ANA grant focuses on the Widdiss Group's alleged ineligibility for funding under that program and its use of the funds for purposes counter to the NAPA's purpose of promoting economic and social self-sufficiency for American Indians. See complaint ¶ 10; *see also* plaintiff's memorandum in support of their motion for preliminary injunction at 5-7, 9. Even assuming that the contract and the grant were issued on the basis of the Widdiss Group's alleged misrepresentations, and that the government may not fund under these programs an Indian group which lacks "legal authority to represent or contract for the Tribe,"[*] it is clear that an asserted right to have the

_____

[*]Complaint ¶ 12. Regarding the Widdiss Group's alleged misrepresentation of its status as the tribe's governing body, defendant has submitted an affidavit by Lucille Dawson, the Acting Director for Program Operations in the ANA, who says that she was well aware that the Gay Head Indians lacked state or federal recognition as a tribe, and that it was never the intent of the ANA to imply recognition of the Gay Heads as a tribe or of the Widdiss Group as its governing body. Dawson affidavit at ¶¶ 7, 10. Defendant contends that it is funding the Widdiss Group as an Indian organization and not as a tribe. Similarly, the affidavit of William A. Millar, the director of the Health Systems Branch, Nashville Program Office, of the IHS, states specifically that the agency contracted with the Gay Head Indians in their status as a tribe which had not yet obtained federal recognition. Millar affidavit at ¶¶ 5, 8. Therefore, the issue of the Widdiss Group's "legal authority" to represent or contract for the tribe is a red herring, since neither the IHS nor the ANA require that the groups or in-

government act in accordance with the law is insufficient, standing alone, to support plaintiffs' standing. *See Allen v. Wright*, 104 S. Ct. at 3326-27. Plaintiffs' challenge to continued funding boils down to a complaint that the Widdiss Group is ineligible due to various alleged misrepresentations. While it may be true that a rejected applicant for a government contract or grant has standing to challenge the procedures by which the contract or grant was awarded or the eligibility of the actual recipient, *see Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841 (D.C. Cir. 1982), plaintiffs cannot even qualify as "disappointed bidders" since they did not apply for either the contract or grant themselves. Further, even a disappointed applicant lacks standing to challenge subsequent administration of a contract or grant. *See id.* at 842. Absent a more specific interest in the funds allocated under the grant or contract, which might exist, for example, if the government was using the contract as a means of disposing of, distributing, or overseeing tribal assets, plaintiffs have alleged no more serious an injury than could any member of the public, and they therefore lack standing to challenge the government's alleged maladministration of either the grant or the contract. *See id.*; *see also Allen v. Wright*, *supra*; *Capital Legal Foundation v. Community Credit Corp.*, 711 F.2d 253, 258 (D.C. Cir. 1983).

Plaintiffs' "trust" theory is also insufficient to accord them standing to challenge the contract or grant. If the agreements with the Widdiss Group were being utilized to administer, distribute or dispose of tribal assets, or to carry out treaty obligations, for example, individual members of the tribe or persons who could demonstrate that they held leadership positions in the tribe might have standing to challenge the United States' exercise of its fiduciary obligations toward the tribe in the disposition of assets for which the government acts as trustee. *See Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S. Ct. 1049, 1054-55 (1942); *Sturdevant v. Wilber*, 464 F. Supp. 327, 330-31 (E.D. Wis. 1979); *Harjo v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976), aff'd sub nom., [sic] 581 F.2d 949 (D.C. Cir. 1978). But the funds for the contract and grant at issue are not "tribal assets," nor is the government obliged to provide them by treaty; rather, as defendant points out, they are gratuitous appropriations. The statutes under which the Widdiss Group receives funding do not authorize eligibility of Indian groups to receive funds, but instead create a discretionary authority to award contracts and grants to Indian organizations. Appropriations made under the statutes are not trust property in which Indians have an interest as beneficiaries akin to the interest beneficiaries have in a private trust, or analogous to the interest Indians have in the administration of tribal assets by the United States. The United States acts in no more a fiduciary capacity in distributing these funds than it does in distributing *any* funds appropriated by Congress. Therefore, the cases cited by plaintiffs in which a trust responsibility on the part of the United States has been found are inapposite. Because the distribution of these funds implicates no trust duty owed by the United States to the Gay Head Indians, plaintiffs cannot claim standing on the basis of the fiduciary obligation owed by the government in the disposition of tribal assets.

Even if plaintiffs could satisfy the "injury in fact" requirement, they would be unable to overcome the prudential limitations on standing because they have not asserted an injury to

_____

dividuals with whom they deal have such legal authority. Alternatively, defendant would be entitled to summary judgment on the issue, since plaintiffs have submitted no authority whatever that the agencies may only deal with the legally recognized governing body of a tribe.

an interest arguably within the "zone of interests" protected or regulated by the NAPA or the Buy Indian Act. *See, e.g., American Friends Service Committee v. Webster*, 720 F.2d 29, 49 (D.C. Cir. 1983). As defendant points out, plaintiffs do not seek a grant to identify tribal members, aid in obtaining federal recognition, or to help unify the tribe; nor do they seek to obtain a federal contract to plan for the delivery of health services. Rather, plaintiffs' sole interest is in cutting off the federal funds now reaching the tribe. Because no interest in eliminating federal funding of groups which seek to promote these interests is protected or regulated by these statutes, plaintiffs cannot satisfy the zone of interests test, and thus lack standing to challenge administration of either the grant or the contract.[5]

### C. Remaining Motions

Plaintiffs have moved the court to take judicial notice of a number of documents submitted by them to defendant HHS in support of their request that HHS suspend or cancel its grant to the Widdiss Group. Because the court has denied plaintiffs' standing to pursue their challenge to the grant, this motion shall be denied as moot. Even were the court to reach the merits of this motion, however, it appears clear that the documents submitted are not something of which the court can properly take judicial notice under Rule 201 of the Federal Rules of Evidence in that they are neither "generally known within the territorial jurisdiction of the trial court" nor "capable of accurate and ready documentation by resort to sources whose accuracy cannot reasonably be questioned." Arguably, some of these documents might be part of an administrative record which would be submitted by HHS were plaintiffs accorded standing to challenge the agency's grant to the Widdiss Group. Because plaintiffs lack standing to raise such a challenge, however, their request that judicial notice be taken of these documents is moot.

Similarly, the motion of the Wampanoag Tribal Council of Gay Head, Inc. to intervene and plaintiffs' motion to strike the certificate of representation without compensation filed by the corporation's counsel, Henry J. Sockbeson, are also moot. Were this action to proceed, it would appear that the corporation, being the recipient of funds the expenditure of which is the subject of plaintiffs' challenge, might be entitled to intervention as of right. Because the court need not reach the merits of plaintiffs' challenge, however, the participation of the corporation is unnecessary and its motion will be dismissed as moot. Plaintiffs' uncontradicted contention that the corporation's counsel is being compensated for his appearance on behalf of the corporation and thus does not meet the requirements of Local Rule 1-4(a)(6) is also moot.

An appropriate order accompanies this memorandum.

### Order

This matter comes before the court on plaintiffs' motions for mandatory injunction against the Secretary of the Interior, judicial notice of administrative records, and to strike Henry J. Sockbeson's certificate of representation without compensation; defendant Department of Health and Human Services' motion to dismiss for lack of standing; defendant Department of the Interior's motion to dismiss for lack of subject matter jurisdiction; and the motion of the Wampanoag Tribal Council of Gay Head, Inc. to intervene. For reasons stated in the accompanying memorandum, filed by the court this date, it is, by the court, this 14th day of August, 1985,

Ordered that the motion of defendant Department of the Interior to dismiss is granted; and it is further

Ordered that the motion of defendant Department of Health and Human Services to dismiss for lack of standing is granted; and it is further

Ordered that plaintiffs' motion for judicial notice of administrative records is dismissed as moot; and it is further

Ordered that plaintiffs' motion to strike Henry J. Sockbeson's certificate of representation with compensation is dismissed as moot; and it is further

Ordered that plaintiffs' motion for mandatory injunction against the Secretary of the Interior is denied; and it is further

Ordered that the motion of the Wampanoag Tribal Council of Gay Head, Inc. to intervene is dismissed as moot; and it is further

Ordered that this matter is dismissed.

---

[5]Even if plaintiffs were accorded standing to challenge HHS' funding of the grant, the affidavits submitted by plaintiffs are inadequate to create a genuine factual issue as to the alleged misuse of HHS funds by the Widdiss Group. The affidavits of Thelma V. Weissberg and Frank B. James allege only personal belief of improper use of HHS funds without stating any supporting facts or circumstances to support these beliefs. The identical "form" affidavits signed by several dozen members of the tribe, including signatures by parents on behalf of young children who obviously have no knowledge or understanding of the events described, are similarly devoid of any facts. The affidavit of William A. Hahn, the attorney for plaintiffs, is based largely on his "beliefs" regarding the use of HHS funds by the Widdiss Group and dwells on issues and events which appear to be largely if not wholly irrelevant to the action in the case at bar. The use of HHS funds for a "mass mailing" on July 5, 1984, fails to give rise to a factual issue as to whether use of the funds for that purpose violates the terms of the grant. Further, the affiant fails to state that his allegations are made from personal knowledge. According to an affidavit submitted by defendant, review of the grantee's records as of February 25, 1985, failed to disclose any use of funds inconsistent with the grant. Dawson affidavit ¶ 8. Absent a genuine dispute regarding any fact material to plaintiffs' claims, summary judgment for defendant would be proper even if plaintiffs had standing to challenge the grant. *See* Fed. R. Civ. P. 12(b).

---

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

### SHOSHONE-BANNOCK TRIBES, et al. v. HODEL, et al.

### Nos. 83-1076, 82-1451 (D.D.C., July 23, 1985)

#### Summary

Plaintiffs, tribal governing bodies and representatives of tribal governing bodies including Indian school boards, seek the award of attorneys fees as parties under the provisions of the Equal Access to Justice Act (28 U.S.C.A. § 2412). The United States as defendant to the action asserts that because the Equal Access to Justice Act is a waiver of governmental immunity, it should be narrowly construed to exclude governmental entities. The court finds that the plaintiffs can be properly characterized as "organizations" or "associations" within the definition of "party" in section 2412(d)(1)(B) of the Act.

# EXHIBIT

# 9

| Full Text Clauses | Document No.<br>07CC308061 | Document Title<br>Headgate Rock Dam Radial Gate Rehabilitation | Page 106 of 118 |
|---|---|---|---|

90    52.249-02      TERMINATION FOR CONVENIENCE OF THE         SEPTEMBER 1996
      ALT I          GOVERNMENT (FIXED-PRICE) (SEP 1996) -
                     ALTERNATE I

(a) The Government may terminate performance of work under this contract in whole or, from
time to time, in part if the Contracting Officer determines that a termination is in the
Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a
Notice of Termination specifying the extent of termination and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer,
the Contractor shall immediately proceed with the following obligations, regardless of any delay
in determining or adjusting any amounts due under this clause:

        (1) Stop work as specified in the notice.

        (2) Place no further subcontracts or orders (referred to as subcontracts in this clause) for
materials, services, or facilities, except as necessary to complete the continued portion of the
contract.

        (3) Terminate all subcontracts to the extent they relate to the work terminated.

        (4) Assign to the Government, as directed by the Contracting Officer, all right, title, and
interest of the Contractor under the subcontracts terminated, in which case the Government
shall have the right to settle or to pay any termination settlement proposal arising out of those
terminations.

        (5) With approval or ratification to the extent required by the Contracting Officer, settle all
outstanding liabilities and termination settlement proposals arising from the termination of
subcontracts; the approval or ratification will be final for purposes of this clause.

        (6) As directed by the Contracting Officer, transfer title and deliver to the Government--

            (i) The fabricated or unfabricated parts, work in process, completed work,
supplies, and other material produced or acquired for the work terminated; and

            (ii) The completed or partially completed plans, drawings, information, and other
property that, if the contract had been completed, would be required to be furnished to
the Government.

        (7) Complete performance of the work not terminated.

        (8) Take any action that may be necessary, or that the Contracting Officer may direct, for
the protection and preservation of the property related to this contract that is in the possession
of the Contractor and in which the Government has or may acquire an interest.

        (9) Use its best efforts to sell, as directed or authorized by the Contracting Officer, any
property of the types referred to in subparagraph (b)(6) of this clause; provided, however, that
the Contractor (i) is not required to extend credit to any purchaser and (ii) may acquire the
property under the conditions prescribed by, and at prices approved by, the Contracting Officer.
The proceeds of any transfer or disposition will be applied to reduce any payments to be made

| Full Text Clauses | Document No. 07CC308061 | Document Title Headgate Rock Dam Radial Gate Rehabilitation | Page 107 of 118 |
|---|---|---|---|

by the Government under this contract, credited to the price or cost of the work, or paid in any other manner directed by the Contracting Officer.

(c) The Contractor shall submit complete termination inventory schedules no later than 120 days from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 120-day period.

(d) After expiration of the plant clearance period as defined in Subpart 45.6 of the Federal Acquisition Regulation, the Contractor may submit to the Contracting Officer a list, certified as to quantity and quality, of termination inventory not previously disposed of, excluding items authorized for disposition by the Contracting Officer. The Contractor may request the Government to remove those items or enter into an agreement for their storage. Within 15 days, the Government will accept title to those items and remove them or enter into a storage agreement. The Contracting Officer may verify the list upon removal of the items, or if stored, within 45 days from submission of the list, and shall correct the list, as necessary, before final settlement.

(e) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 1-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after 1 year or any extension. If the Contractor fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(f) Subject to paragraph (e) of this clause, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid or remaining to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this paragraph (g) or paragraph (g) of this clause, exclusive of costs shown in subparagraph (g)(3) of this clause, may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated. The contract shall be modified, and the Contractor paid the agreed amount. Paragraph (g) of this clause shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

(g) If the Contractor and Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined as follows, but without duplication of any amounts agreed upon under paragraph (f) of this clause:

(1) For contract work performed before the effective date of termination, the total (without duplication of any items) of--

(i) The cost of this work;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(1)(i) of this clause; and

| Full Text Clauses | Document No.<br>07CC308061 | Document Title<br>Headgate Rock Dam Radial Gate Rehabilitation | Page 108 of 118 |
|---|---|---|---|

      (iii) A sum, as profit on subdivision (g)(1)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

(2) The reasonable costs of settlement of the work terminated, including--

      (i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

      (ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

      (iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

(h) Except for normal spoilage, and except to the extent that the Government expressly assumed the risk of loss, the Contracting Officer shall exclude from the amounts payable to the Contractor under paragraph (g) of this clause, the fair value, as determined by the Contracting Officer, of property that is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government or to a buyer.

(i) The cost principles and procedures of Part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause.

(j) The Contractor shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (e), (g), or (l) of this clause, except that if the Contractor failed to submit the termination settlement proposal or request for equitable adjustment within the time provided in paragraph (e) or (l), respectively, and failed to request a time extension, there is no right of appeal.

(k) In arriving at the amount due the Contractor under this clause, there shall be deducted--

      (1) All unliquidated advance or other payments to the Contractor under the terminated portion of this contract;

      (2) Any claim which the Government has against the Contractor under this contract; and

      (3) The agreed price for, or the proceeds of sale of, materials, supplies, or other things acquired by the Contractor or sold under the provisions of this clause and not recovered by or credited to the Government.

(l) If the termination is partial, the Contractor may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. The Contracting Officer shall make any equitable adjustment agreed upon. Any proposal by the Contractor for an

| Full Text Clauses | Document No.<br>07CC308061 | Document Title<br>Headgate Rock Dam Radial Gate Rehabilitation | Page 109 of 118 |
|---|---|---|---|

equitable adjustment under this clause shall be requested within 90 days from the effective date of termination unless extended in writing by the Contracting Officer.

(m)(1) The Government may, under the terms and conditions it prescribes, make partial payments and payments against costs incurred by the Contractor for the terminated portion of the contract, if the Contracting Officer believes the total of these payments will not exceed the amount to which the Contractor will be entitled.

(2) If the total payments exceed the amount finally determined to be due, the Contractor shall repay the excess to the Government upon demand, together with interest computed at the rate established by the Secretary of the Treasury under 50 U.S.C. App. 1215(b)(2). Interest shall be computed for the period from the date the excess payment is received by the Contractor to the date the excess is repaid. Interest shall not be charged on any excess payment due to a reduction in the Contractor's termination settlement proposal because of retention or other disposition of termination inventory until 10 days after the date of the retention or disposition, or a later date determined by the Contracting Officer because of the circumstances.

(n) Unless otherwise provided in this contract or by statute, the Contractor shall maintain all records and documents relating to the terminated portion of this contract for 3 years after final settlement. This includes all books and other evidence bearing on the Contractor's costs and expenses under this contract. The Contractor shall make these records and documents available to the Government, at the Contractor's office, at all reasonable times, without any direct charge. If approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions may be maintained instead of original records and documents.

91    52.249-10    DEFAULT (FIXED-PRICE CONSTRUCTION)        APRIL 1984

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if--

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include--

(i) Acts of God or of the public enemy,

(ii) Acts of the Government in either its sovereign or contractual capacity,

| Full Text Clauses | Document No.
07CC308061 | Document Title
Headgate Rock Dam Radial Gate Rehabilitation | Page 110 of 118 |
|---|---|---|---|

(iii) Acts of another Contractor in the performance of a contract with the Government,

(iv) Fires,

(v) Floods,

(vi) Epidemics,

(vii) Quarantine restrictions,

(viii) Strikes,

(ix) Freight embargoes,

(x) Unusually severe weather, or

(xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

(d) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

92    52.253-01    COMPUTER GENERATED FORMS    JANUARY 1991

(a) Any data required to be submitted on a Standard or Optional Form prescribed by the Federal Acquisition Regulation (FAR) may be submitted on a computer generated version of the form, provided there is no change to the name, content, or sequence of the data elements on the form, and provided the form carries the Standard or Optional Form number and edition date.

(b) Unless prohibited by agency regulations, any data required to be submitted on an agency unique form prescribed by an agency supplement to the FAR may be submitted on a computer generated version of the form provided there is no change to the name, content, or sequence of the data elements on the form and provided the form carries the agency form number and edition date.

# EXHIBIT

# 10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| The Apache Tribe of the Mescalero Reservation, | : | |
| Plaintiff, | : | Civil Action No.: 96-115 |
| | : | |
| v. | : | |
| | : | |
| Janet Reno, Attorney General, Bruce | : | Document No.: |
| Babbitt, Secretary of the Interior, | : | |
| Defendants. | : | |

### Order

### Denying Plaintiff's Motion for a Temporary Restraining Order and Granting Defendants' Motion to Transfer

This matter comes before the court upon plaintiff's motion for a temporary restraining order and defendants' opposition thereto; defendants' motion to transfer this action to the United States District Court for the District of New Mexico; and plaintiff's opposition thereto. After careful consideration of the pleadings and the entire record herein, the court concludes that a temporary restraining order shall not be imposed because the movant has failed to establish that it will suffer irreparable injury; or that the public interest will be furthered by the granting of injunctive relief. Accordingly, plaintiff's motion for a temporary restraining order is denied.

In addition, the court concludes that defendants' motion to transfer shall be granted because the present action could have been brought in New Mexico and the interests of the parties and of potential witnesses; as well as the interest of justice dictate that the action be heard in that forum.

1

## I. Background

Plaintiff, the Apache Tribe of the Mescalero Reservation ("Tribe"), resides in the state of New Mexico. The tribe operates the Casino Apache, a gambling enterprise located within the reservation. The Tribe owns and operates various types of gambling equipment. The casino and the gambling equipment are the subject of the present action. According to the tribe it is legally conducting gambling activities pursuant to a compact, it and other tribes reached with the Governor of New Mexico, Gary Johnson and subsequently approved by the Secretary of the Interior. This compact, however, was found to have no legal effect as a matter of state law by the New Mexico Supreme Court. State ex rel. Clark v. Johnson, 904 P.2d 11 (1995). That Court also found that all electronic gaming devices, slot machines and casino-style gaming are unlawful in the state of New Mexico. Citation Bingo, Ltd. v. Otten, No. 22,736 (N.M. Nov. 29, 1005). As a result, in December 1995, the United States Attorney for the District of New Mexico, advised ten New Mexico Tribes, that the gambling activities they were conducting were illegal in the state of New Mexico and were not the proper subject of a compact and thus in violation of federal criminal law.

The United States Attorney then advised the tribes, including plaintiff, that if they did not cease their gambling operations withing thirty days, complaints in civil forfeiture would be filed against them. As a result, nine of the tribes filed suit in New Mexico against the present defendants as well as the United States Attorney for the District of New Mexico and the United States. The parties in that suit reached a stipulation in which the Tribes agreed to close their casinos if the court in New Mexico found their enterprises to be illegal. The United States Attorney agreed not to initiate any criminal proceedings or forfeiture actions against the Tribes. Plaintiff, however, is not a party to the suit pending in New Mexico; it decided to proceed in this jurisdiction.

Plaintiff requests that the court issue a temporary restraining order that would prevent the defendants from taking any action which might interfere with plaintiff's gambling operation, including, but not limited to, the institution of any civil action to enjoin or to declare unlawful the Tribe's operation or to cause a forfeiture of any gambling device utilized in said operation.

2

Furthermore, the Tribe seeks to prevent the initiation of any criminal prosecution of any person associated with the Casino Apache.

## II. Discussion

### A. Temporary Restraining Order

A party seeking a temporary restraining order must establish that: (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction. Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C.Cir. 1989); see also Foundation on Economic Trends v. Heckler, 756 F.2d 143, 151 (D.C.Cir. 1985); Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.Cir. 1977). After balancing the four factors, the court concludes that plaintiff has failed to establish that it will suffer irreparable harm if injunctive relief is not granted; or that the public interest will be furthered by the issuance of the temporary restraining order. The court finds it unnecessary to make explicit findings with respect to the other two elements since irreparable harm and the furtherance of a public interest have not been sufficiently established. The court notes, however, the substantial difficulty the plaintiff must overcome in order to succeed on the underlying merits of this case.

In order to establish irreparable harm justifying injunctive relief, a plaintiff must establish injury that is certain, great, and actual, not theoretical. Wisconsin Gas Co. v. Federal Energy Regulatory Commissions, 758 F.2d 669, 674 (D.C.Cir. 1985). The injury must be imminent, creating a "clear and present" need for equitable relief to prevent irreparable harm. Id. (internal citations omitted). Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931). Plaintiff must establish that the irreparable injury is likely to occur. The movant must therefore provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Wisconsin Gas. Co., 758

3

F.2d at 674. Finally, the plaintiff must show that the alleged harm will directly result from the action which he or she seeks to enjoin. Id. Plaintiff has not made the requisite showing.

It is clear from the pleadings submitted by the parties for the court's consideration that the only threatened action is the filing of a civil forfeiture complaint by the government. Thus, plaintiff's reference to the United States Attorney's intention to close the casino and to seek forfeiture of the Tribe's gambling devices is not dispositive since it must be evaluated in light of the fact that in order to carry out the threatened action, the government would have to avail itself of civil forfeiture procedures. There are adequate remedies in civil forfeiture of which the plaintiff can avail itself. "The basis for injunctive relief in the federal courts has always been irreparable harm *and* inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974) (emphasis supplied). Moreover, the United States Attorney in New Mexico does not intend the immediate seizure of any gambling equipment machines.[1] Further, the defendants have represented in the pleadings that they do not intend to interfere in any way with the casino's operations prior to the entry of a judgment of forfeiture in the District of New Mexico. Consequently, the court fails to see any imminent and irreparable harm to the interests of the Tribe. Finally, since the court is granting defendant's motion to transfer this action to the United States District Court for the District of New Mexico, plaintiff is free to seek injunctive relief in that forum.[2]

---

[1]  Plaintiff requests that the court enjoin the defendants from instituting any criminal proceedings against any individual associated with Casino Apache. This is not an appropriate subject for the court to entertain. Newman v. United States, 382 F.2d 479, 480 (D.C.Cir. 1967); see also Shoshone-Bannok Tirbes v. Reno, 56 F.3d 1476, 1480 (D.C.Cir. 1995). Moreover, it is unlikely that any such proceedings will go forward prior to the court in New Mexico resolving the issue of the legality of the gambling operations.

[2]  Plaintiff's argument regarding the public interest is premised on its position vis-a-vis the alleged irreparable harm that is to occur if injunctive relief is not granted. Consequently, the court does not credit it for the same reasons that plaintiff's position on the irreparable harm prong of the standard for the granting of a temporary restraining order fails.

4

## B. Transfer

The defendants seek to transfer this case to the state of New Mexico pursuant to 28 U.S.C. § 1404 (a), which provides:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The defendants bear the burden of establishing that the transfer of this action is proper. Airline Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987); Int'l Brotherhood of Painters & Allied Trades Union v. Best Painting & Sandblasting Co., 621 F.Supp. 906, 907 (D.D.C. 1985). Section 1404 (a) vests "discretion in the district court to adjudicate motions to transfer according to 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Organizations, Inc. v. Ricoh Corp., 487 U.S. 22, 27 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). The threshold determination under § 1404 (a) is whether the action might have been brought in New Mexico.

Plaintiff bases its claims on federal question jurisdiction, and venue is proper in New Mexico because the case involves governmental action that will impact the Tribe's gambling operation which is located there. See Martin-Trigona v. Meister, 668 F.Supp. 1, 4 (D.D.C. 1987). The venue statute, 28 U.S.C. § 1391 (e), holds that venue is proper in the "judicial district in which...a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." It is clear that the events giving rise to the claim have occurred in New Mexico and that the property being affected is similarly located there.

Accordingly, the court's inquiry proceeds to the issue of whether the case should be transferred based on the convenience of the parties, the convenience of the witnesses, and the interest of justice. The court is aware of the deference that should be given to plaintiff's choice of forum. Air Line Pilots Ass'n, 672 F.Supp. at 526 (internal citations omitted). However, the court is to give this factor significantly less deference when plaintiff files a law suit in a foreign forum, as plaintiff itself concedes. Martin-Trigona, 668 F.Supp. at 3. Plaintiff and its gambling

operation are located in New Mexico. All the individuals associated with the casino and the records pertaining thereto are located in New Mexico; the United States Attorney who is investigating the casino is also located there and any civil forfeiture actions will be brought in that jurisdiction. Plaintiff's reference to the fact that its lead counsel is located in the District of Columbia is immaterial. Under § 1404 (a), the court accords insignificant, if any, weight to the location of counsel. Armco Steel Co., L.P. v. CSX Corp., 790 F.Supp. 311, 324 (D.D.C. 1991). Consequently, for the convenience of the parties and the potential witnesses, this action should be transferred to New Mexico.

The court further concludes that the interest of justice favors the transfer of this case to New Mexico. As previously referenced above, an action is currently pending in New Mexico which involves the same issues of law as this action; the fundamental issue being the legality of casino gambling in New Mexico and the concomitant ability of ten Indian tribes to conduct gambling operations in that state.[3] The action in New Mexico involves the same defendants as those in this case. In addition, the two actions present similar factual backgrounds, claims and requests for relief. "A prime factor to be considered is whether the issues in both actions are substantially the same and whether their determination rests upon the same factual matters." National Union Fire Ins. v. R.H. Weber Exploration, 605 F.Supp. 1299, 1303 (S.D.N.Y. 1985). Further, any forfeiture proceeding, which plaintiff presently seeks to enjoin, would be undertaken by the prosecutorial authorities in New Mexico. Finally, the resolution of this dispute will involve, to a large extent, the interpretation of the law of New Mexico. Accordingly, if this case was transferred to New Mexico, it could be consolidated with the one currently pending there, thereby saving judicial resources and costs. See Continental Grain Co. v. FBI-585, 364 U.S. 19,

---

[3]     The plaintiff points out that in the case pending in New Mexico the plaintiff Tribes and the government entered into a stipulation that would prevent the latter from engaging in any action which would impede the operation of the plaintiffs' operations. Plaintiff refused to enter into this stipulation at its own prerogative. Accordingly, plaintiff's strategic decision to not enter into the agreement cannot serve as a basis for preventing the transfer of the case. Had it entered into the agreement, plaintiff would have been accorded exactly the same relief it now seeks in this jurisdiction.

6

26 (1960). Consolidation would also avoid the possibility of inconsistent results.

Moreover, the resolution of this controversy, which both sides acknowledge involve issues very important to the local community, will have an exclusively local effect. Thus,

> in cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home.

Gulf Oil v. Gilbert, 330 U.S. 501, 509 (1947). The parties have both represented that the issues of gambling in New Mexico has produced intense interest among the people of that state. The citizens of New Mexico will be in a better position to observe the course of litigation which will intimately affect them at a more proximate and convenient forum.

Accordingly, it is this 5th of February 1996,

**ORDERED** that plaintiff's motion for a temporary restraining order be and is hereby denied; and it is

**FURTHER ORDERED** that defendants' motion to transfer this action to the United States District Court for the District of New Mexico be and is hereby granted.

**SO ORDERED.**

Ricardo M. Urbina
United States District Judge

Copies Sent To:

Phyllis A. Dow
AUSA
P.O. Box 607
Albuquerque, New Mexico 87103

7



Edward J. Passarelli
General Litigation Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Charles A. Hobbs
Michael L. Roy
Hobbs, Straus, Dean & Walker
1819 H. St., N.W. Suite 800
Washington, D.C. 20006

Gregory M. Quinlan
Fettinger, Bloom & Quinlan, P.C.
P.O. Drawer M
Alamogordo, NM 88310

# EXHIBIT

# 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHOSHONE-BANNOCK TRIBES,

        Plaintiffs,

         v.

JANET RENO,

        Defendant.

Civil Action No. 93-0581 (NHJ)

**FILED**

AUG - 2 1993

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## MEMORANDUM AND ORDER

In 1987, the Idaho district court in Twin Falls, Idaho, commenced an adjudication of water rights within the basin of the Snake River. The United States has appeared before the Idaho court to assert water rights claims on behalf of various federal interests, including several Indian tribes.

The plaintiffs in this case, the Shoshone-Bannock Tribes, are a federally recognized Indian tribe that exercises jurisdiction over the Fort Hall reservation in Idaho. The plaintiffs claim water rights that are subject to determination in the Snake River basin adjudication, rights which the federal government holds in trust for the tribes. The government, however, has refused to file claims to these rights on the plaintiffs' behalf. The plaintiffs have therefore brought this suit seeking (1) an order compelling the government to file the plaintiffs' claims in the Snake River basin adjudication, (2) a declaratory judgment that the government has violated its trust responsibility to the plaintiffs by refusing to file the claims, (3) an order directing the government to release all technical data in its possession relating to the plaintiffs' claims, and (4) an award of damages, costs, and attorney fees.

On March 24, 1993, the Court entered a temporary restraining order directing the government to file claims on behalf of the plaintiffs. On July 9, 1993, this case again came before the Court for a hearing on the plaintiffs' motion for a preliminary injunction and on the government's motion to dismiss. Having determined that the plaintiffs have not shown a clear right to the extraordinary relief they seek, the Court denies the plaintiffs' motion for a preliminary injunction for the reasons that follow.[1]

### DISCUSSION

A preliminary injunction is an extraordinary equitable remedy that may be granted only upon a clear showing of entitlement. In order to obtain preliminary injunctive relief, a plaintiff must demonstrate:

   (1)  a strong showing that the plaintiff is likely to prevail on the merits,

   (2)  that the plaintiff will suffer irreparable injury if injunctive relief is not granted,

   (3)  that an injunction would not substantially harm other interested parties, and

   (4)  that an injunction would not significantly harm the public interest.

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958). Because analysis of the first two of these factors disposes of the plaintiffs' motion, the Court considers here only whether the plaintiffs have demonstrated that they have a substantial likelihood of success on the merits and whether they will suffer irreparable harm if injunctive relief is not granted.

---

1. The motion to dismiss will be decided separately.

2

~elihood of Success on the Merits

A long line of cases has led the courts to recognize "the undisputed existence of a general trust relationship between the United States and the Indian people," <u>United States v. Mitchell</u>, 463 U.S. 206, 225 (1983). Nonetheless, "[w]ith respect to Congress, . . . the trust responsibility is more of a moral than a legal obligation." Stephan L. Pevar, <u>The Rights of Indians and Tribes</u> 33 (2d ed. 1992). Indians cannot compel Congress to fulfill its trust responsibilities, but must instead rely solely on Congress's good faith to keep the promises it has made in exchange for Indian land. <u>Id.</u> To be sure, "Federal officials must faithfully execute the trust duties they have been delegated, and courts are required to carefully scrutinize their actions." <u>Id.</u> However, "Indians and tribes cannot force the government to undertake a specific activity unless a treaty, statute, or agreement expressly imposes or clearly implies that obligation." <u>Id.</u> at 27. When a generalized trust relationship exists, therefore, it imposes no duties other than those set forth in the statutes and regulations that "define the contours of the United States' fiduciary responsibilities." <u>Mitchell</u>, 463 U.S. at 224.

Nevertheless, it is apparently upon this "general" trust responsibility that the plaintiffs rely in arguing that the Attorney General has a duty to file suit on their behalf. <u>See, e.g.</u>, Pls.' Mem. in Support of Mot. for Prelim. Inj. at 7-8. The plaintiffs cite no treaty, statute, or regulation that requires the government to prosecute their claims. Instead, they argue that "this case presents a unique situation" because (1) their water rights claims will be lost if the government does not file them, and (2) "for over five years, the Defendant represented the Shoshone-Bannock Tribes resulting in an

3

_ished attorney-client relationship."  Pls.' Opp'n to Def.'s Mot.
to Dismiss at 10.  The plaintiffs also cite court decisions in support
of their contention that the trust relationship, standing alone,
requires the government to file suit.  The Court addresses each of
these arguments in turn.

1.    **Refusal to File Claims Does Not Violate the Trust Relationship Merely Because the Claims Would Otherwise Be Lost**

The plaintiffs argue that "[i]n unusual circumstances such as
these, the Attorney General can be ordered to file a claim on behalf of
a tribe that would otherwise be lost if not filed."  Pls.' Brief Mem.
in Support of TRO at 2.  In support of their argument the plaintiffs
cite two cases, <u>Covelo Indian Community v. Watt</u>, 551 F. Supp. 366
(D.D.C. 1982), <u>aff'd</u>, No. 82-2377 (D.C. Cir. Dec. 21, 1982), <u>vacated as
moot</u>, No. 82-2377 (D.C. Cir. Feb. 1, 1983), and <u>Joint Tribal Council of
the Passamaquoddy Tribe v. Morton</u>, 388 F. Supp. 649 (D. Me.), <u>aff'd</u>,
528 F.2d 370 (1st Cir. 1975).  Contrary to the plaintiffs' contentions,
however, in neither of these cases was the "key issue" a "deadline by
which the claims in question must have been filed or forever lost."
Pls. Opp'n to Def.'s Mot. to Dismiss at 11.

<u>Covelo</u> dealt with a statute extending the limitations period as it
applied to actions for money damages brought on behalf of Indians with
pre-1966 claims.  This statute contained a provision requiring the
Secretary of the Interior to "submit to Congress legislative proposals
to resolve those Indian claims . . . that the Secretary of the Interior
or the Attorney General believes are not appropriate to resolve by
litigation."  <u>Id.</u> at 369.  The Secretary, however, refused to submit
legislative proposals for the majority of claims deemed inappropriate

4

tigation. <u>Id.</u> at 379. The court concluded that the Secretary had violated his statutory duty, which required him to propose legislative solutions for these claims. <u>Id.</u> at 382. The plaintiffs nevertheless cite <u>Covelo</u> for the proposition that the government must "'institute protective litigation to cover . . . claims' that would otherwise be time barred if not filed." Pls.' Mem. in Support of Mot. for Prelim. Inj. at 6 (quoting <u>Covelo</u>, 551 F. Supp. at 384). This quotation from the last page of the court's order is misleading, however, because the requirement that the government commence "protective litigation" was conditional, not absolute, and depended not upon whether a claim "would otherwise be time barred if not filed," as the plaintiffs argue, but upon whether the Secretary submitted legislative proposals as required by statute. No such statute applies to the water rights claims at issue in this case, and so <u>Covelo</u> cannot serve as authority for an order directing the Attorney General to file the claims.[2]

Nor does the <u>Passamaquoddy</u> case support the plaintiffs' argument. The plaintiffs assert that the court in <u>Passamaquoddy</u> "ordered a protective filing by the United States of a claim on behalf of two Indian tribes to a large land area in Maine which claims would otherwise have been barred by the statute of limitations." Pls.' Mem. in Support of Mot. for Prelim. Inj. at 5. The court did not. The central dispute in the case was whether the Passamaquoddies, an "unrecognized" tribe, had a trust relationship with the United States.

---

    2.  The Court also notes that in <u>National Resources Defense Council, Inc. v. Hodel</u>, 865 F.2d 288 (D.C. Cir. 1988), the Court of Appeals expressly held that <u>Covelo</u> carried no precedential weight. <u>See id.</u> at 317 n.31 ("[I]t is elementary that a vacated district court decision is not binding precedent and should not be cited as such.")

found that the relationship existed, the district court naturally found that the United States could not deny the Passamaquoddies' request for litigation solely on the ground that the trust relationship did not exist.  The court did not, however, "order[] a protective filing" of the Passamaquoddy claims.  Indeed, the court specifically declined to consider whether the United States breached its trust responsibility by refusing to bring suit on behalf of the tribe.  See id. at 663 n.16.  Contrary to the plaintiffs' assertion, the possibility that the tribe's claims might "otherwise have been barred by a statute of limitations" was never an issue in the case. The Passamaquoddy decision therefore offers no support to the plaintiffs' claim that a general trust relationship requires the government to file claims simply because the limitations period is about to expire.

### 2.  The Plaintiffs Have Not Demonstrated that an Attorney-Client Relationship Exists

According to the plaintiffs, the second "unusual circumstance[]" which creates a duty to file the water claims is the existence of an "attorney-client relationship" between the Tribes and the government. Pls.' Opp'n to Def.'s Mot. to Dismiss at 10.  The plaintiffs assert that the government's trust responsibility is "fortified" because "federal executive officials for years prior to the filing deadline undertook to prepare and prosecute the Tribes' claims and to represent the Tribes in court as their attorneys" and because the plaintiffs "relied on that representation, only to be abandoned three days before the filing deadline."  Id. at 15.

The plaintiffs, however, have failed to show that an attorney-

6

relationship existed.  "Although the attorney/client relationship cannot be formed without the consent of the attorney and the individual seeking representation, the required consent may be either express or implied, by the conduct of the parties.  To establish implied consent, however, the parties must manifest an intention to create the attorney/client relationship."  In re Cumberland Inv. Corp., 120 B.R. 627, 629 (Bankr. D.R.I. 1990).  The plaintiffs have submitted no affidavits or other record evidence showing that the parties manifested such an intention.  The plaintiffs make much of a special appearance filed in 1987 in the Snake River basin litigation by Peter Monson on behalf of the Shoshone-Bannock Tribes.  See Ex. 4 to Pls.' Opp'n to Def.'s Mot. to Dismiss.  Yet the plaintiffs' own affidavits make clear that this appearance related only to assertion of the Tribes' on-reservation claims and that preparation of the off-reservation claims did not begin until 1988.  See Affidavit of Howard Funke at 3-6, Ex. 2 to Pls.' Opp'n to Def.'s Mot. to Dismiss.

Apart from the special appearance, the only statements supporting the plaintiffs' argument are their attorneys' conclusory assertions that it was "clear" that the United States was representing the Tribes. See id. at 7; Affidavit of Candy L. Jackson at 2, Ex. 1 to Pls.' Opp'n to Def.'s Mot. to Dismiss.  By contrast, the government has submitted a detailed affidavit that describes the meetings with the plaintiffs as arms-length discussions at which the plaintiffs' own attorneys were present.  The government used these meetings to inform the plaintiffs that it was not planning to recommend the filing of claims on the plaintiffs' behalf, and to invite the plaintiffs to provide historical information or legal arguments in support of their position.  See Decl. of Lynn Collins, Ex. 3 to Def.'s Mot. to Dismiss.  Nothing in any of

7

idavits indicates that either party agreed, expressly or by implication, to the creation of an attorney-client relationship with respect to the off-reservation claims. Accordingly, the Court cannot conclude that the government's trust responsibility was "fortified" by such a relationship.

### 3. The Trust Relationship Alone Does Not Require the Government to File the Claims

The plaintiffs also cite two cases which seem to suggest that the government's general trust responsibility, standing alone, can force the government to file the claims. The first of these, Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F. Supp. 252 (D.D.C. 1973), has been widely cited as standing for the proposition that the trust doctrine can compel the government to do more than statutes strictly require. See, e.g., Note, Rethinking the Trust Doctrine in Federal Indian Law, 98 Harv. L. Rev. 422, 422 n.4 (1984). The decision rested, however, upon explicit requirements set forth in federal regulations. See Pyramid Lake, 354 F. Supp. at 256 n.4; 43 C.F.R. § 418.3(a)(2) (1973). Pyramid Lake therefore does not contradict the principle that enforceable governmental trust obligations must be grounded in an agreement, a statute, or a regulation.

The second case the plaintiffs cite, Fort Mojave Indian Tribe v. United States, 23 Cl. Ct. 417 (1991), is clearly distinguishable from the instant dispute because it was a suit for damages following ineffective government representation, not a suit for injunctive relief compelling the government to initiate litigation. See id. at 426 ("[W]hile it is true that the government ordinarily has broad discretion as to when to institute an action on behalf of Indians, it

8

follow that the government is free from accountability for its actions."). Fort Mojave, therefore, cannot serve as authority for the plaintiffs' claims.

Finally, the Court makes the general observation that because the plaintiffs seek to compel the Attorney General to perform a specific action, their complaint sounds in mandamus. See 28 U.S.C. § 1361. Mandamus will issue, however, "only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." 13th Regional Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980) (citation omitted). This Court has previously held that the lack of such clearly defined duties prevents Indians from compelling the government to bring suit on their behalf. See, e.g., Crow Tribe v. United States, Civ. No. 87-2155, slip op. at 4-5 (D.D.C. Aug. 19, 1992); Littlewolf v. Hodel, 681 F. Supp. 929, 948-49 (D.D.C. 1988). The Court reaches the same conclusion in this case, and therefore holds that the plaintiffs have failed to make a strong showing that they are likely to prevail on the merits of their claim.

## B. Irreparable Harm

The plaintiffs claim that they will suffer irreparable harm if they do not obtain a preliminary injunction because (1) if forced to litigate the claims on their own, they will have to pay exorbitant filing fees, and (2) they do not have access to technical data which the government has assembled and which is necessary for the prosecution of their claims.

The first of these contentions alleges mere economic harm, and is

9

therefore insufficient.  This Circuit has held that to satisfy the
irreparable harm criteria for preliminary injunctive relief, "the
injury must be both certain and great."  Wisconsin Gas Co. v. Federal
Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985).
Furthermore, "economic loss does not, in and of itself, constitute
irreparable harm."  Id.  Only economic loss that threatens the movant's
very survival can constitute irreparable harm.  Id.; Washington Metro.
Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 n.2 (D.C.
Cir. 1977).  The plaintiffs do not claim that they will be destroyed if
they are forced to pay the filing fees, and this allegation of
irreparable harm is therefore insufficient.[3]

The Court likewise rejects the plaintiffs' claims that they will
suffer irreparable harm if this Court does not order the release of the
technical data.  The plaintiffs have not responded to the government's
argument that the plaintiffs can obtain this data through the discovery
process available in the Idaho state courts.  Nor have the plaintiffs
demonstrated that their need for the data is so pressing that other
means of seeking disclosure -- such a suit under the Freedom of
Information Act, for example -- are insufficient.  Finally and most
significantly, however, the plaintiffs have failed to demonstrate that
the water rights they seek to protect have any value whatsoever.  The
government has apparently determined that the claims are meritless, and
the plaintiffs have introduced no evidence to the contrary.  Because
the plaintiffs bear the burden of demonstrating irreparable harm, their
failure to so demonstrate requires the conclusion that a preliminary

---

3.  The Court also notes that the plaintiffs may be able to assert
their water rights without paying filing fees, by lodging
objections to claims filed by other parties.  See Idaho Code § 42-
1412.

10

injunction should not issue.  Accordingly, it is this ____ day of

July, 1993,

ORDERED that the plaintiffs' motion for preliminary injunction be,

and hereby is, denied.

_Norma Holloway Johnson_
NORMA HOLLOWAY JOHNSON
UNITED STATES DISTRICT JUDGE

11