IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE COLORADO RIVER INDIAN TRIBES | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:06cv02212-JR |
| DIRK KEMPTHORNE, Secretary of the Interior, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Colorado River Indian Tribes ("CRIT") submits the following reply to

defendants' (the "Government") opposition to CRIT's motion for a preliminary injunction to halt

the unlawful expenditure of funds from the Colorado River Agency Electrical Services operation

and maintenance reserves ("Electrical Trust Fund") to finance an $11 million project[1] to

rehabilitate the spillway gates on Headgate Rock Dam.

**ARGUMENT**

**I.      BIA's Invasion of the Electrical Trust Fund Is Unlawful**

CRIT's argument that the BIA has illegally raided the Electrical Trust Fund is

compelling:  Congress has mandated that the fund be used only for the operation and

---

[1] In its original motion, CRIT asserted that the cost of the project was some $9 million based on the information then available to it.  The Government now advises that the total cost will be some $11 million -- $7.8 million already has been transferred to the Bureau of Reclamation ("BOR") to fund the project and the Bureau of Indian Affairs ("BIA") is in the process of authorizing $3 million of additional funding.  Government's Opposition ("Gov. Opp.") at 23 n.8, and Exh. 5, Baker Dec. ¶ 9.  Significantly, it is not clear that all of the $7.8 million transferred to BOR has been expended yet.  Only half of the rehabilitation work has been completed at this point.  Gov. Exh. 1, Sutliff. Dec. ¶ 9.

maintenance of the power system; the spillway gates are not part of the power system but, instead, are part of the irrigation system for which the dam originally was constructed.[2]

The dichotomy between the irrigation system and the power system on Indian irrigation projects was recognized by Congress, when it enacted legislation dividing funds collected on Indian irrigation projects into two pools: one consisting of collections made from irrigation water users, and the second consisting of revenues collected from power operations.[3]  Revenues collected from water users were authorized to be used for the operation and maintenance of the relevant irrigation project.  25 U.S.C. § 385a.  Conversely, revenues collected from power operations were authorized to be appropriated for the operation, maintenance and repair of the power system.  25 U.S.C. § 385c.

The Government argues that the BIA has properly determined that the rehabilitation of the spillway gates qualifies under 25 U.S.C. § 385c because it is necessary to ensure continuous operation of the power system at the dam.  This argument is strained and unpersuasive.  The statute does not authorize any and all expenditures to "insur[e] continuous operation of the power system" even if those expenditures do not involve the power system, itself.  Rather, it authorizes the establishment of a reserve to be used for emergencies – "creation and maintenance of reserve funds to be available for making repairs and replacements to, defraying emergency expenses for, and insuring continuous operation of the power system."

Further, as CRIT previously has noted, the Government's argument proves too much.  The fact that failure of the spillway gates would affect the power system does not make them

---

[2] The dam, including the spillway gates, constitute part of an "irrigation facility" or "irrigation system" under the BIA's new irrigation regulations which take effect on March 31, 2008.  These regulations define an "irrigation facility" as "all structures and appurtenant works for the delivery, diversion, and storage of irrigation water. These facilities may be referred to as projects, systems, or irrigation areas." 73 Fed.Reg. 11037 (2008) (to be codified at 25 C.F.R. 171.100).

[3] Act of August 7, 1946, 60 Stat. 895 (1946).

part of the power system. The failure of the dam, itself (or an upstream dam) would also have disastrous consequences for the power plant but that does not give the BIA the ability to invade the Electrical Trust Fund to repair them.

Moreover, the Government's argument ignores the other side of the equation: whether the spillway gates are part of the electrical system rather than the irrigation system. The answer to this question is clear: the spillway gates are part of the irrigation system, not the electrical system. They were constructed as part of the original dam, and were designed to maintain the River's level at a normal elevation of 363.5 feet, allowing the gravity diversion of water into the Reservation's main irrigation canal.[4] Some fifty years later the power plant was added by constructing hydroelectric turbines on the downstream side of three spillway gates. At most, the modifications made to gates 8, 9, and 10 when the power plant was added might be deemed part of the power system. But the other seven gates remain part of the irrigation project, not part of the power system.

The Government suggests that the spillway gates now serve a dual function, supporting both the irrigation system and the power system: "the spillway gates … are critical to maintaining water levels for irrigation and power operations." Gov. Opp. at 4. But the primary purpose of the gates ever since their installation has been to help effectuate the diversion of water from the Colorado River into the CRIT irrigation system.[5] Thus, for purposes of enforcing the spending limitation imposed by 25 U.S.C. § 385c, the rehabilitation of the spillway gates constitutes maintenance of the irrigation system rather than the power system. *See Washington*

---

[4] Department of the Interior, Office of Indian Affairs, *Final Report, Headgate Rock Dam*, June 1, 1943 at 14, 96,111,112. (Pl. Exh. 1)

[5] The irrigation system had the full use of all ten spillway gates for some 50 years until the construction of the power plant. Thereafter, it has had the use of seven of the ten gates, while the power system has had the use of three gates. Proportionately, since the gates were installed, they have supported the functioning of the irrigation system approximately 93% of the time, and the functioning of the power system 7% of the time.

*v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994) (where an expenditure has a dual purpose, its propriety is determined by its overriding purpose or primary purpose).

The Government resists this conclusion, arguing that no "primary function" restriction appears in the statutory language of 25 U.S.C. § 385c.  But neither did such a limitation appear in the Department of Justice Circular that defined the permissible expenditures at issue in *Washington v. Reno*.  Rather, this rule of construction was employed by the court to enforce spending limitations in a reasonable fashion when confronted with agency expenditures that arguably serve multiple purposes, some of which are permissible and some of which are not.

For these reasons, funding the rehabilitation of the spillway gates entirely through the Electrical Trust Fund contravenes 25 U.S.C. § 385c and 31 U.S.C. § 1301(a) and, more fundamentally, the Appropriations Clause of the Constitution.

## II.     CRIT Has Standing to Challenge the BIA's Raid Upon the Fund

Contrary to the Government's contention, CRIT is entitled to challenge BIA's unlawful expenditure of funds in contravention of 25 U.S.C. § 385c.   An aggrieved party can bring an action to challenge an agency's expenditures as inconsistent with the permissible statutory objectives.  *See Raymond Proffitt Foundation v. U.S. Army Corps of Engineers*, 343 F.3d 199, 207 (3d Cir. 2003).  Because the purpose of the power system is to provide power for the CRIT Reservation[6] and the purpose of the Electrical Trust Fund is to maintain the power system, CRIT is aggrieved when funds are illegally diverted from the trust fund for other purposes.

The Government argues correctly that 25 U.S.C. § 385c does not give CRIT a property interest in the monies held pursuant to that statute and that they remain public funds which

---

[6] The purpose of the power plant was to "provide … energy for irrigation and drainage pumping and other uses on the Colorado River Indian Reservation." *Energy and Water Development Appropriations for 1985:  Hearings Before a Subcomm. of the House Comm. on Appropriations*, 98th Cong. 144 (Feb. 27, 1984) (Exhibit 3 to CRIT's motion for preliminary injunction).

Congress can use for any purpose. But the Government then leaps to the fallacious conclusion that BIA's expenditure of funds contained in the power revenues account cannot injure CRIT because CRIT has no interest in that account. The Government ignores that, although Congress can lift the limits it has imposed in § 385c and reprogram those funds for other purposes, the BIA cannot. CRIT has an obvious and legitimate interest in enforcing the spending limitations Congress has imposed in § 385c because those limitations ensure that the funds in issue will be spent, directly or indirectly, for the benefit of CRIT. Its interests are within the zone of interests to be protected or regulated by the statute. *See Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399-400 (1987).

In addition, CRIT has standing because it is a "suitable challenger" to enforce 25 U.S.C. § 385c. Its interests are "sufficiently congruent with those of [Congress in enforcing the statutory spending limitations] that [it is] not 'more likely to frustrate than to further … statutory objectives.'" *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Defense*, 87 F.3d 1356, 1360 (D.C. Cir. 1996) ("*SATO*").

### III.    CRIT Does Not Have an Adequate Remedy in the Court of Federal Claims

The Government argues that CRIT's claim cannot be entertained by this Court because the waiver of sovereign immunity in the Administrative Procedure Act ("APA") is inapplicable where there are adequate remedies in another court. The Government contends that CRIT has an adequate remedy for breach of trust in the Court of Federal Claims ("CFC"). But, as the Government argues elsewhere in its brief, CRIT does not have a property interest in the monies held pursuant to 25 U.S.C. § 385c. It cannot pursue a claim for breach of trust for the improper expenditure of those funds.

Furthermore, CRIT seeks equitable relief, not money damages, and the CFC does not have general equitable powers. *See Doe v. United States*, 372 F.3d 1308, 1313 (Fed. Cir. 2004). Even the restoration of funds wrongfully expended in violation of 25 U.S.C. § 385c would constitute specific relief of the sort available under the APA rather than money damages. *See America's Community Bankers v. F.D.I.C.*, 200 F.3d 822, (D.C. Cir. 2000) (restoring funds is a form of specific relief even if the agency no longer has the precise funds in issue); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 n.3 (8th Cir. 1988) (tribal suit seeking transfer of funds from one account to another was a non-monetary action).

The D.C. Circuit and other courts have not found that the possibility of a subsequent claim for damages precludes them from enjoining agency misuse of funds in violation of applicable statutory limitations or normal appropriation channels. *See SATO, supra*; *Alabama Power Co. v. U.S. Dep't. of Energy*, 307 F.3d 1300, 1312-16 (11th Cir. 2002); *Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958, 968 (4th Cir. 1984). Indeed, the Eleventh Circuit has noted that "[b]oth justice and judicial economy dictate that we stop any unauthorized expenditures at this stage." *Alabama Power Co. v. U.S. Dep't. of Energy*, 307 F.3d at 1311.

## IV.    BIA's Invasion of the Fund Is Not Unreviewable

The Government makes the audacious argument that the Court cannot review whether the BIA complied with the spending limitations imposed by 25 U.S.C. § 385c because this is an issue that is committed to agency discretion by law. To state this argument is to refute it. Agencies do not enjoy unfettered discretion to decide for themselves whether they are complying with statutory directives and limitations.

The Supreme Court decision cited by the Government in support of this contention, *Lincoln v. Vigil*, 508 U.S. 182 (1993), demolishes it. The Supreme Court noted that the APA

6

embodies a basic presumption of judicial review and that review is precluded only in those "rare circumstances" where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. *Id.* at 190-91. The Court ruled that the allocation of funds from a <u>lump-sum</u> appropriation is an unreviewable action because the very point of such an appropriation is to give an agency discretion and the capacity to adapt to changing circumstances. *Id.* at 192. In contrast, "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes...." *Id.* at 193. But, the Court concluded, "as long as the agency allocates funds from a lump-sum appropriation <u>to meet permissible statutory objectives,</u> [the APA] gives the courts no leave to intrude." *Id.* (emphasis added).

Of course, no lump-sum appropriation is at issue here and CRIT's very claim is that the BIA is allocating funds contrary to statutory limitations. This case is like *Ramah Navajo School Board, Inc. v Babbitt*, 87 F.3d 1338, 1347 (D.C. Cir. 1996), where the court observed, "[t]he situation here is in marked contrast to that in *Lincoln*; there is overwhelming evidence that Congress intended ... to limit the Secretary's discretion in funding matters and to provide for judicial review of all of the Secretary's actions."

### V.    CRIT Is Entitled to Preliminary Injunctive Relief

Finally, the Government contests CRIT's entitlement to a preliminary injunction, arguing that CRIT's asserted injuries are speculative and are not irreparable in nature. The facts, however, do not bear out the Government's arguments.

The Government questions, for example, whether the Electrical Trust Fund will be depleted by the spillway gate rehabilitation project to the extent suggested by CRIT. CRIT advised the Court that the Fund reportedly had a balance of approximately $20 million heretofore

and was growing at a rate of about $1.2 million annually, so that funding the rehabilitation of the spillway gates from the account would cut it almost in half and require another eight years to re-grow the fund to its current level.  The Declaration of Perry J. Baker confirms the essential validity of all these points.  He states that the current balance in the account is approximately $11 million (after the transfer of $7.8 million to BOR) and will be reduced to $8 million to completely fund the rehabilitation.  He further asserts that the fund will be replenished by approximately $1.5 million a year for the next 6 years, and that no major expenditures are anticipated for the next six years.  Gov. Exh. 5, Baker Dec. ¶ 13.

CRIT contends that the illegal depletion of the fund precludes or delays the BIA from addressing significant unmet needs for the operations and maintenance of the on-Reservation power system, detailed in the declaration of Lee Gardner, which are estimated to cost between $14.7 - $16.5 million.  Among the needed system improvements identified by Mr. Gardner are the following:

> (1) In particular, the delayed looping of the 69 KV system between the Big River substation and the Poston Substation should be completed, at a cost of about **$1.5 to $2 million**. This would increase the reliability of the system. (2) Also, the addition of a major 230/161/69 KV substation to connect to the WAPA system at Black Point, on the California portion of the Reservation, would give the Reservation a second WAPA grid connection at a shared cost of perhaps **$4-$5 million**.  This would greatly increase reliability and allow access to the electric grid for future reservation renewable generation developments. (3) Review and complete system improvements recommended by ESC as well as the replacement of old wooden poles at a cost of approximately **$4 million**.

Pl. Exh. 8, Gardner Dec. ¶ 13.

The Government contends that the BIA already has almost completed the replacement of old wooden poles and implies that this $4 million alleged need has been satisfied.  But the Declaration of John Sutliff, on which it relies, does not go nearly so far.  He says merely that the BIA "continues to work on" the ESC recommendations and that "[t]he third and final stage (for the

near future) of the pole contract is scheduled to be completed in April 2008." Defs. Ex. 1, Sutliff
Dec. ¶ 14. Mr. Sutliff does not say that all of the wooden poles will then have been replaced. He
does not say how many of the other system improvements recommended by ESC have been
completed. And he does not estimate the cost of the remaining items.

Furthermore, Mr. Sutliff does not contest the need for a looping of the 69 KV system or the
estimated price tag; he simply says that this activity is being studied but is not yet ready for
construction. *Id.* He agrees that the addition of a substation "is an acceptable long term goal," but
asserts that repair of the spillway gates is a higher priority. *Id.*

In sum, the Government has confirmed the legitimacy of all the system improvements
identified by Mr. Gardner. It has not contested any of his price estimates. And it has not
demonstrated that these improvements have already been completed. Assuming that the
Government is correct that the fund will be replenished by approximately $1.5 million a year,
permitting the BIA to draw down another $3 million from the fund for the rehabilitation of the
spillway gates will delay these needed improvements of the power system by at least two years.
That period of delay is even longer to the extent that BOR is allowed to retain previously
transferred monies from the fund that have not yet been paid to the contractor and so could be
restored to the fund.

An eventual damages award that replenishes the depleted Trust Fund will not remedy the
harm caused by this delay – it cannot undo service interruptions or losses that occurred during
the interim. Nor can a damages award remedy lost business and economic opportunities during
the interim period that were caused by deficiencies in the power system. The Government
contends that service interruptions or losses are unlikely because alternative electrical power can
be purchased on the open market. But the ability to purchase power is of little use if the

transmission facilities are damaged and an alternative power loop or substation connection to the larger power grid does not exist. Moreover, purchasing replacement power on the open market could come at a high cost to the end use customers on the CRIT Reservation, as the Government itself emphasizes. Gov. Exh. 1, Sutliff Dec. ¶ 12.

And the Government's argument that these injuries are uncertain to occur does not preclude the grant of preliminary injunctive relief here. Where there is a high likelihood that plaintiff will prevail on the merits, "a mere possibility of irreparable harm will entitle plaintiff[] to a preliminary injunction." *Immigrant Assistance Project v. INS*, 306 F.3d 842, 873 (9th Cir. 2002); *see also Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam) (stay pending appeal) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits").

In addition, CRIT is harmed because the BIA's raid upon the Electrical Trust Fund covers up – and prevents or delays the solution of -- the real underlying problem, *i.e.* the lack of legitimate appropriated funds to repair and maintain the irrigation system (due to the BIA's failure for many decades to adequately fund the irrigation trust account through water user fees). Were the BIA to acknowledge the need for a congressional appropriation, then CRIT could lobby in favor of that solution. But CRIT cannot effectively lobby for congressional assistance so long as the BIA is covering up the problem.

The Government responds that nothing is stopping CRIT from lobbying for an earmark for funding the rehabilitation of the spillway gates, notwithstanding that BIA takes the position that the project already is fully and properly funded. This is mere rhetoric. For the kind of lump sum appropriations from which Indian irrigation funding is usually drawn, the agency's view is

10

not always dispositive, but it is always a dominant consideration when Congress determines

whether appropriated funds are necessary for a project.  As the General Accountability Office

explains in its Congressional appropriations law reference work:

> The amount of a lump-sum appropriation is not derived through guesswork. It is
> the result of a lengthy budget and appropriation process. The agency first submits
> its appropriation request to Congress through the Office of Management and
> Budget, supported by detailed budget justifications [generally listing specific
> construction projects]. Congress then reviews the request and enacts an
> appropriation which may be more, less, or the same as the amount requested.
> Variations from the amount requested are usually explained in the appropriation
> act's legislative history, most often in committee reports.[7]

Any lobbying effort by CRIT would be the height of futility unless and until the BIA

acknowledges the existence of a need for the funds.

CRIT' cannot obtain a subsequent damages award that will compensate it for the lost

opportunity to seek now a real legislative solution to the funding problem.  Thus, its injury in this

regard is irreparable.  "The loss of First Amendment freedoms [including the ability to petition

for redress of grievances], for even minimal periods of time, unquestionably constitutes

irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (Brennan, J., plurality opinion).

The BIA's raid upon the Electrical Trust Fund thwarts CRIT's ability to effectively utilize its

First Amendment rights and causes it irreparable injury.[8]

The Government complains that, if an injunction is granted, the BIA might have to

consider funding the spillway rehabilitation project through alternative sources and that such

funding may threaten other BIA projects.  But an injunction "will only place the defendants in

the position in which they should have been initially—the position of requesting from Congress

---

[7] General Accountability Office, *Principles of Federal Appropriations Law* Volume II, page 6-6 (2006)
(http://www.gao.gov/special.pubs/d06382sp.pdf).
[8] In no event should the issue of irreparable injury prevent the Court from now enjoining any further violation of 25
U.S.C. § 385c in this matter.  The material facts are undisputed and the violation is clear.  Pursuant to Fed.R.Civ.P.
65(a)(2), the Court has explicit authority to consolidate the preliminary injunction hearing with the trial on the
merits, in whole or in part.  This would moot any issue about whether the injuries caused by the unlawful invasion of
the Electrical Trust Fund are irreparable and focus the case solely on the merits of CRIT's claim.

sufficient appropriations to fund" rehabilitation of the spillway gates. *Washington v. Reno*, 35

F.3d at 1103.

Wherefore, it is once again respectfully submitted that CRIT's motion for a preliminary

injunction should be granted.

Dated: March 12, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:  /s/ Steven D. Gordon
    Steven D. Gordon (D.C. Bar No. 219287)
    Lynn E. Calkins (D.C. Bar No. 445854)
    Stephen J. McHugh (D.C. Bar No. (485148)
    Holland & Knight L.L.P.
    2099 Pennsylvania Ave. NW, Suite 100
    Washington, D.C. 20006
    202-955-3000 (phone)
    202-955-5564 (fax)

    *Counsel for Plaintiff the Colorado River*
    *Indian Tribes*

*Of Counsel*

Eric N. Shepard
Attorney General
Colorado River Indian Tribes
Route 1, Box 23-B
Parker, Arizona 85344

**CERTIFICATE OF SERVICE**

I certify that, on this 12th day of March, 2008 I electronically transmitted the foregoing Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction to the Clerk of the Court, using the ECF systems for filing, and caused the ECF system to transmit a Notice of Electronic Filing to the counsel of record listed on the ECF system for this case.


/s/Steven D. Gordon
Steven D. Gordon


# 5189538_v1